UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

| | |
|---|---|
| JASON RIIS, CODY HOLCOMBE, AARON HENNING, GENA ALVAREZ, DIRK SPARKS, and AARON PETERS, <br><br> Plaintiffs, <br><br> vs. <br><br> MATTHEW SHAVER, in his personal capacity; THE CITY OF PIERRE; THE CITY OF SISSETON; ADAM WOXLAND, former South Dakota Highway Patrol Trooper, in his official and individual capacities; CORPORAL KOREY WARE, with the Sisseton Police Department, in his official and individual capacities; MARK WEIBRECHT, former South Dakota Highway Patrolman, in his official and individual capacities; THE CITY OF WAGNER; THE CITY OF WAGNER POLICE DEPARTMENT; OFFICER DESARAE GRAVATT, City of Wagner Police Officer; OFFICER BRIAN MCQUIRE, City of Wagner Police Officer; and LAW ENFORCEMENT OFFICERS JAMES DOES ONE THROUGH SIX, <br><br> Defendants. | 3:17-CV-03017-RAL <br><br><br><br> OPINION AND ORDER ON MOTIONS FOR SUMMARY JUDGMENT |

The six Plaintiffs in this civil-rights action claim that they were illegally catheterized so that police could test their urine for drugs. After discovery, all the Defendants moved for summary judgment on all claims, and all the Plaintiffs moved for summary judgment on their liability claims. For the reasons explained herein, this Court denies the Plaintiffs' motions for summary judgment,

1

grants parts of the Defendants' motions for summary judgment on certain claims and denies summary judgment on other claims because of the presence of genuine issues of material fact.

## I. Facts

Both Plaintiffs and Defendants filed statements of undisputed material facts with their respective motions for summary judgment. Docs. 99, 100, 109, 115, 121. Plaintiffs then responded to Defendants' statements of undisputed material facts in a single filing, Doc. 136, the groups of Defendants filed their own responses to Plaintiffs' statements of undisputed material facts, Docs. 137, 138, 139, 142, and Plaintiffs filed a statement of material facts opposing Defendants' motions for summary judgment, Doc. 134. Competing motions for summary judgment present a challenge to any court in setting forth pertinent facts, particularly when there are five different motions for summary judgment and some facts are only relevant to certain parties. Under Rule 56 of the Federal Rules of Civil Procedure, this Court must view the facts in the light most favorable to the non-movant, and the Plaintiffs and Defendants are both movants and non-movants here. This Court has taken care to draw facts not subject to genuine dispute from both Plaintiffs' and Defendants' statements of undisputed material facts and at times sets forth exactly how the parties disagree on certain material facts. This Court also recognizes that some of the facts in the Plaintiffs' statement of undisputed material facts are only relevant to certain Defendants.

### A. Jason Riis

Not long after midnight in late March 2016, Pierre police officer Nathan Howell stopped a vehicle driven by Jason Riis for having an inoperable license-plate light. Doc. 109 at ¶ 19; Doc.

136 p.7[1] at ¶ 19; Doc. 99 at ¶ 74; Doc. 138 at ¶ 74.[2]  During the stop, Officer Howell noticed that

Riis was "speaking very rapidly" and "gesturing very wildly." Doc. 109 at ¶ 20; Doc. 136 p.7 at

¶ 20; Doc. 99 at ¶ 74; Doc. 138 at ¶ 74.  Officer Howell also saw the capped tips of hypodermic

needles protruding from the purse of Riis's passenger, Amanda Cadwell, who had an active

warrant for her arrest. Doc. 109 at ¶ 21; Doc. 136 p.7 at ¶ 21.  A search of Cadwell's purse revealed

several bags containing a white, crystalline substance that field tested positive for

methamphetamine, as well as a green, leafy substance that Officer Howell thought smelled like

marijuana.  Doc. 109 at ¶ 21; 136 p.7 at ¶ 21.  Riis agreed to some field sobriety tests, but his

performance and behavior during these tests made Officer Howell believe that Riis had been

driving while impaired. Doc. 109 at ¶¶ 22–23; Doc. 136 p.7 at ¶¶ 22–23.  Officer Howell arrested

Riis on suspicion of driving under the influence of a controlled substance. Doc. 109 at ¶ 25; Doc.

136 p.7 at ¶ 25.

Officer Howell drove Riis to the jail, where he asked Riis to voluntarily provide a urine

sample.  Doc. 109 at ¶ 26; Doc. 136 p.7 at ¶ 26.  Riis refused, so Officer Howell drafted a search

warrant and a supporting affidavit for Riis's blood and urine. Doc. 109 at ¶¶ 26–27; Doc. 136 p.7

at ¶¶ 26–27; Doc. 99 at ¶ 74; Doc. 138 at ¶ 74; Doc. 106-34.  Officer Howell stated in the affidavit

that he had found hypodermic needles, methamphetamine, and possibly marijuana in Riis's

vehicle; that Riis spoke very rapidly and gestured wildly; that Riis failed field sobriety tests; and

that Riis refused to voluntarily provide a urine sample. Doc. 109 at ¶ 27; Doc. 136 p.7 at ¶ 27;

---

[1]Document 136 is Plaintiffs' response to all of Defendants' statements of material fact.  Because Document 136 contains multiple paragraphs bearing the same numbers, this Court cites to the page number as well as the paragraph number.
[2]When drawing facts from Plaintiffs' statement of undisputed material facts, this Court cites to the response by the relevant Defendant, not the responses of those Defendants who had nothing to do with a particular Plaintiff's catheterization.

Doc. 106-34. Officer Howell's affidavit requested authority to search Riis for "Blood and Urine" but did not mention catheterization. Doc. 106-34; Doc. 99 at ¶ 74; Doc. 138 at ¶ 74.

A state court judge issued a warrant that "commanded" law enforcement to search "[t]he person of Jason Riis" for "Blood and Urine." Doc. 124-30; Doc. 109 at ¶ 28; Doc. 136 p.7 at ¶ 28; Doc. 99 at ¶ 74; Doc. 138 at ¶ 74. When shown the search warrant around 3 a.m., Riis said that he would provide a urine sample but that he could not do so at the time. Doc. 109 at ¶ 29; Doc. Doc. 136 p.7 at ¶ 29; Doc. 99 at ¶ 75; Doc. 138 at ¶ 75. Officer Howell left the urine sample kit with the jailers, who promised to inform dispatch once Riis had been able to urinate. Doc. 99 at ¶ 76; Doc. 138 at ¶ 76; Doc. 136 p.7 at ¶ 29; Doc. 109 at ¶ 29. Officer Howell had no further contact with Riis until after he was catheterized. Doc. 99 at ¶ 76; Doc. 138 at ¶ 76.

Approximately twelve hours later, at 3:04 p.m., dispatch informed Pierre police officer Charles Swanson that Riis had yet to provide a urine sample at the jail. Doc. 109 at ¶ 30; Doc. 136 p.8 at ¶ 30. Officer Swanson met with Riis at the jail, and Riis said that he still couldn't urinate. Doc. 99 at ¶ 77; Doc. 138 at ¶ 77. According to Riis's testimony, Officer Swanson responded by saying "It's too late. We're going to the hospital to get catheterized," and then immediately drove Riis to Avera St. Mary's Hospital (Avera St. Mary's) in Pierre. Doc. 99 at ¶ 78; Doc. 138 at ¶ 78. Officer Swanson testified differently, saying that he told Riis that the alternative to being unable to urinate was for Riis to be catheterized. Doc. 99 at ¶ 77; Doc. 138 at ¶ 77. According to Officer Swanson, Riis then asked to be catheterized because he was unable to produce a sample. Doc. 99 at ¶ 77; Doc. 138 at ¶ 77; Doc. 106-37 at 2. Riis denied ever asking to be catheterized. Doc. 99 at ¶ 78; Doc. 138 at ¶ 78; Doc. 106-38 at 3. As Riis tells it, Officer Swanson said Riis was going to be catheterized because he would not voluntarily provide a urine sample. Doc. 99 at ¶ 78; Doc. 138 at ¶ 78; Doc. 106-38 at 3.

Officer Swanson drove Riis to Avera St. Mary's, where Riis informed hospital staff that he was still unable to urinate. Doc. 109 at ¶ 31; Doc. 136 p.8 at ¶ 31; Doc. 99 at ¶ 77; Doc. 138 at ¶ 77. Officer Swanson testified that Riis was "quite polite" during interactions. Doc. 106-37 at 3; Doc. 99 at ¶ 77; Doc. 138 at ¶ 77. He said that Riis was asked multiple times both at the jail and the hospital to provide a voluntary sample and each time he advised that he could not. Doc. 106-37 at 3; Doc. 99 at ¶ 77; Doc. 138 at ¶ 77.

After Riis told hospital staff that he could not urinate, Nurse Steve Cable catheterized Riis at around 3:20 p.m. Doc. 109 at ¶ 34; Doc. 136 p.8 at ¶ 34; Doc. 99 at ¶ 77; Doc. 138 at ¶ 77; Doc. 106-37 at 3. Riis did not tell hospital staff of his objection to being catheterized or his willingness to urinate voluntarily into a specimen container. Doc. 109 at ¶ 32; Doc. 136 p.8 at ¶ 32. Riis testified, however, that the reason he did not tell hospital staff of his willingness to give a voluntary urine sample was because Officer Swanson had already told him that it was "too late, that I was going to get catheterized." Doc. 136 p.8 at ¶ 32; Doc. 124-25 at 6. Riis also testified that Officer Swanson, at the request of staff, held Riis's penis during the catheterization, and that there were between five and ten officers in the room while the procedure was performed. Doc. 136 p.8–9 at ¶ 34; Doc. 124-25 at 7.

Peter Maningas, a doctor at Avera St. Mary's, signed an order for Riis's catheterization. Doc. 124-21 at 9; Doc. 109 at ¶ 33; Doc. 136 p.8 at ¶ 33, p.4 at ¶ 13. Dr. Maningas testified that he believed that warrants for a urine sample were "directed towards [staff at Avera St. Mary's] as well to help [police] comply with that order." Doc. 124-21 at 7; see also Doc. 124-21 at 6. This testimony prompted Plaintiffs' counsel to ask Dr. Maningas if "you had no role in deciding whether

or not you would do a forced catheterization.[3]  You simply, if you got a piece of paper like the one we've just discussed [a warrant], did it, true?"  Doc. 124-21 at 7.  Dr. Maningas replied "[y]es."  Doc. 124-21 at 7.[4]  Dr. Maningas testified that he authorized more than ten forcible catheterizations for law enforcement purposes since starting at Avera St. Mary's in 2011.  Doc. 124-21 at 6; Doc. 99 at ¶¶ 10–11; Doc. 138 at ¶¶ 10–11.  Avera St. Mary's stopped doing forcible catheterizations in the summer of 2016.  Doc. 99 at ¶ 14; Doc. 138 at ¶ 14.

Riis described the catheterization as painful: "It was like peeing razorblades.  It was like a urinary tract infection.  It was really painful.  And it hurt from my stomach to the end of my penis."  Doc. 99 at ¶ 79; Doc. 138 at ¶ 79; Doc. 106-39 at 2.  He said that the sensation of "peeing razorblades" lasted for two weeks after he was catheterized.  Doc. 99 at ¶ 79; Doc. 138 at ¶ 79; Doc. 106-39 at 2.

Riis's urine tested positive for amphetamine, methamphetamine, and THC.  Doc. 109 at ¶ 35; Doc. 136 p.9 at ¶ 35.  An analysis of Riis's blood, however, did not detect amphetamine or methamphetamine.  Doc. 109 at ¶ 35; Doc. 136 p.9 at ¶ 35.  Riis testified during his deposition that he had used methamphetamine three days before the traffic stop and marijuana one day before.  Doc. 109 at ¶ 24; Doc. 136 p.7 at ¶ 24.  Riis was charged with several offenses, including ingesting a controlled substance, to which he pleaded guilty.  Doc. 109 at ¶ 36; Doc. 136 p.9 at ¶ 36.

**B.  Cody Holcombe**

In late June 2016, an informant told former South Dakota Highway Patrol trooper Mark Weibrecht that a guy named "Cody"—later identified as Cody Holcombe—had "fronted" her

---

[3]During Dr. Maningas's deposition, Plaintiffs' counsel used the phrase "forced catheterization" to mean "forcible catheterization of a suspect brought in by law enforcement who's suspected of a crime."  Doc. 124-21 at 6.
[4]However, Dr. Maningas also replied "[y]es" when asked whether he could decline to order a catheterization if it was "medically risky or otherwise unwarranted."  Doc. 124-21 at 11.

methamphetamine at his residence the day before.  Doc. 100 at ¶ 30; Doc. 136 p.39 at ¶ 30.  She said that her boyfriend lived with Holcombe in the lower level of 214 North Grand Street in Pierre, South Dakota, and that she had seen approximately two ounces of methamphetamine at this residence on the previous day.  Doc. 100 at ¶¶ 31–33; Doc. 136 p.39 at ¶¶ 31–33.

Trooper Weibrecht obtained a warrant to search the lower level of 214 North Grand Street for evidence of illegal drug activity.  Doc. 100 at ¶ 34; Doc. 136 p.39 at ¶ 34; Doc. 99 at ¶ 51; Doc. 139 at ¶ 51; Doc. 106-12; Doc. 106-13.  Upon executing the warrant, however, law enforcement learned that Holcombe and the informant's boyfriend lived in the building's upper level.  Doc. 100 at ¶ 35; Doc. 136 p.39 at ¶ 35.  They also learned that the informant's boyfriend had parole conditions that allowed police to search his home without a warrant so long as they had reasonable suspicion.  Doc. 100 at ¶ 37; Doc. 136 p.40 at ¶ 37.  Based on this information, Trooper Weibrecht and several other officers entered the upper level of 214 North Grand Street, where they encountered Holcombe.  Doc. 100 at ¶ 37; Doc. 136 p.40 at ¶ 37.  Holcombe declined an FBI agent's[5] request to interview him, but added words to the effect of "but if you find anything in there, it's all mine."  Doc. 100 at ¶ 38; Doc. 136 p.40 at ¶ 38.

Trooper Weibrecht applied for a second search warrant, this time requesting permission to search the upper level of 214 North Grand Street.  Doc. 100 at ¶ 36; Doc. 136 p.40 at ¶ 36.  As relevant here, Trooper Weibrecht's affidavit asked for authority to search "[t]he persons present during the execution of the search warrant; specifically, their urine."[6]  Doc. 99 at ¶ 52; Doc. 139

---

[5]The FBI agent was assisting state law enforcement in the search.  Certain state, federal, and tribal law enforcement officers work together in Central South Dakota on the Northern Plains Safe Trails Drug Enforcement Task Force.

[6]Holcombe filed Trooper Weibrecht's affidavit to search the lower level of 214 North Grand Street, Doc. 106-12, while Trooper Weibrecht filed the affidavit he drafted to search the upper level, Doc. 123-9. Both affidavits request authority to search "[t]he persons present during the execution of the search warrant; specifically, their urine."  Doc. 106-12; Doc. 123-9.

at ¶ 52; Doc. 106-12; Doc. 123-9.  A state judge granted Trooper Weibrecht's request, issuing a search warrant that "commanded" law enforcement to search, among other things, "[t]he persons present during the execution of the search warrant; specifically, their urine."  Doc. 123-10 at 2; Doc. 106-13 at 2; Doc. 99 at ¶ 53; Doc. 139 at ¶ 53.[7]  Trooper Weibrecht was present when law enforcement executed the warrant to search the residence where Holcombe and the informant's boyfriend lived.  Doc. 100 at ¶ 41; Doc. 136 p.40 at ¶ 41; Doc. 123-6 at 8.

Pierre police officers Lee Coppersmith and Cole Martin were also on scene to help execute the search warrant.  Doc. 109 at ¶ 37; Doc. 136 p.9 at ¶ 37.  Officer Coppersmith asked Holcombe to voluntarily provide a urine sample, but Holcombe refused.  Doc. 109 at ¶ 40; Doc. 136 p.9 at ¶ 40; Doc. 124-6 at 4–5; Doc. 124-13 at 5; Doc. 99 at ¶ 54; Doc. 138 at ¶ 54.  Officers Coppersmith and Martin decided to take Holcombe to Avera St. Mary's to be catheterized.  Doc. 99 at ¶¶ 54, 132; Doc. 138 at ¶¶ 54, 132; Doc. 109 at ¶ 41; Doc. 136 p.9 at ¶ 41; Doc. 124-6 at 5.  Holcombe swore at Officer Coppersmith on the way to Avera St. Mary's and was combative when Officer Coppersmith walked him from the patrol car to the hospital.  Doc. 99 at ¶ 55; Doc. 138 at ¶ 55; Doc. 124-6 at 5.  Holcombe became aggressive again when inside Avera St. Mary's, but calmed down once Officers Coppersmith and Martin placed him on a hospital bed and held him down.  Doc. 99 at ¶ 56; Doc. 138 at ¶ 56; Doc. 124-6 at 5.

Hospital staff asked Chad Carda, an emergency room doctor at Avera St. Mary's, to sign an order authorizing Holcombe's catheterization.  Doc. 109 at ¶ 42; Doc. 136 p.9 at ¶ 42.  Dr. Carda initially refused to sign the order because he was unsure whether Holcombe had consented to the procedure.  Doc. 109 at ¶ 42; Doc. 136 p.9 at ¶ 42; Doc. 124-4 at 3.  Holcombe told the

---

[7]Both the first and second warrants "commanded" law enforcement to search, among other things, "[t]he persons present during the execution of the search warrant; specifically, their urine."  Doc. 123-10 at 2; Doc. 106-13 at 2; Doc. 99 at ¶ 53; Doc. 139 at ¶ 53.

officers that he would try to urinate, and the officers gave him a chance to do so. Doc. 109 at ¶ 43; Doc. 136 p.9 at ¶ 43. Hospital staff assisted Holcombe, providing him with water and a specimen container. Doc. 109 at ¶ 44; Doc. 136 p.10 at ¶ 44. Officer Coppersmith testified that Holcombe said he had to use the bathroom and tried three times to urinate voluntarily. Doc. 99 at ¶ 57; Doc. 138 at ¶ 57; Doc. 124-6 at 5–6. Each time Holcombe tried to urinate into a cup "for at least a minute" but could not. Doc. 99 at ¶ 57; Doc. 138 at ¶ 57; Doc. 124-6 at 5–6. Holcombe testified similarly. He said that the officers told him he would be catheterized, but then granted his request to try to urinate on his own. Doc. 124-13 at 6; Doc. 136 p.9 at ¶¶ 43–44. According to Holcombe, he "tried a few times to push my bladder to use the restroom and it did not happen and I was at that time guided to a table." Doc. 124-13 at 6; Doc. 136 p.9 at ¶¶ 43–44.

Dr. Carda authorized Holcombe's catheterization believing that Holcombe consented to the procedure. Doc. 109 at ¶ 45; Doc. 136 p.10 at ¶ 45. When asked how Holcombe had manifested his consent, Dr. Carda testified: "The nurse came to me and told me that he had consented and I was only a few feet away from the room and asked the police officer if that was true, and he and the patient both looked at me and nodded their head . . . ." Doc. 124-4 at 3. According to Dr. Carda, this interaction occurred after Holcombe had tried to urinate several times but could not. Doc. 124-4 at 3; Doc. 136 p.11 at ¶ 45.

After Holcombe's unsuccessful attempts to produce a urine sample, a nurse said, "We will just do a catheter to be done with the process." Doc. 99 at ¶ 59; Doc. 138 at ¶ 59; Doc. 124-6 at 6; see also Doc. 124-22 at 7. The officers neither told Holcombe that he was out of time and had to be catheterized nor asked the nurse to allow Holcombe more time to provide a sample. Doc. 99

at ¶ 58; Doc. 138 at ¶ 58; Doc. 124-22 at 8–9.[8]  Holcombe, whose hands were cuffed in front of his body, laid down on the bed, lowered his pants, and took out his penis.  Doc. 99 at ¶ 59; Doc. 138 at ¶ 59; Doc. 106-1; Doc. 124-6 at 6.

One of the officers in the room during Holcombe's catheterization was wearing a body camera.  The video from the bodycam shows Holcombe lying on the bed while the nurses prepare the catheter.  Doc. 106-1.  The following timeline explains how the catheterization occurred; the times given represent the minutes and seconds on the video, which starts at zero and runs upward:

> 01:32–01:37: Holcombe says, "I'm scared . . . officer hold me."
> 01:38–01:42:  An officer asks, "Are you serious, man?" and Holcombe laughs and says "No."
> 02:34: Holcombe says, "I think I can pee," but no one responds.
> 02:35–02:38: Holcombe says, "Oh God that [or but] she don't care."
> 02:38: Nurse Pam Templeton starts inserting the catheter.
> 02:40–02:43: Holcombe says, "Oh God almighty, damn!"  He scrunches up in what looks like pain and brings his hands down, making contact with Nurse Templeton's arm. Holcombe brings his hands back up, covers his face, and moans.
> 02:43: An officer places his hand on Holcombe's arm and keeps it there.
> 02:53: Holcombe says, "Just give her some pee, for God's sake."
> 03:00: Nurse Templeton tells Holcombe to relax so the urine will come out.
> 04:35–40: The catheterization is done.

Doc. 106-1.

Holcombe recalled the catheterization as causing "lots of pain"; "I've never been through anything like that before in my life.  And it felt like it bottomed out in me.  And then I think she pulled back a little bit and then it started bleeding off into the cup, the thing that they were trying to put the urine in."  Doc. 99 at ¶ 60; Doc. 138 at ¶ 60; Doc. 124-13 at 6.  Holcombe felt "degraded"

---

[8]Officer Martin testified that he did not know whether the nurse would have allowed Holcombe more time to urinate had the officers asked, but that "in general, they would probably allow more time."  Doc. 99 at ¶ 58; Doc. 138 at ¶ 58; Doc. 124-22 at 8–9.

by the catheterization and said he still suffers emotionally.  Doc. 99 at ¶ 62; Doc. 138 at ¶ 62.  He said that it burns when he urinates and that, two or three times a week, he has difficulty urinating. Doc. 99 at ¶ 62; Doc. 138 at ¶ 62; Doc. 124-13 at 7.

Trooper Weibrecht was not at the hospital when Holcombe was catheterized and did not learn of the catheterization until after the fact when he returned to work.[9]  Doc. 100 at ¶ 42; Doc. 136 p.9 at ¶ 42; Doc. 123-6 at 8, 18–19.   He testified that his only involvement with the catheterization was obtaining the search warrant that was used to get Holcombe's urine. Doc. 123-6 at 8.  Trooper Weibrecht explained during his deposition that in the 50 to 100 times he obtained search warrants for a suspect's urine, he never had to have a suspect catheterized. Doc. 123-6 at 19–20.  Instead, the suspects agreed to provide a sample when presented with the warrants.  Doc. 123-6 at 18–20.  According to the Plaintiffs, however, the following exchange shows that Trooper Weibrecht knew that Holcombe would be catheterized if he refused to urinate:

> Plaintiffs' Attorney: Did you ever have any discussion with any other law enforcement agencies or their members about what to do if a person refused to give a urine sample after a Search Warrant had been issued?
> Trooper Weibrecht: I would say the understanding would be that most officers felt that they were obligated to take it by catheter.

Doc. 123-6 at 20; Doc. 136 p.40 at ¶ 42; Doc. 99 at ¶ 22; Doc. 139 at ¶ 22.  However, Trooper Weibrecht went on to explain that his source for this "understanding" was just his own opinion rather than a discussion with other law enforcement officers. Doc. 123-6 at 20–23.

---

[9]Weibrecht states in his brief that he left work before Holcombe's catheterization because his wife went into labor. Doc. 104 at 7; Doc. 147 at 4. Although this may be true, the statement of material fact and deposition testimony Weibrecht cites do not say anything about his having to leave work because his wife was giving birth.

Holcombe's urine tested positive for amphetamine, methamphetamine, and THC.  Doc. 109 at ¶ 47; Doc. 136 p.13 at ¶ 47.  He was charged with several offenses, including ingesting a controlled substance, to which he pleaded guilty.  Doc. 109 at ¶ 48; Doc. 136 p.13 at ¶ 48.

**C.  Aaron Peters**

Wagner police officer DesaRae Gravatt was on patrol one evening in early 2016 when she saw Aaron Peters standing outside an apartment complex.  Doc. 121 at ¶¶ 1–5; Doc. 136 p.22 at ¶¶ 1–5; Doc. 122-1 at 2; Doc. 99 at ¶ 43; Doc. 142 at ¶ 43.  Officer Gravatt recognized Peters and confirmed with dispatch that there was a bench warrant for his arrest.  Doc. 121 at ¶¶ 10–11; Doc. 136 p.23 at ¶¶ 10–11.  Officer Gravatt thought Peters to be a flight risk, so she radioed for backup.  Doc. 121 at ¶¶ 11–12; Doc. 136 p.23 at ¶¶ 11–12.  When the other officers arrived, Officer Gravatt entered the apartment she knew Peters was in and placed him under arrest.  Doc. 121 at ¶¶ 13–18; Doc. 136 p.23 at ¶¶ 13–18.

Peters's behavior made Officer Gravatt think he was under the influence of methamphetamine; he had acted "strange" when outside the apartment complex earlier and had yelled, tensed up, and talked very fast during his arrest.  Doc. 121 at ¶¶ 19–22; Doc. 136 p.23 at ¶¶ 19–22.  Officer Gravatt took Peters to the Lake Andes jail, where she gave him water and asked him to provide a urine sample.  Doc. 121 at ¶¶ 23–24; Doc. 136 p.23–24 at ¶¶ 23–24; Doc. 99 at ¶ 44.  Peters refused to provide a sample because he did not believe that being under the influence was related to his bench warrant for failing to pay attorney fees.  Doc. 121 at ¶ 27; Doc. 136 p.24 at ¶ 27.  Officer Gravatt told Peters that she would get a warrant to catheterize him if he refused to urinate voluntarily.  Doc. 121 at ¶ 28; Doc. 136 p.24 at ¶ 28.  According to Peters, she said "Fuck you, I'll just go get a warrant," while another officer told him "We're going to shove something down your penis," if he didn't urinate voluntarily.  Doc. 99 at ¶ 45; Doc. 142 at ¶ 45.

12

Officer Gravatt applied for a warrant permitting "a search/seizure of [Peters] for the withdrawal of his urine." Doc. 122-4 at 1; Doc. 121 at ¶ 30; Doc. 136 p.24 at ¶ 30. Her supporting affidavit did not mention catheterization, Doc. 121 at ¶ 31; Doc. 136 p.24 at ¶ 31, although it did recount how Peters had refused to provide a urine sample voluntarily. Doc. 122-4 at 2–3. A state court judge issued a warrant that "commanded" law enforcement to "search/seize the person of Aaron Peters and transport him to the Wagner Community Hospital to have a sample of his Urine taken buy [sic] reliable and accepted method, in medically approved, reasonable manner." Doc. 122-4 at 5. The warrant directed law enforcement to send Peters's urine to the state lab to be tested for drugs. Doc. 122-4 at 4–5.

Back at the jail, several police officers, including Officer Gravatt and Wagner police officer Brian McGuire, continued to ask Peters for a urine sample, but Peters refused. Doc. 121 at ¶¶ 35–36; Doc. 136 p.24–25 at ¶¶ 35–36. One of the officers explained that if Peters would not provide a sample, they would take him to the Wagner Community Hospital for a catheter. Doc. 121 at ¶ 37; Doc. 136 p.25 at ¶ 37. The Wagner Defendants say the officer also "explained the process of how a catheter works," although Peters points out that there is no evidence about the substance of this explanation. Doc. 121 at ¶ 38; Doc. 136 p.25 at ¶ 38. Peters still refused. Doc. 121 at ¶ 39; Doc. 136 p.25 at ¶ 39. Upon being told of the possible catheterization, Peters responded that the police "had better take him to the hospital then because he [was] not providing a urine sample." Doc. 121 at ¶ 39; Doc. 136 p.25–26 at ¶ 39; Doc. 122-3 at 2.

The police took Peters to the Wagner Community Hospital. Doc. 121 at ¶ 41; Doc. 136 p.26 at ¶ 41. There, Peters volunteered to provide a urine sample and was given two glasses of water. Doc. 121 at ¶ 43; Doc. 136 p.26 at ¶ 43; Doc. 122-2 at 11. Although he tried to urinate voluntarily—going a "few drops" into the urinal—he did not produce a sample. Doc. 122-1 at 6;

Doc. 99 at ¶ 47; Doc. 142 at ¶ 47.  Peters testified that he asked for some privacy and more time to urinate but was told that it was "too late." Doc. 122-2 at 11; Doc. 136 p.26–27 at ¶¶ 43, 45.  At some point after Peters attempted to produce a sample, a nurse said, "We have other things to do."[10]  Doc. 122-1 at 6, 8; Doc. 123-3 at 2; Doc. 121 at ¶ 46; Doc. 136 at ¶ 46.

The nurse and law enforcement officers, including Officers Gravatt and McGuire, prepared to catheterize Peters.  Doc. 121 at ¶ 48; Doc. 136 p.30 at ¶ 48.  Both parties submitted the video from the body camera Officer Gravatt wore during the catheterization.   The video records the following:

> 01:00–03: Peters says, "Why can't I just admit it instead of doing all this?
> 01:18: Peters says, "Can I just say yes?"
> 01:25–29: An officer says, "You had a couple hours to say yes," and Peters replies, "Well, I said yes right now."
> 03:10–13: Peters says, "Why can't you guys just give me like five more minutes, just take one more shot?"
> 03:43–44: Peters says, "I'm telling you, I'll pee."
> 03:45–49: An officer tells Peters to lay down.
> 03:59–04:34: Four officers hold Peters down on the hospital bed.
> 04:37: The nurse says, "You're going to feel a sharp pain, okay?"
> 04:40: The nurse begins the catheterization while the officers hold Peters down.
> 04:41–05:21: Peters screams in obvious pain repeatedly.
> 05:21: The video ends.

Doc. 101-39.  The parties disagree somewhat over how long the catheterization lasted; the Wagner Defendants say between 15 to 45 seconds while Peters says at least 39 seconds.  Doc. 121 at ¶ 52; Doc. 136 p.31 at ¶ 52.  The positions of the people shown on the video block from view the actual

---

[10]An affidavit from Officer Gravatt suggests that the nurse made this statement after Peters attempted to produce a sample, but before he was placed on the bed to be catheterized. Doc. 122-3 at 2.  The video recording of Peters's catheterization does not capture any statement of the nurse that she has other things to do. Doc. 101-39.  Peters does not dispute that the nurse said she had other things to do, but claims that the Wagner Defendants have the statement in the wrong sequence.  Doc. 136 p.28 at ¶ 46.  Exactly when the nurse said she had other things to do is not material to this Court's decision.

insertion and retraction of the catheter. Doc. 101-39. The Wagner Defendants claim that between the time of his arrest to the time of the catheterization, Peters had approximately three hours to provide a urine sample. Doc. 121 at ¶ 54; Doc. 136 p.31 at ¶ 54. Peters disagrees, asserting that the Wagner Defendants denied his request to urinate at the hospital. Doc. 136 p.31 at ¶ 54. The police returned Peters to the Lake Andes Jail after the catheterization. Doc. 121 at ¶ 53; Doc. 136 p.31 at ¶ 53.

According to the Wagner Defendants, Officer Gravatt believed that the nurse got to determine whether to catheterize Peters because it was a medical procedure. Doc. 121 at ¶¶ 42, 47, 63; Doc. 122-1 at 7. They also assert that Officer Gravatt "reasonably believed" that the nurse "was in charge of the events at the hospital, and Officer Gravatt believed that she needed to follow the nurse's directives." Doc. 121 at ¶ 63. Peters disagrees with these statements of "fact," arguing that the Wagner Defendants are mischaracterizing Officer Gravatt's testimony. Doc. 136 pp.26, 29, 35 at ¶¶ 42, 47, 63. Officer Gravatt's testimony on this point reads as follows:

> Peters's Attorney: Now, there was nothing stopping you at the hospital from giving him more water and allowing him more time to try to urinate, was there?
> Officer Gravatt: The nursing staff.
> Peters's Attorney: Who was in charge of the prisoner?
> Officer Gravatt: At that point, it would be the nurse.
> Peters's Attorney: Who had custody of the prisoner?
> Officer Gravatt: He was in custody with us, but at this point it's a medical procedure, so it was up to her.
> Peters's Attorney: Well, we are talking about when he is in the bathroom trying to urinate before he goes into the room where he was going to get catheterized, right?
> Officer Gravatt: It's all in the same room.  That bathroom is connected to the same room.
> Peters's Attorney: We are talking when he is in the bathroom that's separated by a door that shuts - -
> Officer Gravatt: Correct.
> Peters's Attorney: -- from the room where he's catheterized, true?
> Officer Gravatt: True.

> Peters's Attorney: Now, when he is in that bathroom with the
> officer, he is in custody of your department, isn't he?
> Officer Gravatt: Yes, sir.

Doc. 122-1 at 7.

Peters testified that he urinated blood for a week after the catheterization and that it felt like he was peeing "razor blades." Doc. 99 at ¶ 48; Doc. 142 at ¶ 48; Doc. 122-2 at 16. He felt like the police "raped" him and still feels that way today. Doc. 99 at ¶ 49; Doc. 142 at ¶ 49. Peters also testified that he initially refused to authorize the release of the video of his catheterization because he was scared and didn't want people to know his identity. Doc. 99 at ¶ 50; Doc. 142 at ¶ 50. He eventually changed his mind, however, because he wanted to stop this sort of thing from happening to someone else. Doc. 99 at ¶ 50; Doc. 142 at ¶ 50.

Since Peters's arrest, judges in South Dakota's First Judicial Circuit have included in search warrants that law enforcement cannot catheterize arrestees. Doc. 121 at ¶ 34; Doc. 136 p.24 at ¶ 34. The Wagner Police Department in turn has stopped requesting search warrants for arrestees' urine samples. Doc. 121 at ¶¶ 33, 68; Doc. 136 p.24, 36 at ¶¶ 33, 68. Instead, the Wagner Police Department requests search warrants for blood, which it sends to the State crime lab to be tested for drugs. Doc. 99 at ¶ 122; Doc. 142 at ¶ 22.

### D.  Gena Alvarez

At approximately 9:00 p.m. on September 3, 2015, former South Dakota Highway Patrol trooper Adam Woxland stopped Gena Alvarez for failing to dim her headlights when approaching oncoming traffic. Doc. 100 at ¶¶ 1–2; Doc. 136 p.36 at ¶¶ 1–2; Doc. 99 at ¶ 98; Doc. 139 at ¶ 98. Trooper Woxland smelled alcohol when he approached Alvarez's vehicle and saw a beer bottle in the front cup holder. Doc. 100 at ¶ 3; Doc. 136 p.36 at ¶ 3. Alvarez failed a field sobriety test and had a PBT reading of .171, so Trooper Woxland placed her under arrest. Doc. 100 at ¶¶ 4–5; Doc.

136 p.36 at ¶¶ 4–5.  Alvarez became very upset while sitting in Trooper Woxland's patrol car, having what Woxland described as "anxiety attacks."  Doc. 100 at ¶ 6; Doc. 136 p.36 at ¶ 6; Doc. 123-1 at 2.  Trooper Woxland removed Alvarez's handcuffs and directed her boyfriend, who was a passenger in her car, to try to console her.  Doc. 100 at ¶ 7; Doc. 136 at p.36 at ¶ 7.  Trooper Woxland wrote in his police report that Alvarez "was having anxiety from things that had happened in her past."  Doc. 123-1 at 2; Doc. 136 p.36 at ¶ 7.

On the way to the jail, Alvarez started breathing very hard and then stopped moving.  Doc. 100 at ¶ 8; Doc. 136 p.37 at ¶ 8.  Trooper Woxland stopped to make sure Alvarez was okay; although she was breathing, she was unresponsive to his yelling at her.  Doc. 100 at ¶ 9; Doc. 136 p.37 at ¶ 9.  Concerned about Alvarez not responding, Trooper Woxland took her to the Winner Regional Healthcare Center (Winner Hospital).  Doc. 100 at ¶ 10; Doc. 136 p.37 at ¶ 10.  There, Alvarez woke up when Trooper Woxland lightly shook her.  Doc. 100 at ¶ 11; Doc. 136 p.37 at ¶ 11.  She was very confused and refused medical attention.  Doc. 100 at ¶ 12; Doc. 136 p.37 at ¶ 12.

Trooper Woxland left the hospital and drove Alvarez to the Winner City Jail.  Doc. 100 at ¶ 13; Doc. 136 p.37 at ¶ 13.  Alvarez refused to stand next to the jailers and said she did not know why they were there before curling up on the jail room bench and starting to cry.  Doc. 100 at ¶ 14; Doc. 136 p.37 at ¶ 14; Doc. 99 at ¶ 99; Doc. 139 at ¶ 99.

Trooper Woxland left the jail to apply for a search warrant for Alvarez's blood and urine. Doc. 100 at ¶ 15; Doc. 136 p.37 at ¶ 15.  He drafted a supporting affidavit in which he described the traffic stop and how Alvarez had experienced anxiety attacks and had become unresponsive after her arrest.  Doc. 123-2 at 3.  He also discussed Alvarez's behavior at the jail, explaining that she did not know why the jailors where there, that she had curled up and started crying, and that

17

he had learned from another officer that Alvarez was pulling her hair out and banging her head on the cement wall. Doc. 123-2 at 3. Trooper Woxland wrote that he "would like to get a blood sample to test for the presence of alcohol and a urine sample to test for the presence of illegal drugs based on what I have experienced tonight." Doc. 123-2 at 3; Doc. 99 at ¶ 100; Doc. 139 at ¶ 100. A state court judge issued a search warrant that "commanded" law enforcement to search "[t]he person of Gena Alvarez" for a "Blood Sample from Gena Alvarez" and a "Urine Sample from Gena Alvarez." Doc. 123-3 at 1; Doc. 100 at ¶ 16; Doc. 136 p.37 at ¶ 16. Neither the supporting affidavit nor the warrant mentioned catheterizing Alvarez. Doc. 99 at ¶ 102; Doc. 139 at ¶ 102; Doc. 123-3; Doc. 123-2.

While Trooper Woxland secured the search warrant, Alvarez became very difficult at the jail. Doc. 100 at ¶ 17; Doc. 136 p.37 at ¶ 17. She was put in a restraint chair because she was hitting her head on the concrete walls, yelling and screaming, and not calming down or listening. Doc. 100 at ¶ 17; Doc. 136 p.37 at ¶ 17. At the jail, Trooper Woxland told Alvarez that he had a search warrant and asked her to provide a urine sample. Doc. 99 at ¶ 103; Doc. 139 at ¶ 103; Doc. 123-4 at 8; Doc. 100 at ¶ 18; Doc. 136 p.37 at ¶ 18. When asked how Alvarez responded, Trooper Woxland testified that she was "strapped into a chair and wasn't listening to much of what I said." Doc. 123-4 at 8. He said that he never had a "calm conversation" with her because she was too hysterical. Doc. 123-4 at 8; Doc. 99 at ¶ 103; Doc. 139 at ¶ 103; Doc. 100 at ¶ 18; Doc. 136 p.37 at ¶ 18.

Trooper Woxland and jailer Rhonda Olson took Alvarez to the Winner Hospital. Doc. 100 at ¶ 19; Doc. 136 p.38 at ¶ 19. Alvarez became nonresponsive during the drive. Doc. 100 at ¶ 19; Doc. 136 p.38 at ¶ 19. Trooper Woxland helped Alvarez out of the backseat and took her into the

hospital.  Doc. 100 at ¶ 20; Doc. 136 p.38 at ¶ 20.  Inside, he gave a urine cup to nurse Chelsey Reiser.  Doc. 100 at ¶ 20; Doc. 136 p.38 at ¶ 20.

Trooper Woxland had Winner police officers April Ferguson[11] and Dan Furness assist him with the blood draw and catheterization.  Doc. 100 at ¶ 21; Doc. 136 p.38 at ¶ 21; Doc. 118-1 at 2; Doc. 123-4 at 3.  While Trooper Woxland completed some paperwork, Nurse Reiser tried unsuccessfully to get Alvarez to provide a urine sample.  Doc. 100 at ¶¶ 22–23; Doc. 136 p.38 at ¶¶ 22–23; Doc. 123-5 at 14.  Alvarez was very emotional; Officer Ferguson recalled her saying "something along the lines that she was sexually assaulted in Texas," while Trooper Woxland remembered Alvarez saying things about her father.  Doc. 123-5 at 14; Doc. 123-4 at 10; Doc. 100 at ¶ 23; Doc. 136 p.38 at ¶ 23; Doc. 99 at ¶¶ 104–05; Doc. 139 at ¶¶ 104–105.

Nurse Reiser obtained a blood sample from Alvarez before attempting to catheterize her.  Doc. 100 at ¶ 24; Doc. 136 p.38 at ¶ 24.  Alvarez resisted being catheterized, yelling, "squirming," and trying to kick Nurse Reiser.  Doc. 100 at ¶ 23; Doc. 136 p.38 at ¶ 23; Doc. 123-4 at 9.  Officers Ferguson and Furness held Alvarez's legs to stop her from kicking while Nurse Reiser catheterized her.  Doc. 123-4 at 9; Doc. 123-5 at 14–15; Doc. 100 at ¶¶ 23–24; Doc. 136 p.38 at ¶¶ 23–24; Doc. 99 at ¶ 104; Doc. 139 at ¶ 104.  Alvarez's pants were off during the procedure, and her vagina was exposed.  Doc. 99 at ¶ 104; Doc. 139 at ¶ 104; Doc. 123-4 at 9–10; Doc. 123-5 at 15.  Officer Ferguson testified that Trooper Woxland, having been in the room during the catheterization, was in a position to see Alvarez's vagina.  Doc. 123-5 at 15; Doc. 99 at ¶ 105; Doc. 139 at ¶ 105.  Trooper Woxland testified that he did not view Alvarez's vagina, however.  Doc. 123-4 at 9; Doc. 139 at ¶ 105.  A field test of Alvarez's urine showed THC in her system.  Doc. 100 at ¶ 25; Doc.

_____

[11]Officer Ferguson was known as April Al Salihi in September 2015, but has since changed her name.  Doc. 123-5 at 3.

19

136 p.38 at ¶ 25.  When Alvarez looked at the field test, she stated without prompting that she used marijuana regularly.  Doc. 100 at ¶ 25; Doc. 136 p.38 at ¶ 25.  Alvarez was charged with several offenses, including driving under the influence, possession of two ounces or less of marijuana, ingestion of an intoxicant other than an alcoholic beverage, and open container.  Doc. 100 at ¶ 26; Doc. 136 p.38 at ¶ 26.  She pleaded guilty to driving under the influence and the State dismissed the other charges.  Doc. 100 at ¶ 27; Doc. 136 p.38 at ¶ 27.

Alvarez's deposition testimony made clear that she has not had an easy life.  She was born in prison because her mother had been arrested for trying to rob a bank and shooting a police officer while pregnant with her.  Doc. 99 at ¶ 106; Doc. 139 at ¶ 106.  Alvarez was physically, emotionally, and sexually abused as a child.  Doc. 99 at ¶ 107; Doc. 139 at ¶ 107.  She described particularly horrible abuse by her father, saying that he would sexually abuse her and allow his friends to do the same.  Doc. 124-1 at 16, 18.  Alvarez has been diagnosed with psychological disorders including posttraumatic stress disorder (PTSD).  Doc. 99 at ¶ 109; Doc. 139 at ¶ 109.

When asked what happened when she arrived at the Winner Hospital, Alvarez described waking up to bright lights and people holding her down, people taking off her clothes, "[b]egging" and "[s]creaming" for them to stop, and "[s]creaming at" her dad "to stop" even though he wasn't there.  Doc. 124-1 at 10; Doc. 99 at ¶ 110; Doc. 136 at ¶ 110.  She testified that being held down and catheterized reminded her of being sexually abused by her father and his friends.  Doc. 124-1 at 17–18; Doc. 99 at ¶ 111; Doc. 139 at ¶ 111.  She also said that she felt a "huge pressure pain inside of me" after the catheterization, that she had pain from the catheterization for four to six weeks, and that she developed bacterial vaginosis.[12]  Doc. 124-1 at 11–12, 18; Doc. 99 at ¶¶ 112–

---

[12]Alvarez testified that she did not mention the catheterization when she saw a doctor about the bacterial vaginosis. Doc. 124-1 at 12; Doc. 139 at ¶ 113. Instead, she testified that she had falsely

13, 115; Doc. 139 at ¶¶ 112–13, 115.   When asked about emotional problems from the catheterization, Alvarez testified that her sex life with her fiancée has deteriorated, that she has nightmares, that she fears the police, and that she feels humiliated and degraded.  Doc. 124-1 at 13, 19; Doc. 99 at ¶¶ 114–15; Doc. 139 at ¶¶ 114–15.

Part of Alvarez's Fourth Amendment argument is that Officer Furness, a man, should not have held her leg during the catheterization.   Trooper Woxland was asked about this during his deposition:

> Alvarez's Attorney: All right.  So why did you have a male officer holding her legs when she had no pants on?
> Trooper Woxland: There was no other female officers.
> Alvarez's Attorney: Were there any female nurses?
> Trooper Woxland: Yes.  But I'm not going to have a female nurse try to hold this lady down.
> Alvarez's Attorney: You mentioned the jailer [Rhonda Olson] was a female?
> Trooper Woxland: Um-hmm.
> Alvarez's Attorney: She could have done it, correct?
> Trooper Woxland: She accompanied me there just in case something happened and she stayed out of the room.
> Alvarez's Attorney: But she could have done it, correct?
> Trooper Woxland: Yes.

Doc. 123-4 at 10; Doc. 99 at ¶ 104; Doc. 139 at ¶ 104.   Trooper Woxland disputes any "implication" that he "directed personnel on what actions to take during the course of the catheterization process," and claims that there is no evidence that he did so.  Doc. 139 at ¶ 104.

During his deposition, Trooper Woxland testified that he had previously discussed forcible catheterization with Judge Kathleen Trandahl,[13] the South Dakota state court judge then assigned to Tripp County.  Doc. 123-4 at 11; Doc. 100 at ¶ 29; Doc. 136 p.38 at ¶ 29.   Trooper Woxland

---

told the doctor that she had blacked out and had a sexual encounter with an unknown person.  Doc. 124-1 at 12; Doc. 139 at ¶ 113.

[13]There is no affidavit in the record from now-retired Judge Trandahl regarding any such conversation and very little information about the unrelated Norman Ford case.

said that in an earlier case involving a man named Norman Ford he had asked Judge Trandahl if a warrant for a blood and urine sample authorized forcible catheterization.  Doc. 123-4 at 11. According to Trooper Woxland, Judge Trandahl answered "absolutely."  Doc. 123-4 at 11; Doc. 100 at ¶ 29; Doc. 136 p.38 at ¶ 29.  Alvarez contends that the following testimony from Winner police officer Donavan Coonrod contradicts Trooper Woxland's testimony about forcible catheterizations:

> Alvarez's Attorney: And the City of Winner, you've learned, does not do forcible catheterizations of drug suspects, correct?
> Officer Coonrod: Correct.
> Alvarez's Attorney: There was testimony that Judge Rank[14] has made it clear that she considers a warrant to take urine is insufficient to justify a forcible catheterization.  Do you know anything about that subject, in other words, Judge Rank's position on that?
> Officer Coonrod: We're just told not to put catheter anywhere in the search warrant and we are not to do anything to do with catheters.
> Alvarez's Attorney: Who told you that?
> Officer Coonrod: That's just the way Judge Rank has told us.
> Alvarez's Attorney: How long have you been an officer here?
> Officer Coonrod: I've been an officer at the Winner Police Department since 2011.
> Alvarez's Attorney: Was it any different when Judge Trandahl was here?
> Officer Coonrod: I don't think so.

Doc. 135-4 at 2; Doc. 136 p.38–39 at ¶ 29; Doc. 133 at 78–79.  Alvarez also argues that the Norman Ford case was different because Alvarez was only suspected of having committed a misdemeanor whereas Ford's case involved a felony charge of possession of a controlled substance.  Doc. 133 at 79–80; Doc. 134 at ¶ 164; Doc. 135-5.

The parties disagree over paragraph 104 of Alvarez's material facts, which states that "Woxland had no evidence that Alvarez had any drug in her system other than marijuana."  Doc. 99 at ¶ 104.  Alvarez relies on paragraph 104 to argue that she was catheterized "solely on suspicion

---

[14]Judge Bobbi Rank became a state circuit court judge after the retirement of Judge Trandahl.

of ingestion of marijuana, a minor misdemeanor." Doc. 98 at 74. Trooper Woxland contests

paragraph 104, and the portion of his testimony cited by Alvarez in support of paragraph 104 is:

> Alvarez's Attorney: And you never had any evidence that Ms.
> Alvarez was involved with any drugs other than marijuana, did you?
> Trooper Woxland's Attorney: You mean at what point?
> Alvarez's Attorney: At any point?
> Trooper Woxland: No, I didn't know if she had marijuana in her
> system before that.
> Alvarez's Attorney: But you also had no evidence that she had any
> other drugs in her system other than marijuana at any point, did you?
> Trooper Woxland: No, I didn't have any evidence to show she had
> drugs in her system.

Doc. 123-4 at 9. Trooper Woxland's supporting affidavit stated that he wanted to test Alvarez's

urine for the "presence of illegal *drugs*," meaning more than one drug. Doc. 123-2 at 3 (emphasis

added). Nothing in the affidavit or the testimony Alvarez cites establishes that Trooper Woxland's

pre-drug test suspicions were limited just to marijuana.

### E.   Aaron Henning

On October 7, 2016, Court Services Officer Kraig Archer received a call about

questionable activities at a home (the Home) in Sisseton where four probationers were living. Doc.

99 at ¶ 80; Doc. 137 at ¶ 80; Doc. 115 at ¶¶ 1–2; Doc. 136 p.15 at ¶¶ 1–2. Archer and Court

Services Officer Chris Hansen went to the Home with Sisseton Chief of Police Jim Croymans.

Doc. 99 at ¶ 80; Doc. 137 at ¶ 80; Doc. 115 at ¶ 3; Doc. 136 p.16 at ¶ 3. Officers Archer and

Hansen knocked on the front door of the Home and identified themselves as "Probation

Department." Doc. 115 at ¶ 4; Doc. 136 p.16 at ¶ 4. The unlocked door opened, and the officers

encountered an unknown male—later identified as Aaron Henning—sitting on a couch in the living

room. Doc. 115 at ¶ 5; Doc. 136 p.16 at ¶ 5. The Home belonged to the uncle of one of Henning's

friends, and Henning had stopped there to shower before a wedding. Doc. 99 at ¶ 81; Doc. 137 at

¶ 81. Henning knew the Court Services officers but was not on probation himself. Doc. 99 at ¶¶

81–82; Doc. 137 at ¶¶ 81–82.  He told the officers that he did not know where their probationers were because he did not live at the Home.  Doc. 115 at ¶ 6; Doc. 136 p.16 at ¶ 6.

The officers learned that S.B., one of the probationers, was showering, so they waited to speak with her.  Doc. 115 at ¶¶ 7–8; Doc. 136 p.16 at ¶¶ 7–8.  In the meantime, dispatch notified Chief Croymans that Henning had an outstanding arrest warrant in Roberts County.  Doc. 115 at ¶ 9; Doc. 136 p.16 at ¶ 9.  Chief Croymans arrested Henning and took him to jail before returning to the Home.  Doc. 115 at ¶ 10; Doc. 136 p.16 at ¶ 10.

Under questioning from the Court Services officers, S.B. admitted that she had smoked marijuana "outside of the house in the yard," and that she had some marijuana roaches in her room. Doc. 115 at ¶¶ 11–13; Doc. 136 p.16 at ¶¶ 11–13.  Officer Hansen began searching S.B.'s room based on the search and seizure provision of her probation.  Doc. 115 at ¶ 14; Doc. 136 p.16 at ¶ 14.  Officer Hansen reported to Officer Archer and Chief Croymans finding drug-related items in S.B.'s bedroom.  Doc. 115 at ¶ 15; Doc. 136 p.16 at ¶ 15.  Officer Archer became concerned about noises coming from the back of the Home, so he asked the owner, L.B., whether anyone else was inside.  Doc. 115 at ¶ 16; Doc. 136 p.16 at ¶ 16.   L.B. said that he had some friends in the back, and Chief Croymans asked these individuals to come out to the living room until Officer Hansen finished searching S.B.'s bedroom.  Doc. 115 at ¶¶ 16–17; Doc. 136 p.16 at ¶¶ 16–17.   While checking the back of the Home for more people, Chief Croymans saw what he believed to be drug-related items (two homemade metal pipes) in plain sight on the bed in the northeast bedroom.  Doc. 115 at ¶ 18; Doc. 136 p.16 at ¶ 18.  He contacted Korey Ware, a corporal with the Sisseton Police Department, and requested assistance in writing and applying for a search warrant.  Doc. 115 at ¶ 19; Doc. 136 p.16 at ¶ 19.

Corporal Ware's affidavit requesting a search warrant recounted how officers had found a tobacco grinder smelling of marijuana and small empty plastic bags in S.B.'s bedroom and "several drug related items," including "a couple homemade pipes," in L.B.'s bedroom. Doc. 117-3 at 4; Doc. 115 at ¶ 20; Doc. 136 p.16 at ¶ 20. A good portion of the affidavit consisted of statements from Corporal Ware based on his training and experience, including that: "people often use tobacco grinders to grind marijuana;" "people often package illegal substances in bags like the ones" found in the Home; illegal drug traffickers "usually keep paraphernalia for packaging" drugs, including plastic bags; illegal drug traffickers "commonly have people at their residence or arriving at their residence purchasing illegal substances;" and that illegal drug traffickers "routinely have short term traffic (come and go traffic) at their residences." Doc. 117-3 at 4–5; Doc. 115 at ¶ 20; Doc. 136 p.16 at ¶ 20. Corporal Ware requested authority to search the Home for certain "property," including drugs, paraphernalia, and a "[u]rine sample from everyone present at the time probation agents and Chief Croymans entered the residence." Doc. 117-3 at 3; Doc. 115 at ¶ 20; Doc. 136 p.16 at ¶ 20; Doc. 99 at ¶ 83; Doc. 137 at ¶ 83. Corporal Ware's affidavit did not mention Henning by name or explain how the officers had encountered him at the Home. Doc. 99 at ¶ 83; Doc. 137 at ¶ 83; Doc. 117-3. Nor did the affidavit mention catheterization. Doc. 99 at ¶ 83; Doc. 137 at ¶ 83; Doc. 117-3.

A state court judge granted Corporal Ware's request for a warrant. The first portion of the warrant stated:

> Proof by Affidavit(s) has been made before me by that there is probable cause to believe that the property described herein may be found at the location set forth herein and the property is:
> - Any controlled substance, including but not exclusively, methamphetamine, cocaine, and prescription drugs
> - Marijuana or green leafy substance
> - Paraphernalia used to ingest illegal and/or controlled substances into the body.

25

. . . .

- Urine sample from anyone present at the time probation agents and Chief Croymans arrived at the residence.

Doc. 117-4 at 2–3.  The second portion of the warrant stated:

> YOU ARE THEREFORE COMMANDED TO SEARCH: (describe premises or area with legal description and particularity)
>
> ● Blue single-story home with unfinished basement.  The residence is located on the northwest corner of Maple Street and 7th Avenue West.  The front door is located on the south side of the residence with a back door on the west.  The address to the residence is 406 7th Avenue West which belongs to [L.B.]."

Doc. 117-4 at 3.  Like Corporal Ware's affidavit, the warrant did not mention catheterization or Henning by name.  Doc. 117-4 at 3.

Corporal Ware and others searched the Home and found methamphetamine, homemade metal pipes, jewelry bags containing a crystal-like substance, jewelry bags containing a white powdery residue, mirrors with white powdery residue on them, a green leafy plant-like substance that field tested positive for marijuana, and hypodermic needles.  Doc. 115 at ¶ 22; Doc. 136 p.18 at ¶ 22; Doc. 99 at ¶ 86; Doc. 137 at ¶ 86.

Upon finishing the search, Corporal Ware went to the jail and told Henning that he needed to collect a urine sample from him.  Doc. 115 at ¶ 23; Doc. 136 p.18 at ¶ 23.  Henning refused to provide a sample, so Corporal Ware explained that he had a signed search warrant for Henning's urine.  Doc. 115 at ¶¶ 24–25; Doc. 136 at p.18 at ¶¶ 24–25.  Henning refused again, stating "I don't care, you're not taking my piss."  Doc. 115 at ¶ 26; Doc. 136 p.18 at ¶ 26.  Corporal Ware told Henning that if he did not provide a urine sample, the police would take him to Coteau des Prairies Hospital to collect a sample from him involuntarily.  Doc. 115 at ¶ 27; Doc. 136 p.18 at ¶ 27. According to Corporal Ware's testimony, Henning responded that he would sue Corporal Ware because taking a urine sample from him involuntarily "would technically mean [that Corporal

Ware] raped him."[15] Doc. 117-10 at 6; Doc. 115 at ¶ 28; Doc. 136 p.18 at ¶ 28.  Henning testified that after he had refused to provide a sample, Chief Croymans looked at Corporal Ware and "basically said, F[…] it.  Take him up to the hospital and catheterize him."  Doc. 124-10 at 5; Doc. 99 at ¶ 88; Doc. 137 at ¶ 88.  The Sisseton Defendants deny that Chief Croymans said this.  Doc. 137 at ¶ 88.  Corporal Ware showed Henning a copy of the search warrant and gave him an opportunity to examine it.  Doc. 115 at ¶ 29; Doc. 136 p.18 at ¶ 29.  Henning continued to refuse to provide a urine sample and told Corporal Ware that he would sue Corporal Ware and win if Corporal Ware took a urine sample from him involuntarily.  Doc. 115 at ¶ 30; Doc. 136 p.18 at ¶ 30.

Corporal Ware took Henning to Coteau des Prairies Hospital to collect an involuntary urine sample.  Doc. 115 at ¶ 32; Doc. 136 p.19 at ¶ 32.  He presented the nursing staff with the search warrant, and Henning was escorted into an examination room.  Doc. 115 at ¶ 33; Doc. 136 p.19 at ¶ 33.  Henning was given another chance to provide a urine sample voluntarily, but he continued to refuse.  Doc. 115 at ¶¶ 34–35; Doc. 136 p.19 at ¶¶ 34–35.  Nursing staff pulled Henning's pants down and Nurse Tracy Carlson catheterized him.  Doc. 99 at ¶ 89; Doc. 137 at ¶ 89; Doc. 115 at ¶ 36; Doc. 136 p.19 at ¶ 36.  Corporal Ware stood beside the bed while Nurse Carlson performed the procedure.[16]  Doc. 115 at ¶ 37; Doc. 136 p.19 at ¶ 37.

---

[15]Corporal Ware's supplemental report says that Henning responded to the threat of having a urine sample taken involuntarily by saying "Go ahead because then that's rape."  Doc. 117-2 at 6; Doc. 115 at ¶ 28.  Henning denies that he said this but admits to saying that he would sue and comparing involuntary catherization to rape.  Doc. 136 p.18 at ¶ 28.
[16]The parties agree that Henning's catheterization was conducted "pursuant to" the search warrant.  Doc. 99 at ¶ 90; Doc. 137 at ¶ 90.

Henning's urine tested positive for methamphetamine and THC.[17]  Doc. 115 at ¶ 38; Doc.

136 p.19 at ¶ 38.  He was charged with several offenses, including possession of a controlled

substance (methamphetamine), unauthorized ingestion of a controlled drug or substance

(methamphetamine), and possession of two ounces of marijuana or less.  Doc. 115 at ¶ 40; Doc.

136 p.19 at ¶ 40.  Henning pleaded guilty to the possession of a controlled substance charge, which

is a Class 5 Felony under South Dakota law.  Doc. 115 at ¶ 41; Doc. 136 p.19 at ¶ 41.  He received

a suspended imposition of sentence upon serving sixty days in jail and three years of probation.

Doc. 115 at ¶ 42; Doc. 136 p.19 at ¶ 42.

When asked about injuries from the catheterization, Henning testified that he has difficulty

urinating, that it takes longer for him get an erection, and that he has trouble ejaculating.  Doc. 99

at ¶¶ 91–93; Doc. 137 at ¶¶ 91–93; Doc. 124-10 at 8–9.  He also testified that he has dreams about

being catheterized, that the nurses had to use three different catheters to obtain a urine sample from

him, and that two jailers were holding him down during the procedure.  Doc. 124-10 at 8; Doc. 99

at ¶ 94; Doc. 137 at ¶ 94.  The "most stressful" part about the catheterization, Henning said, "is

knowing in my head that, you know, people I grew up with, people I know, people that I trusted

were doing something like that to me."  Doc. 124-10 at 8; Doc. 99 at ¶ 96; Doc. 137 at ¶ 96.  He

explained that "any time I grab onto my penis and do anything with it, I think about it.  It's always

there.  It doesn't go away."  Doc. 124-10 at 8; Doc. 99 at ¶ 96; Doc. 137 at ¶ 96.

**F.  Dirk Sparks**

On the morning of March 14, 2016, Pierre police officer Matthew Shaver responded to a

domestic disturbance at Dawn Brende's residence in Pierre.  Brende asked Officer Shaver to

---

[17]Henning admitted during his deposition that he had used methamphetamine two days before he
was catheterized.  Doc. 115 at ¶ 39; Doc. 136 p.19 at ¶ 39.

remove her boyfriend, Dirk Sparks, from the residence. Officer Shaver initially spoke with Sparks in Brende's kitchen but, for safety reasons, asked Sparks to continue the discussion outside. Doc. 109 at ¶ 1; Doc. 136 p.3 at ¶ 1; Doc. 99 at ¶ 66; Doc. 138 at ¶ 66. Sparks ran to the basement instead of complying, and Officer Shaver followed him. Doc. 109 at ¶ 2; Doc. 136 p.3 at ¶ 2. Officer Shaver noticed marijuana, drug paraphernalia, and a kitchen steak knife in the area of the basement to which Sparks had fled. Doc. 109 at ¶ 3; Doc. 136 p.3 at ¶ 3. Brende told Officer Shaver that Sparks was coming down from methamphetamine, so Officer Shaver arrested Sparks on suspicion of ingesting a controlled substance.[18] Doc. 109 at ¶¶ 4, 6; Doc. 136 p.3 at ¶¶ 4, 6; Doc. 99 at ¶ 66; Doc. 138 at ¶ 66.

Officer Shaver drove Sparks to the jail, where he asked Sparks to voluntarily provide a urine sample. Doc. 109 at ¶ 7; Doc. 136 p.3 at ¶ 7. Sparks refused, saying that he would "fight," so Officer Shaver drafted a search warrant and a supporting affidavit. Doc. 99 at ¶ 67; Doc. 138 at ¶ 67; Doc. 109 at ¶ 7; Doc. 136 p.3 at ¶ 7; Doc. 124-37 at 3; Doc. 106-27 at 2. Officer Shaver explained in the affidavit that he had found marijuana and drug-related items near Sparks in the basement; that Brende had said Sparks was coming down from methamphetamine; that Sparks was "fidgety" and "changed moods very rapidly" en route to the jail; that Officer Shaver believed Sparks was under the influence of an intoxicating substance "due to the drug items found and in connection to his behaviors exhibited;" and that Sparks had refused to voluntarily produce a urine sample. Doc. 124-41; Doc. 109 at ¶ 8; Doc. 136 p.3 at ¶ 8; Doc. 99 at ¶ 68; Doc. 138 at ¶ 68. Shaver's affidavit requested authority to search Sparks for "Blood and Urine," but did not mention catheterization. Doc. 124-41; Doc. 99 at ¶ 70; Doc. 138 at ¶ 70.

---

[18]Sparks admitted during his deposition that he had used methamphetamine three days before his arrest. Doc. 109 at ¶ 5; Doc. 136 p.3 at ¶ 5; Doc. 124-35 at 5.

A state court judge issued a warrant stating that law enforcement was "commanded" to search "[t]he person of Dirk L. Sparks" for "Blood and Urine." Doc. 124-40. When Sparks still wouldn't provide a sample, Officer Shaver contacted his superiors, who told him to take Sparks to Avera St. Mary's in Pierre to be catheterized. Doc. 99 at ¶¶ 72, 128–29; Doc. 138 at ¶ 72, 128–29; Doc. 106-32 at 2–3; Doc. 124-33 at 8. Officer Shaver told Sparks that he would be catheterized if he did not provide a sample voluntarily, but Sparks continued to refuse. Doc. 109 at ¶ 10; Doc. 136 p.3 at ¶ 10; Doc. 124-35 at 5.

Officer Shaver then drove Sparks to Avera St. Mary's to be catheterized. Doc. 109 at ¶ 11; Doc. 136 p.3 at ¶ 11. A doctor asked Sparks if he would provide a sample by urinating, and Sparks refused. Doc. 109 at ¶ 12; Doc. 136 p.3 at ¶ 12. Peter Maningas, a doctor at Avera St. Mary's, signed an order for Sparks's catheterization.[19] Doc. 124-21 at 9; Doc. 109 at ¶ 13; Doc. 136 p.4 at ¶ 13.

One of the officers at the hospital captured Sparks's catheterization on his body camera. Doc. 106-2. The video begins with Sparks laying on a hospital bed. Doc. 106-2. He is wearing a spit guard and his arms are handcuffed to the bed. A hospital employee states that they gave Sparks an opportunity to urinate on his own, and Sparks replies that he already told them he isn't doing

---

[19]As mentioned on pages 5 and 6 of this Opinion and Order, Dr. Maningas testified that he believed that warrants for a urine sample were "directed towards [staff at Avera St. Mary's] as well to help [police] comply with that order." Doc. 124-21 at 7; see also Doc. 124-21 at 6. This testimony prompted Plaintiffs' counsel to ask if Dr. Maningas "had no role in deciding whether or not you would do a forced catheterization. You simply, if you got a piece of paper like the one we've just discussed [a warrant], did it, true?" Doc. 124-21 at 7. Dr. Maningas replied "[y]es." Doc. 124-21 at 7. However, Dr. Maningas also replied "[y]es" when asked whether he could decline to order a catheterization if it was "medically risky or otherwise unwarranted." Doc. 124-21 at 11. Dr. Maningas testified that he authorized more than ten forcible catheterizations for law enforcement purposes since starting at Avera St. Mary's in 2011. Doc. 124-21 at 6; Doc. 99 at ¶¶ 10–11; Doc. 138 at ¶¶ 10–11. Avera St. Mary's stopped doing forcible catheterizations in the summer of 2016. Doc. 99 at ¶ 14; Doc. 138 at ¶ 14.

anything voluntarily.  Doc. 106-2 at 00:44–51.  Two officers then restrain Sparks's legs while nurse Pam Templeton inserts the catheter.  Doc. 106-2 at 00:51–01:45; Doc. 109 at ¶ 14; Doc. 136 p.6 at ¶ 14.  Sparks flinches and swears, and his legs struggle as Templeton performs the procedure. Doc. 106-2 at 00:51–01:45. The catheterization lasts just over six-and-a-half minutes.  Doc. 106-2 at 00:55–07:40. Officer Shaver was present during the catheterization.  Doc. 111-7 at 2; Doc. 124-36 at 33.

Sparks testified that because of the catheterization, he has "problems urinating, starting and a steady stream," and he has "sometimes noticed that I have urinated in my pants a little bit."  Doc. 106-33 at 2; Doc. 99 at ¶ 73; Doc. 138 at ¶ 73.  He described having nightmares since the catheterization as well as "[e]xtreme fear of the police now."  Doc. 106-33 at 2; Doc. 99 at ¶ 73; Doc. 138 at ¶ 73.  Sparks also testified that it's "harder for me to get an erection now and it's also sometimes harder to achieve orgasm."  Doc. 106-33 at 2; Doc. 99 at ¶ 73; Doc. 138 at ¶ 73.

Sparks's urine tested positive for amphetamine, methamphetamine, and THC.  Doc. 109 at ¶ 15; Doc. 136 p.5 at ¶ 15.  He was charged with several offenses in state court, including ingesting a controlled substance.  Doc. 109 at ¶ 16; Doc. 136 p.6 at ¶ 16.  Sparks moved to suppress the results of the catheterization, arguing that the search was unreasonable and that the warrant violated the Fourth Amendment's particularity requirement.  Doc. 109 at ¶ 17; Doc. 136 p.6 at ¶ 17; Doc. 124-36 at 2, 50–57.  Then-state Judge Mark Barnett disagreed, issuing an oral ruling that the police did not violate the Fourth Amendment.  Doc. 109 at ¶ 17; Doc. 136 p.6 at ¶ 17; Doc. 134 at ¶ 165; Doc. 124-36 at 60–64.  Thereafter, the State made a plea offer and Sparks agreed to plead no contest to ingesting a controlled substance.  Doc. 109 at ¶ 18; Doc. 136 p.7 at ¶ 18; Doc. 134 at ¶ 165; Doc. 135-6.  Sparks did not appeal Judge Barnett's denial of his motion to suppress. Doc. 109 at ¶ 17; Doc. 136 p.6 at ¶ 17.

### G. Information from Experts' Testimony

Plaintiffs submitted an expert report from Dr. Gerald Butz, a urologist, discussing the risks of catheterization. Doc. 110-36; Doc. 99 at ¶ 116. According to Dr. Butz, catheterization of even a willing patient involves "significant dangers." Doc. 110-36 at 2. For a male patient, "the risks include rupture of the urethra because the sphincter is tight and does not allow the catheter to pass." Doc. 110-36 at 2. This risk grows, Dr. Butz wrote, when catheterization is involuntary: "With forced catheterization of an unwilling adult male patient, the sphincter is likely to be 'tight as a drum,' thereby increasing the risk of rupture of the urethra. Forced catheterization can cause rupture of the urethra, scarring, a stricture, infection, and life-long problems." Doc. 110-36 at 3. Dr. Butz acknowledged that the risk of urethral rupture is lower when the patient is an unwilling female, but said that there is still a risk of infection. Doc. 110-36 at 4. And he stated that "any person would experience pain during the forced catheterization, and possibly afterwards." Doc. 110-36 at 4. According to Dr. Butz, nurses "are not trained to avoid or reduce the risks of catheterization in the way that urologists are trained to avoid or reduce them." Doc. 110-36 at 5. Nurses who catheterize a patient "just by pushing harder" create "significant medical risks," Dr. Butz wrote. Doc. 110-36 at 5.[20]

Defendants responded to Dr. Butz with a report from their own expert, urologist Dr. Darlys Hofer. Doc. 117-29. According to Dr. Hofer, "[c]atheterization is a safe and routine medical

---

[20]According to Dr. Butz, an "alternative method to obtain a urine sample from an unwilling adult is by injecting a needle into the adult's bladder." Doc. 110-36 at 6. In Dr. Butz's opinion, "[t]he risk to an adult male or adult female from this method is very small, significantly smaller than forced catheterization." Doc. 110-36 at 6. Dr. Darlys Hofer, the Defendants' expert urologist, refuted Dr. Butz's opinion that injecting a needle into the bladder is a safer way of obtaining a urine sample from an unwilling adult. She said: "I have not seen a urologist perform a suprapubic aspiration in over 30 years. That procedure would be significantly more uncomfortable, complicated, dangerous, and lengthy than a catheterization. It is only done in complex urologic situations." Doc. 117-29 at 2.

procedure." Doc. 117-29 at 2. It "rarely presents a risk" of urethral rupture and infection, and a "tear of the urethra" caused by the procedure "usually resolves without complications." Doc. 117-29 at 2. Dr. Hofer explained that catheterizations may be "uncomfortable" but usually aren't painful, that the standard of care doesn't require use of an anesthetic, and that the "procedure is usually brief." Doc. 117-29 at 2. Nurses perform "[m]ost catheterizations," Dr. Hofer wrote, and they are trained on how to avoid and minimize risks. Doc. 117-29 at 2. According to Dr. Hofer, there "are many occasions when catheterization of an unwilling person is necessary," and "standard medical practice is that someone resisting the procedure be restrained while it is done, usually by someone holding the patient's limbs." Doc. 117-29 at 2.

Plaintiffs also submitted an expert report from Dr. Donald Habbe, a forensic pathologist, on the testing of blood and urine for drugs. Doc. 110-37. Defendants did not retain a forensic pathologist but rather appear to agree with Dr Habbe's opinions. Doc. 137 at ¶ 117; Doc. 138 at ¶ 117; Doc. 139 at ¶ 117; Doc. 142 at ¶ 117. The most important points from Dr. Habbe's report are that drugs remain detectable in urine longer than in blood and that marijuana remains detectable in hair longer than it does in urine. Doc. 110-37 at 3–4. Because the parties quibble a bit over how to characterize Dr. Habbe's report, Doc. 141 at 16–17; Doc. 136 p.14 at ¶ 51, this Court sets forth some of his opinions verbatim:

- Amphetamine or methamphetamine, for a heavy user, could be positive in urine for 2–4 days. In blood, it will could [sic] be positive for up to about a day.
- The cut-off point matters, whether 'trace' is considered positive or a certain level is considered positive. The higher the cut-off point, the shorter the time that the cut-off amount will show up in urine.
- In blood, the half-life of the street version of methamphetamine is 6 hours to 10 hours, so in a day most of it will be gone.
- A heavy user of marijuana could have marijuana in his/her urine for up to 2 months. This tells nothing about impairment.

33

- A hair sample of marijuana [sic] allows a longer look back into how long ago a person has used marijuana than a urine sample allows.
- For infrequent users of marijuana, the half-life of metabolites of marijuana in the blood is 20 to 57 hours. For more frequent users, the half-life of metabolites of marijuana in the blood is 3 to 13 days. The total length of time that metabolites of marijuana are detectable in the blood depends on the amount of marijuana the person has ingested.

Doc. 110-37 at 3–4.

The Plaintiffs also submitted an expert report by Dr. Steven Manlove, a psychiatrist. Doc. 110-38. Dr. Manlove wrote that there is "significant comorbidity between street drug abuse and" PTSD; that mental health experts "commonly hypothesize that many people use illegal drugs to find relief from symptoms of" PTSD and other mental disorders; and that forcible catheterization[21] "is likely to be emotionally traumatic to the person being catheterized;" would likely worsen pre-existing PTSD and other mental disorders; and "may make the person catheterized more likely to use illegal drugs in the future, because it exacerbates the person's pre-existing" PTSD or other mental disorder. Doc. 110-38 at 3–4. Dr. Manlove also provided an opinion on catheterizing a female victim of sexual abuse:

> [A]ny woman with a history of sexual abuse who—as part of a forcible catheterization—has her pants and underwear forcibly removed by a male law enforcement officer or officers, then has her legs pulled apart by a male law enforcement officer or officers, so she can be forcibly catheterized, is likely to suffer significant trauma and, possibly, post-traumatic stress disorder, and thereby make her more likely to use illegal drugs in the future.

Doc. 110-38 at 4.

---

[21]Dr. Manlove used the term "forcible catheterization" to mean "urinary catheterization against a person's will, imposed involuntarily by people who are perceived as antagonists (for instance, imposed on a drug suspect by law enforcement officers)." Doc. 110-38 at 3.

**H.  Plaintiffs' Complaint and the Claims that remain**

Plaintiffs' civil-rights suit names as Defendants Officer Shaver in his individual capacity, former Troopers Woxland and Weibrecht in their official and individual capacities, Corporal Ware in his official and individual capacity, Officers Gravatt and McGuire in their official capacities, law enforcement officers James Does one through six in their official capacities,[22] the City of Wagner Police Department, and the Cities of Pierre, Sisseton, and Wagner.  Doc. 72.  Plaintiffs alleged that Defendants violated 42 U.S.C. §§ 1983 and 1985(3) by depriving them of their rights under the Fourth, Fifth, and Fourteenth Amendments and conspiring to do the same, Doc. 72 at ¶¶ 94–102, and that the Cities of Pierre, Sisseton, and Wagner are liable under <u>Monell v. Department of Social Services</u>, 436 U.S. 658 (1978), Doc. 72 at ¶¶ 105–114.  Plaintiffs requested injunctive relief, compensatory and punitive damages, and attorney's fees and costs.  Doc. 72 at 24.

Plaintiffs moved for partial summary judgment against all Defendants on the issue of liability.  Doc. 97.  They argued that their catheterizations violated the Fourth Amendment because the warrants were not particular enough and the catheterizations were unreasonable, Doc. 98 at 52–72; that the Defendants sued individually are not entitled to qualified immunity, Doc. 98 at 77–87; and that the Wagner Police Department and the Cities of Pierre, Sisseton, and Wagner are liable under <u>Monell</u> because the official policies or customs of these entities caused the violations of Plaintiffs' Fourth Amendment rights, Doc. 98 at 88–103.  Five of the Plaintiffs argued that their catheterizations were unlawful for additional reasons:  Peters, Holcombe, and Riis argued that their catheterizations were unreasonable because they had all agreed to provide a urine sample voluntarily, Doc. 98 at 72–73; Peters argued that his catheterization was unreasonable because

---

[22]Plaintiffs' Complaint alleges that law enforcement officers James Does one through six are "officers who acted on behalf of, or to assist, the City of Wagner and the City of Wagner Police Department in forcibly catheterizing Aaron Peters."  Doc. 72 at ¶ 2.

Officer Gravatt was present during the procedure and "recorded it," Doc. 98 at 76–77; Alvarez argued that her catheterization was unreasonable because it was based solely on suspicion of marijuana use and because a male officer held her leg during the procedure, Doc. 98 at 74–75; and Henning argued that his catheterization was unlawful because it was based solely on suspicion of marijuana use and the search warrant was not supported by probable cause and did not command the search of anyone's urine, Doc. 98 at 75–76; Doc. 133 at 53; Doc. 149 at 32–35.

Defendants moved for summary judgment on all of Plaintiffs' claims. Docs. 102, 108, 114, 119. All Defendants argued that they did not violate the Plaintiffs' Fourth Amendment rights, that there is no evidence of a conspiracy, and that the Plaintiffs lack standing to seek injunctive relief. Troopers Woxland and Weibrecht argued that the Eleventh Amendment bars claims seeking monetary damages from them in their official capacities, while Officer Shaver and the City of Pierre argued that issue preclusion bars Sparks from bringing his Fourth Amendment claim. Those Defendants sued in their individual capacities—Trooper Woxland, Trooper Weibrecht, Officer Shaver, and Corporal Ware—argued that they were not "personally responsible" for the catheterizations and are protected by qualified immunity. The Municipal Defendants (the Wagner Police Department and the Cities of Pierre, Wagner, and Sisseton) argued that they did not cause the catheterizations, that there was no underlying constitutional violation, and that the Plaintiffs have failed to show a policy or custom under Monell.

Plaintiffs have conceded that Defendants are entitled to summary judgment on their Fifth Amendment claim, their § 1985(3) conspiracy claim, their claim for injunctive relief, Holcombe's claim that probable cause did not exist for his warrant, and their claims for damages against Troopers Woxland and Weibrecht in their official capacities. Doc. 133 at 84–85. What remains, then, are Plaintiffs' § 1983 claims that Defendants violated their Fourth Amendment rights.

## II.    Summary Judgment Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On summary judgment, the evidence is "viewed in the light most favorable to the nonmoving party." True v. Nebraska, 612 F.3d 676, 679 (8th Cir. 2010) (quoting Cordry v. Vanderbilt Mortg. & Fin., Inc., 445 F.3d 1106, 1109 (8th Cir. 2006)). There is a genuine issue of material fact if a "reasonable jury [could] return a verdict for either party" on a particular issue. Mayer v. Countrywide Home Loans, 647 F.3d 789, 791 (8th Cir. 2011). A party opposing a properly made and supported motion for summary judgment must cite to particular materials in the record supporting the assertion that a fact is genuinely disputed. Fed. R. Civ. P. 56(c)(1); Gacek v. Owens & Minor Distrib., Inc., 666 F.3d 1142, 1145 (8th Cir. 2012). "Mere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment." Thomas v. Corwin, 483 F.3d 516, 527 (8th Cir. 2007). When there are cross motions for summary judgment, each party's motion must be evaluated independently in accordance with the standard weight of evidence accorded to the non-moving party to determine if there is any genuine issue of material fact. See Wermager v. Cormorant Twp. Bd., 716 F.2d 1211, 1214 (8th Cir. 1983); see also St. Luke's Methodist Hosp. v. Thompson, 182 F. Supp. 2d 765, 769 (N.D. Iowa 2001).

## III.   Analysis

### A. Section 1983 Claims Generally

Section 1983 provides a cause of action against any "person" who, acting "under color of" state law, deprives the plaintiff of "rights, privileges, or immunities secured by the Constitution."

42 U.S.C. § 1983. Municipalities and their employees are suable "persons" under § 1983, and the employees can be sued in both their official and individual capacities. Monell, 436 U.S. at 690; Johnson v. Outboard Marine Corp., 172 F.3d 531, 535 (8th Cir. 1999). Plaintiffs sued three officers in their official capacities: Corporal Ware, Officer Gravatt, and Officer McGuire.[23] A suit against a municipal employee in his or her official capacity is treated as a suit against the municipality for which the employee works. Kentucky v. Graham, 473 U.S. 159, 166 (1985) ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."); Hess v. Ables, 714 F.3d 1048, 1054 (8th Cir. 2013). As explained more fully below, a municipality is not liable under § 1983 unless there is an unconstitutional act by one of its employees and its official policy or custom caused the act. Monell, 436 U.S. at 694; Webb v. City of Maplewood, 889 F.3d 483, 487 (8th Cir. 2018); Elder-Keep v. Aksamit, 460 F.3d 979, 986 (8th Cir. 2006) ("[T]o establish the liability of an official acting in his official capacity, the plaintiff must prove that a policy or custom of the city caused the alleged violation." (cleaned up and citation omitted)).

The pleading requirements and available defenses are different for claims brought against municipal employees in their individual capacities. One big difference is that officers sued under § 1983 in their individual capacities can raise qualified immunity as a defense. This doctrine "shields a government official from liability in a § 1983 action unless the official's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known." Partlow v. Stadler, 774 F.3d 497, 501 (8th Cir. 2014). Courts use a two-step inquiry to determine whether qualified immunity applies: "(1) whether the facts shown by the plaintiff make

---

[23]Plaintiffs also sued Troopers Woxland and Weibrecht in their official capacities, but they have since agreed that the troopers are entitled to summary judgment on these official capacity claims.

out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct." Id. Plaintiffs must meet both steps to defeat qualified immunity, and courts can begin (and perhaps end) with either step. Greenman v. Jessen, 787 F.3d 882, 887 (8th Cir. 2015). In this case, however, questions of municipal liability require this Court to determine whether the Defendants violated the Plaintiffs' Fourth Amendment rights. Thus, beginning with the second step of qualified immunity would not save this Court any time or allow it to avoid deciding any constitutional questions.

This Court believes that the best approach to analyzing the many issues in this case is to begin with the Pierre Defendants' argument about issue preclusion on Sparks's claim before turning to the Plaintiffs' Fourth Amendment claims.

### B. Issue Preclusion Bars Sparks's § 1983 Action

Officer Shaver and the City of Pierre argue that issue preclusion (sometimes called collateral estoppel) bars Sparks from asserting a Fourth Amendment violation because he already litigated the constitutionality of his catheterization in his state court criminal case. Issue preclusion may bar a § 1983 plaintiff from relitigating a Fourth Amendment issue decided against him in a state criminal proceeding. Allen v. McCurry, 449 U.S. 90, 102–05 (1980); see also Munz v. Parr, 972 F.2d 971, 973 (8th Cir. 1992) ("[T]he Supreme Court has made clear that collateral estoppel applies to section 1983 actions involving alleged Fourth Amendment violations."). In Sanders v. Frisby, 736 F.2d 1230 (8th Cir. 1984) (per curiam), for instance, the Eighth Circuit gave preclusive effect to a state trial court's denial of the plaintiff's motion to suppress even though the denial was never addressed by an appellate court, the judgment of conviction following the litigation of the motion to suppress was reversed on other grounds, and the case ended in a guilty plea upon remand. Id. at 1231–32. The Eighth Circuit noted at the end of its Sanders decision that the case before it

39

was significantly different from <u>Haring v. Prosise</u>, 462 U.S. 306, 323 (1983), where the Supreme Court held that a plaintiff's guilty plea did not collaterally estop him from seeking damages for Fourth Amendment violations that he never litigated in state court.   Unlike <u>Haring</u>, the Fourth Amendment claims in <u>Sanders</u> were actually decided.   <u>Sanders</u>, 736 F.2d at 1232.   Sparks does not cite <u>Haring</u>, and for good reason: he litigated the constitutionality of the catheterization before pleading guilty.   <u>Sanders</u>, 736 F.2d 1232; <u>Coney v. Smith</u>, 738 F.2d 1199, 1199–1200 (11th Cir. 1984) (per curiam) (concluding that <u>Haring</u> did not apply where the plaintiff litigated the legality of an arrest and search before pleading guilty); <u>Daubenmire v. City of Columbus</u>, 507 F.3d 383, 390 (6th Cir. 2007) (distinguishing <u>Haring</u> in a § 1983 case where the plaintiffs had litigated the legality of their arrests in an earlier criminal case).

Here, state law controls the preclusive effect of Judge Barnett's decision that catheterization of Sparks was constitutional.   <u>Heck v. Humphrey</u>, 512 U.S. 477, 480 n.2 (1994); <u>Migra v. Warren City Sch. Dist. Bd. of Educ.</u>, 465 U.S. 75, 81 (1984) ("It is now settled that a federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered.").   In South Dakota, issue preclusion "bars a point that was actually and directly in issue in a former action and was judicially passed upon and determined by a domestic court of competent jurisdiction." <u>Hayes v. Rosenbaum Signs & Outdoor Advert., Inc.</u>, 853 N.W.2d 878, 882 (S.D. 2014) (cleaned up and emphasis and citation omitted).   The Supreme Court of South Dakota has held that four factors must be met for issue preclusion to apply:

> (1) The issue decided in the prior adjudication was identical with the one presented in the action in question;
> (2) There was a final judgment on the merits;
> (3) The party against whom the plea is asserted was a party or in privity with a party to the prior adjudication; and

> (4) The party against whom the plea is asserted had a full and fair
> opportunity to litigate the issue in the prior adjudication.

Grand State Prop., Inc. v. Woods, Fuller, Shultz & Smith, P.C., 556 N.W.2d 84, 87 (S.D. 1996)

(citation omitted); see also SDDS, Inc. v. South Dakota, 994 F.2d 486, 492 (8th Cir. 1993)

(applying this same test to determine whether collateral estoppel applied to a prior decision by a

South Dakota state court judge). "In examining whether these elements are present, a court should

construe the doctrine liberally, unrestricted by technicalities." People ex rel. L.S., 721 N.W.2d 83,

90 (S.D. 2006).

Sparks challenges only the second factor, which requires that there be a "final judgment on

the merits." Relying on Peters v. Barker & Little, Inc., 772 N.W.2d 657 (S.D. 2009), Sparks argues

that Judge Barnett's denial of his motion to suppress was not a final ruling or final judgment

because it was not reduced to writing, signed by the court, attested to by the clerk, or filed in the

clerk's office. Doc. 133 at 82–84; Doc. 135-6 at ¶ 5; Doc. 134 at ¶ 165. Peters concerned a trial

court's decision to enforce a default judgment after it orally granted a motion to set aside the

judgment at an earlier hearing. 772 N.W.2d at 659. The Supreme Court of South Dakota rejected

the defendant's argument that the oral order should be enforced, explaining that "an order is not

final until it is 'reduced to writing, signed by the court or judge, attested to by the clerk and filed

in the clerk's office." Id. at 660 (quoting SDCL § 15-6-58). The Supreme Court of South Dakota

reached a similar decision in State v. Lowther, 434 N.W.2d 747 (S.D. 1989), abrogated on other

grounds by State v. Plastow, 873 N.W.2d 222 (S.D. 2015). There, the trial court issued an oral

order granting the defendant's motion to suppress and dismissing the indictment without prejudice.

Id. at 750. The state re-indicted the defendant and the defendant refiled his motion to suppress.

Id. This time, however, the trial court denied the motion in part. Id. The defendant argued on

appeal that the trial court's initial grant of his motion to suppress was "res judicata" and could not

be reconsidered. Id. at 752. The Supreme Court of South Dakota disagreed, explaining that "no final order was reduced to writing, signed or duly recorded by filing." Id. A recorded ruling was necessary, the Supreme Court of South Dakota explained, because "the trial court may change its ruling before the order is signed and entered." Id.

Contrary to Sparks's argument, Peters and Lowther do not establish that a decision must be reduced to writing, signed, and duly recorded by filing before the decision can qualify as a "final judgment." As the Supreme Court of South Dakota has explained, a "final judgment" for purposes of issue preclusion is "[e]ssentially . . . a prior adjudication of an issue that is 'sufficiently firm to be accorded conclusive effect.'" Bank of Hoven v. Rausch, 449 N.W.2d 263, 265 (S.D. 1989) (quoting Restatement (Second) of Judgments § 13 (Am. Law Inst. 1982)). The criteria for determining finality are whether the parties were "fully heard" and whether the decision was "deliberated and firm," "subject to appeal," and "procedurally definite." Restatement (Second) of Judgements § 13 cmt. g.

Judge Barnett's decision that Spark's catherization was constitutional is sufficiently final for issue preclusion purposes. First, Sparks was fully heard on whether his catheterization violated the Fourth Amendment. His attorney submitted a brief on the issue, Doc. 124-36 at 52, and Judge Barnett held a hearing at which the attorney questioned Officer Shaver and argued that the catheterization was unconstitutional, Doc. 124-36 at 51–57. Second, Judge Barnett's ruling was considered; he questioned the attorneys, discussed the case law, and provided a rationale for his ruling. Doc. 124-36 at 42–65. Third, nothing Judge Barnett said suggested that the ruling was tentative or subject to change. Indeed, Judge Barnett stated that his decision could be appealed. Doc. 124-36 at 63–64. Fourth, Sparks had the opportunity to appeal Judge Barnett's decision, but he chose to forego that opportunity by pleading no contest. Coon v. Weber, 644 N.W.2d 638, 646

42

n.9 (S.D. 2002) (explaining that a defendant could not appeal the denial of his motion to suppress after pleading guilty). Finally, and most importantly, Sparks's criminal case ended when he pleaded no contest and Judge Barnett entered a judgment of conviction. Doc. 124-34. In sum, Judge Barnett's decision had the hallmarks of finality: the parties were "fully heard," and the decision was "deliberated and firm," "subject to appeal," and "procedurally definite." Restatement (Second) of Judgements § 13 cmt. g.

Sparks does not dispute the other elements of the test for issue preclusion, which plainly are met. Sparks was a party to his own criminal case, and the transcript of the suppression hearing shows that he was given a full and fair opportunity to litigate the constitutionality of his catheterization before Judge Barnett. The transcript also shows that the issues decided in his criminal case are identical to the issues he raises now. Just as he does here, Sparks argued in state court that Officer Shaver conducted an unreasonable search and that the warrant needed to authorize catheterization to satisfy the particularity requirement. Doc. 124-36 at 51–57. Indeed, he cites some of the same cases now—Elliot v. Sheriff of Rush County, 686 F. Supp. 2d 840 (S.D. Ind. 2010), and United States v. Nelson, 36 F.3d 758 (8th Cir. 1994)—that he did before Judge Barnett. Doc. 124-36 at 53–56. Judge Barnett ruled against Sparks on both his reasonableness and particularity requirement arguments. Doc. 124-36 at 58–64. This Court therefore concludes that Judge Barnett's ruling, regardless of whether it was right or wrong, on Sparks's Fourth Amendment arguments is entitled to preclusive effect. Because issue preclusion bars Sparks from relitigating his Fourth Amendment claims, Officer Shaver is entitled to summary judgment.

Although Sparks also sued the City of Pierre, a Monell claim requires an underlying constitutional violation by a city employee. Webb, 889 F.3d at 487 (explaining that for liability under Monell, "there must be an unconstitutional act by a municipal employee," although there

"need not be a finding that a municipal employee is liable in his or her individual capacity" (citation omitted)).   Sparks based his <u>Monell</u> claim on his allegation that the catheterization violated his Fourth Amendment rights.  Because issue preclusion bars Sparks's Fourth Amendment claims, his <u>Monell</u> claim against the City of Pierre also fails and the City of Pierre is entitled to judgment as a matter of law on Sparks's claim.

### C. Fourth Amendment

The Fourth Amendment prohibits "unreasonable searches and seizures" and requires that warrants "*particularly* describ[e] the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV (emphasis added).    Plaintiffs argue that Defendants violated this particularity requirement by insufficiently describing the place to be searched.  They also claim that the catheterizations exceeded the scope of the warrants and were unreasonable intrusions into their bodies.  This Court addresses the Plaintiffs' particularity argument before turning to their arguments that the catheterizations exceeded the scope of the warrants and were unreasonable.

#### 1. Particularity

The Fourth Amendment's particularity requirement "makes general searches under [warrants] impossible and prevents the seizure of one thing under a warrant describing another." <u>Marron v. United States</u>, 275 U.S. 192, 196 (1927); <u>see also</u> <u>Maryland v. Garrison</u>, 480 U.S. 79, 84 (1987) ("The manifest purpose of this particularity requirement was to prevent general searches.").  A search violates the Fourth Amendment if performed under a warrant that lacks adequate particularity.  <u>Groh v. Ramirez</u>, 540 U.S. 551, 559 (2004).

As the Supreme Court reiterated in <u>United States v. Grubbs</u>, 547 U.S. 90 (2006), however, the Fourth Amendment does not impose a "general particularity requirement," but simply requires a particular description of "'the place to be searched' and 'the persons or things to be seized.'"  <u>Id.</u>

at 97 (internal marks omitted).  The Court has thus "rejected efforts to expand the scope of this provision to embrace unenumerated matters."  Id.  In Dalia v. United States, 441 U.S. 238 (1979), for instance, the Court held that a warrant authorizing the police to install a listening device in a suspect's office did not need to specify that it would be executed by means of a covert entry.  Id. at 256–257.  After all, the Court explained, nothing in the Fourth Amendment requires search warrants to "include a specification of the precise manner in which they are to be executed."  Id. at 257.  Instead, "it is generally left to the discretion of the executing officers to determine the details of how best to proceed with the performance of a search authorized by warrant—subject of course to the general Fourth Amendment protection against unreasonable searches and seizures."  Id. (footnote and internal marks omitted).

Plaintiffs argue that the warrants violated the particularity requirement because they did not specify the Plaintiffs' genitals, urethras, and bladders as the places to be searched.  Doc. 98 at 52–56; Doc. 133 at 50.  In Plaintiffs' view, a judge needed to decide whether the Defendants could "invade" these areas of their bodies.[24]  Doc. 133 at 50–51.  This Court agrees with Defendants that Plaintiffs' particularity argument is, in some part, an attempt to avoid Dalia's statement that search

---

[24]To support their argument under the particularity requirement, Plaintiffs cite to an affidavit from former South Dakota Attorney General Marty Jackley.  Doc. 98 at 54; Doc. 99 at ¶ 120; Doc. 110-40.  Jackley affirms in the affidavit that he gave the following quote to a newspaper concerning a request for a urine sample by the South Dakota Division of Criminal Investigation (DCI): "That request for a forced urine sample needs to be made directly to a judge, and it needs to be specific that we may be using this method."  Doc. 110-40 at ¶ 4 (cleaned up).  Jackley made clear in the affidavit that his statement only applies to the DCI and was intended "to reflect a general best-practices policy for the collection of urine samples by the DCI—an agency that often has time to compile affidavits and apply to a judge for a search warrant with the benefit of information gathered by other law enforcement first responders."  Doc. 110-40 at ¶ 9.  Jackley also clarified that his statement was not "intended to imply that collection of urine samples in absence of a specifically worded affidavit would be unconstitutional."  Doc. 110-40 at ¶ 10.  Despite having been the South Dakota Attorney General at the time of his directive to the DCI, Jackley's opinion on what a warrant should include is not controlling here.

warrants need not specify the precise way they are to be executed.  Plaintiffs do not cite any cases suggesting that the warrants needed to list their genitals, urethras, and bladders to comply with the particularity requirement.  Nor do any of the Plaintiffs besides Henning appear to argue that the warrants were facially deficient in particularizing the place to be searched.  See Groh, 540 U.S. at 557–58 (holding that a search warrant that completely failed to describe the items to be seized was invalid on its face).  Rather, Plaintiffs' real complaint seems to be that the warrants did not authorize the Defendants to forcibly catheterize them.  See Doc. 98 at 52–56; Doc. 133 at 17–19; Doc. 149 at 23–24.  Indeed, Plaintiffs' response to Dalia is that they are not arguing that the warrants failed to specify the precise manner of execution but "that the affidavits and warrants, when used for forcible catheterizations, fail the particularity requirement." Doc. 133 at 17–18; see also Doc. 133 at 18 (saying that the Plaintiffs "attack the use of affidavits and warrants that say nothing about forcible catheterization to perform forcible catheterization").  Such an argument relates more to the scope and reasonableness of the searches than to the particularity requirement.

The warrants here were not so lacking in particularity that they were facially invalid for any purpose whatsoever.  Cf. Groh, 540 U.S. at 557–58 (holding that a search warrant that completely failed to describe the items to be seized was invalid on its face).  Warrants need not describe the place to be searched with exact precision.  United States v. Thurman, 625 F.3d 1053, 1057 (8th Cir. 2010) ("The particularity requirement is a standard of practical accuracy rather than a hyper technical one." (cleaned up and citation omitted)).  Rather, a warrant satisfies the particularity requirement if it describes the place to be searched with "sufficient particularity as to enable the searcher to locate and identify the place[] . . . with reasonable effort and to avoid mistakenly searching the wrong place[]." United States v. Gleich, 397 F.3d 608, 611 (8th Cir. 2005).  The warrants here meet that standard.  They directed the officers to search the Plaintiffs

for a urine sample.  See Doc. 110-21 at 1 (commanding officers to search the "person of Gena

Alvarez" for a urine sample); Doc. 124-30 at 1 (commanding officers to search "the person of

Jason Riis" for urine); Doc. 122-4 at 4 (commanding officers to search "the person of Aaron

Peters" and to transport him to the hospital "to have a sample of his Urine taken buy [sic] reliable

and accepted method, in medically approved, reasonable manner"); Doc. 123-10 at 2 (commanding

officers to search "[t]he persons present during the execution of the warrant; specifically, their

urine"); Doc. 117-4 at  (directing officers to seize a urine sample "from anyone present at the time

probation agents and Chief Croymans arrived at the residence").[25]  These warrants, setting aside

for now the additional argument of Henning, were sufficient to allow law enforcement to collect a

urine sample at least through conventional means of having individuals urinate into a cup.  See

United States v. Fiorito, 640 F.3d 338, 346 (8th Cir. 2011) (explaining that the particularity issue

"cannot be decided in a vacuum," and that courts may consider "such factors as the purpose for

which the warrant was issued, the nature of the items to which it is directed, and the total

circumstances surrounding the case" (citation omitted)).

As noted above, however, Plaintiffs argue that the warrants failed the particularity

requirement when used to compel forcible catheterization.  Defendants no doubt should have

sought explicit judicial approval before forcibly catheterizing the suspects.  See Dalia, 441 U.S. at

259 n.22 (explaining that the "'preferable approach' would be for Government agents in the future

to make explicit to the authorizing court their expectation that some form of surreptitious entry

will be required" to execute the warrant); Schmerber v. California, 384 U.S. 757, 770 (1966) ("The

importance of informed, detached and deliberate determinations of the issue whether or not to

---

[25]This Court recognizes that Henning makes a separate argument about the particularity
requirement and the warrant used to catheterize him.  That argument is addressed below.

invade another's body in search of evidence of guilt is indisputable and great."); United States v. Husband, 226 F.3d 626, 634 (7th Cir. 2000). This would have allowed a neutral decisionmaker to balance the need for the catheterizations against the Plaintiffs' interest in privacy and well-being. Husband, 226 F.3d at 634. But as Dalia explained, the Fourth Amendment does not require search warrants to specify the exact way they are to be executed, typically leaving that decision to the police. 441 U.S. at 257. As explained in the next sections of this Opinion, however, the warrants' failure to mention catheterization otherwise impacts the evaluation of whether the catheterizations violated the Fourth Amendment.

### 2. Reasonableness Arguments

The catheterizations of course were searches, so they had to be reasonable to comply with the Fourth Amendment. Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 652 (1995). Even when warrants are valid, the officers still must conduct the searches in a reasonable manner, according to the warrants' terms. Dalia, 441 U.S. at 258 (explaining that "the manner in which a warrant is executed is subject to later judicial review as to its reasonableness"); Hummel-Jones v. Strope, 25 F.3d 647, 651 (8th Cir. 1994) (stating that a valid warrant does not immunize the execution of a search from a review for reasonableness). The reasonableness of a search challenged in a § 1983 case can be a question for the jury when there are material factual disputes. See Gardner v. Evans, 920 F.3d 1038, 1050 (6th Cir. 2019) (stating that the question of reasonableness of a search is "left to the jury" when there are material factual disputes); Cavanaugh v. Woods Cross City, 718 F.3d 1244, 1253 (10th Cir. 2013) ("As a general matter our cases hold that, where there are disputed issues of material fact, the question of reasonableness underlying a Fourth Amendment violation is for the jury."); see also Fleming v. Harris, 39 F.3d 905, 907 (8th Cir. 1994) ("Although probable cause in a section 1983 action is sometimes a jury question, when the issue of probable cause arises

in a damage suit and the facts are not disputed or are susceptible to only one reasonable inference, the question is one of law for the court.")  This Court addresses Plaintiffs' argument that the catheterizations were unreasonable intrusions into their bodies before addressing their argument about the scope of the warrants.

### a. Unreasonable Intrusion

"The overriding function of the Fourth Amendment is to protect personal privacy and dignity against unwarranted intrusions by the State." Schmerber, 384 U.S. at 767.  Searches that intrude into the human body implicate the "most personal and deep-rooted expectations of privacy," and require a "more substantial justification" to be considered reasonable.  Winston v. Lee, 470 U.S. 753, 760, 767 (1985); see also Maryland v. King, 569 U.S. 435, 446 (2013) ("Virtually any intrusion into the human body will work an invasion of cherished personal security that is subject to constitutional scrutiny." (cleaned up and citations omitted)).  Courts deciding whether a search intruding beneath the surface of the body is reasonable must weigh the individual's interest in privacy and security against society's interest in conducting the search. Winston, 470 U.S. at 760.  Three Supreme Court cases provide a useful framework for deciding whether the catheterizations were reasonable.

In Rochin v. California, 342 U.S. 165 (1952), the Supreme Court suppressed two morphine pills police obtained by illegally breaking into the suspect's home, wrestling with the suspect in an unsuccessful attempt to remove the pills from his mouth, and then taking him to a hospital to have his stomach pumped.  Id. at 166, 172.  The Supreme Court held that the search and seizure

violated due process, saying that the officers' conduct "shocks the conscience" and was "too close to the rack and the screw to permit of constitutional differentiation."[26]  Id. at 172.

The Supreme Court in <u>Schmerber v. California</u>, 384 U.S. 757 (1966), held that the police did not violate the Fourth Amendment by compelling an individual suspected of drunk driving to undergo a blood draw.  384 U.S. at 768–72.  Three factors convinced the Court that the police had acted reasonably.  First, there was a "clear indication," rather than a "mere chance," that the blood test would reveal alcohol in the suspect's blood.  Id. at 769–71.  Second, the police chose a reasonable test to measure the suspect's blood-alcohol level; the extraction of blood for testing is not only "highly effective" and "commonplace," but also "for most people the procedure involves virtually no risk, trauma, or pain."  Id. at 771.  Third, the test was conducted in a reasonable manner, with a doctor drawing the suspect's blood in a hospital setting and according to accepted medical practices.  Id. at 771.  But the Supreme Court cautioned that not every intrusion into a suspect's body would be reasonable:

> The integrity of an individual's person is a cherished value of our society.  That we today hold that the constitution does not forbid the State['s] minor intrusions into an individual's body under stringently limited conditions in no way indicates that it permits more substantial intrusions, or intrusions under other conditions.

Id. at 772.

The Supreme Court rejected just such a "more substantial intrusion" in <u>Winston v. Lee</u>, 470 U.S. 753 (1985).  There, the Court enjoined police from forcing an armed robbery suspect to have a bullet lodged in his chest surgically removed.  <u>Winston</u>, 470 U.S. at 763–67.  The Court

---

[26]<u>Rochin</u> was decided under the Fourteenth Amendment's Due Process Clause, before the Supreme Court decided that the Fourth Amendment's exclusionary rule applied to the states.  The Supreme Court has since stated that <u>Rochin</u> "today would be treated under the Fourth Amendment, albeit with the same result."  <u>Cty. of Sacramento v. Lewis</u>, 523 U.S. 833, 849 n.9 (1998).

analyzed the reasonableness of the proposed surgery under what it called the "Schmerber balancing test," which consists of three factors: (1) "the extent to which the procedure may threaten the safety or health of the individual;" (2) "the extent of intrusion upon the individual's dignitary interests in personal privacy and bodily integrity;" and (3) "the community's interest in fairly and accurately determining guilt or innocence." Winston, 470 U.S. at 761–63.  The Court held that the surgery, which involved placing the suspect under general anesthesia and "surgical probing beneath his skin," would be unreasonable under this test; although the bullet may have been helpful in prosecuting the suspect, this interest did not outweigh the potential health risks to the suspect and the "severe" intrusions on his privacy.  Id. at 763–67.

Courts have applied the Schmerber balancing test to other bodily intrusions, including body-cavity searches, United States v. Oyekan, 786 F.2d 832, 839–40, 839 n.13 (8th Cir. 1986); Rodriques v. Furtado, 950 F.2d 805, 809–11 (1st Cir. 1991); proctoscopies, United States v Gray, 669 F.3d 556, 564–65 (5th Cir. 2012), vacated on other grounds 568 U.S. 802; x-rays, Spencer v. Roche, 659 F.3d 142, 147–48 (1st Cir. 2011); and catheterizations, Elliott v. Sheriff of Rush Cty., 686 F. Supp. 2d 840, 858–60 (S.D. Ind. 2010).  And courts have analyzed searches under the Schmerber test even when the police had a warrant.  See Gray, 669 F.3d at 564; Husband, 226 F.3d at 630–36; United States v. Bullock, 71 F.3d 171, 176–77 (5th Cir. 1995).  This Court now applies the Schmerber balancing test and other relevant factors to determine whether the catheterization of each plaintiff was reasonable.

### i)   Threat to Health or Safety

The first Schmerber factor considers "the extent to which the procedure may threaten the safety or health of the individual."  Winston, 470 U.S. at 761.  The parties disagree sharply on this factor.  Defendants believe that the threat to the Plaintiffs' health and safety was minimal.  They

point to the Eighth Circuit's statement that catheterization is a "rather common and safe though painful procedure," LeVine v. Roebuck, 550 F.3d 684, 689 (8th Cir. 2008), as well as Dr. Hofer's report. Doc. 141 at 10–11; Doc. 146 at 10–13; Doc. 147 at 2; Doc. 148 at 5–6. Again, Dr. Hofer wrote that "[c]atheterization is a safe and routine medical procedure" that "may be uncomfortable, but is usually not painful," and that the "use of a catheter rarely presents a risk of rupture of the urethra and a risk of infection, but these risks are acceptable." Doc. 117-29 at 2. The Defendants argue that Dr. Butz addressed only the possible complications from catheterizations whereas Dr. Hofer addressed the probability that these complications would occur. According to Defendants, Dr. Hofer's opinion that the use of a catheter rarely presents the risk of urethral rupture and infection is undisputed.

Plaintiffs counter that forcible catheterization presents a significant risk of physical and emotional harm. They rely on the reports of Dr. Butz and Dr. Manlove as well as their own testimony that the catheterizations were painful. As noted above, Dr. Butz stated that catheterization of even a willing patient involves "significant dangers;" that the risks for a male patient include rupture of the urethra because the sphincter is tight and does not allow the catheter to pass; that a urethral rupture in a male may require surgery and may cause life-long impairment of urinary function; that the risk of urethral rupture increases when a man is forcibly catheterized because the sphincter is "likely to be 'tight as a drum;'" that forced catheterization of a male can cause scarring, a stricture, infection, and life-long problems; that the risk of urethral rupture and other injuries when forcibly catheterizing a female is "not as common as to an adult male," but that the risk of infection is still present; and that "any person would experience pain during the forced catheterization, and possibly afterwards." Doc. 110-36 at 3–4. Dr. Manlove stated that forcible catheterization is likely to be "emotionally traumatic" and would likely worsen pre-

existing PTSD and other mental disorders. Doc. 110-38 at 3–4. He also wrote that being forcibly catheterized with the assistance of a male officer would be especially traumatic for a woman with a history of sexual abuse. Doc. 110-38 at 4. Plaintiffs argue that Dr. Hofer's opinion is irrelevant because it does not address forcible catheterizations and that Dr. Butz's and Dr. Manlove's statements about forcible catheterizations are therefore undisputed. They also argue that the Eighth Circuit's statement in LeVine that catheterization is a "rather common and safe though painful procedure" is not controlling and did not involve forcible catheterization and further that, in any event, the first Schmerber factor presents a factual question that must be decided on the record before this Court. Doc. 133 at 11–12.

The Plaintiffs' catheterizations posed some risk to their health and safety but were not especially dangerous procedures. Both urologists acknowledged that catheterization poses a risk of urethral rupture and infection. But Dr. Hofer opined that these risks are rare, Doc. 117-29 at 2, and Dr. Butz did not say how likely it is that urethral rupture and infection would occur, Doc. 110-36. Rather, he merely said that the risk of urethral rupture increases with forcible catheterization of a man and that the risk of urethral rupture and "other injuries" when forcibly catheterizing a woman "are not as common as to an adult male."[27] Doc. 110-36 at 3–4. Dr. Butz did not say what the effects of urethral rupture in a woman would be or even that forcible catheterization increases the risk of injury for women.[28] Doc. 110-36. The risk of urethral rupture and infection are less

---

[27]The Pierre Defendants argue that Riis's and Holcombe's catheterizations did not occur during a struggle that would complicate the insertion of the catheters "and thereby increase the chances of complications like urethral rupture." Doc. 145 at 4. Even if the Pierre Defendants are correct about Riis and Holcombe not resisting, Dr. Butz did not say that a struggle is necessary to increase the risk of urethral rupture. Doc. 110-36.

[28]Plaintiffs argue that a critical factor under Winston is the uncertainty of the risks of the procedure. In Winston, the Supreme Court said that the medical risks of the surgery were "apparently not extremely severe" but were "a subject of considerable dispute," and that this "very uncertainty militate[d] against finding the operation to be 'reasonable.'" 470 U.S. at 766. The surgeons in

serious than the risks posed by the anesthesia and surgery in Winston. See 470 U.S. at 756, 763–64, 764 n.7. Moreover, the Plaintiffs' catheterizations appear to have been carried out in a medically appropriate manner; nurses performed the procedures in hospital settings, and Dr. Hofer said that it is standard medical practice to restrain patients resisting catheterization by holding their limbs. Doc. 117-29 at 2; see Schmerber, 384 U.S. at 771 (finding that the blood test was performed in a reasonable manner in part because a physician drew the suspect's blood in a hospital setting "according to accepted medical practices").

At the same time, Plaintiffs' catheterizations posed a greater risk to their health and safety than a blood draw, which "involves virtually no risk, trauma, or pain." Schmerber, 384 U.S. at 771. First, forcibly catheterizing someone obviously causes pain; Dr. Butz and the Plaintiffs testified to this, and the Eighth Circuit recognized as much in LeVine. See LeVine, 550 F.3d at 689 (stating the catheterization is a "painful procedure"). Although Dr. Hofer said that catheterization "is usually not painful," her report does not appear to address the potential for pain when the patient resists or the catheterization is involuntary. In any event, commonsense dictates that inserting a tube into the urethra and bladder of an unwilling and, in some of the Plaintiffs' cases, highly emotional suspect would cause pain. The video of Peters's catheterization, which shows him screaming in pain repeatedly for at least forty seconds, illustrates just how painful the procedure can be. Second, forcible catheterization may pose a real risk to some people's mental health, especially illustrated here by Alvarez's case. Alvarez had been diagnosed with psychiatric

---

Winston could not agree on the nature and scope of the operation, so it was difficult to determine the actual risk the suspect faced. Id. at 763–64; see also Lee v. Winston, 717 F.2d 888, 900–01 (4th Cir. 1983) (describing the various opinions by the medial experts). The Plaintiffs' catheterizations were far less complicated than the operation in Winston and do not involve the same risks or level of uncertainty. In short, this is not a situation where the uncertainty of the medical risks counts against a finding of reasonableness.

issues including PTSD.  Doc. 99 at ¶ 109; Doc. 139 at ¶ 109.  Male officers were in the room as
Alvarez was being catheterized, one of whom was holding down one of her legs as the catheter
was run up her urethra.  As Dr. Manlove explained, forcible catheterization is likely to be
"emotionally traumatic," to worsen preexisting PTSD, and to "make other mental disorders
worse." Doc. 110-38 at 3–4.

     In sum, the physical risks of catheterizing the Plaintiffs were slight though not nonexistent,
with the physical risks to the male Plaintiffs being a bit greater.  The risk of pain to all Plaintiffs
was higher than the risk of physical injury, but there was a risk to the Plaintiffs' mental wellbeing,
as particularly illustrated by Alvarez's case.  The first <u>Schmerber</u> factor indicates some modest
risk to the Plaintiffs' health and safety through involuntary catheterization.

### ii)  Extent of Intrusion

     The second <u>Schmerber</u> factor—the extent of intrusion upon the Plaintiffs' dignitary
interests in personal privacy and bodily integrity—weighs heavily against finding that the
catheterizations were reasonable.  Exposure of a suspect's genitals to police officers followed by
the insertion of a tube into his or her urethra and bladder is an extreme invasion of personal dignity.
<u>See</u> <u>Hunter v. S.D. Dep't of Soc. Servs.</u>, 377 F. Supp. 3d 964, 984 (D.S.D. 2019) ("[T]he forceful
use of a catheter is a gross personal indignity far exceeding that involved in a simple blood test."
(internal marks omitted) (quoting <u>Ellis v. City of San Diego</u>, 176 F.3d 1183, 1192 (9th Cir. 1999)));
<u>see also</u> <u>Skinner v. Railway Labor Execs. Ass'n</u>, 489 U.S. 602, 617 (1989) ("There are few
activities in our society more personal or private than the passing of urine." (citation omitted)).
And this experience would be particularly frightening when, as here, the suspects know that they
are being catheterized not for medical purposes but for the police to collect incriminating evidence.
As then Judge Anthony Kennedy explained:

> In addition to the fears and anxieties harbored by most suspects, the person accused of concealing contraband within his body is faced with the real prospect that the most intimate portions of his anatomy will be invaded and that he will suffer resulting pain or even physical harm. As in the case before us, the suspect usually faces this ordeal without assistance, surrounded by persons who administer the procedure on behalf of the government and thus appear to him to have as their overriding motive the obtaining of evidence to convict, and not his personal wellbeing.

United States v. Cameron, 538 F.2d 254, 258 (9th Cir. 1976) (Kennedy, J.).

Defendants offer two main arguments on the second Schmerber factor. First, they argue that the Plaintiffs had lower expectations of privacy because they were arrestees. See King, 569 U.S. at 462 ("The expectations of privacy of an individual taken into police custody necessarily are of a diminished scope." (cleaned up and citation omitted)); Doc. 141 at 11; Doc. 146 at 13. While this may be true, Schmerber and Winston both involved individuals in police custody, so the Schmerber balancing test still applies. And the catheterizations were so invasive that the second Schmerber factor weighs strongly in Plaintiffs' favor notwithstanding any diminished expectations of privacy.

Second, Defendants argue that the dignitary interests implicated by catheterization are similar to those implicated by body-cavity searches, which Defendants point out were upheld in Bell v. Wolfish, 441 U.S. 520 (1979), and Rodriques v. Furtado, 950 F.2d 805 (1st Cir. 1991). See Doc. 141 at 12; Doc. 148 at 6. Neither Bell nor Rodriques are helpful to Defendants. Bell involved visual[29] body-cavity inspections of pretrial detainees following contact visits with persons from outside the prison. 441 U.S. at 558. Prison officials testified that the searches were necessary to discover and deter the smuggling of weapons, drugs, and other contraband into the facility. Id. The Supreme Court held that the prison could conduct the searches on less than probable cause

---

[29]Prison officials did not touch the detainees during the inspections. Id. at 558 n.39.

because the prison's "significant and legitimate security interests" outweighed the inmates' interest in privacy. Id. at 559–60. But this decision did not turn on any finding that visual body-cavity searches were minimally invasive. Indeed, these searches gave the Court "pause," and the Court took care to explain that it did "not underestimate the degree to which these searches may invade the personal privacy of inmates." Id. Rodriques upheld a body-cavity search but also recognized that such searches are extremely invasive. The police in Rodriques obtained a warrant to search the plaintiff's apartment and vaginal cavity for drugs. 950 F.2d at 807. The affidavit in support of the warrant alleged that the plaintiff was trafficking in drugs which she kept hidden in her vagina. Id. at 807 n.1. A doctor visually and manually inspected the plaintiff's vaginal cavity at the hospital prompting the plaintiff to sue the police under § 1983. Id. at 808. The First Circuit concluded that the search of the plaintiff's vagina constituted "a drastic and total intrusion of the personal privacy and security values shielded by the fourth amendment [sic]" but reasoned that "[s]ociety's interest in the prevention and punishment of drug trafficking" tipped the balance in favor of allowing the search. Id. at 811. Even if body-cavity searches are analogous to the Plaintiffs' catheterizations, Rodriques and Bell reinforce that such searches are extreme invasions of the Plaintiffs' personal dignity. Moreover, the justifications for the searches in Rodriques and Bell are absent here; the Plaintiffs were not smuggling drugs or weapons in their urethras and bladders, and the catheterizations would only provide evidence of drug ingestion rather than the more serious crime of drug trafficking.

### iii) Community Interest

The last Schmerber factor is the "community's interest in fairly and accurately determining guilt or innocence," which is "of course of great importance." Winston, 470 U.S. at 762. This factor concerns the Defendants' need to obtain the Plaintiffs' urine via catheterization as well as

the probability that the urine would contain evidence of drug ingestion. See Winston, 470 U.S. at 762, 765; Schmerber, 384 U.S. at 770. A state's need for evidence is higher when the evidence is essential to proving the suspect's guilt and lower when the evidence is merely cumulative. See Winston, 470 U.S. at 765–66 (concluding that the state could not demonstrate the requisite "compelling need" for the bullet because it had "substantial additional evidence" of the suspect's guilt); id. at 762–63 (explaining that the blood draw in Schmerber was reasonable because it was "highly effective . . . [e]specially given the difficulty of proving drunkenness by other means" (citation omitted)). Similarly, the need to perform a procedure is greater when it is the only way to obtain the evidence and lesser when an alternative and less invasive means exists. United States v. Booker, 728 F.3d 535, 547 (6th Cir. 2013) (recognizing that the reasonableness inquiry is not a "least-intrusive-means test," but concluding that it was "relevant that far less intrusive means were available to investigate" whether the defendant was hiding drugs in his rectum); Gray, 669 F.3d at 565 (finding that alternatives to subjecting the defendant to a proctoscopy "militate[d] against society's great interest in conducting the procedure" (citation and emphasis omitted)). As to probability, there must be a "clear indication" that the desired evidence will be found before police may intrude "beyond the body's surface."[30] Schmerber, 384 U.S. at 769–70. Finally, courts will consider the nature of the crime when deciding the community's interest in fairly and accurately determining guilt or innocence. See United States v. Lassiter, 607 F. Supp. 2d 162, 167 (D.D.C. 2009) ("Given the violent nature of the alleged acts in this case, the community's interest in accurately determining guilt or innocence is particularly strong."); United States v. Mabie, No.

---

[30]One leading commentator has argued that this "clear indication" requirement "is most logically interpreted . . . to necessitate something more than the quantum of evidence ordinarily needed to meet the probable cause test." Wayne R. LaFave, Search & Seizure § 4.1(e) (5th ed. October 2019 update).

4:09CR0351 ERW/TCM, 2009 WL 2836445, at *3 (E.D. Mo. Aug. 31, 2009) (considering the nature of the crime).

Defendants had at least some need for the Plaintiffs' urine. A urine test is more effective than a blood test for determining whether someone has used drugs. As Dr. Habbe explained, marijuana, amphetamine, and methamphetamine remain detectable in urine longer than in blood. Doc. 110-37 at 3. A blood test may therefore miss some evidence that a urine test would detect. This was certainly true for Riis; his urine tested positive for amphetamine and methamphetamine, but his blood test showed no presence of these drugs. Moreover, the Defendants did not have much additional evidence to show the Plaintiffs' guilt; in most of the cases a urine test was the best way to prove that the Plaintiffs had ingested (and thereby under South Dakota law) possessed drugs.[31] Although Plaintiffs note that their refusals to provide a urine sample could have served as evidence of their guilt, a refusal is not enough by itself to convict and is not nearly as convincing as a positive urinalysis. State v. Stanley, 896 N.W.2d 669, 676 n.5 (S.D. 2017).[32]

The Defendants' need to catheterize the Plaintiffs was not as great. For one thing, there are questions of fact on whether Peters, Riis, and Holcombe (and seemingly Alvarez as well) ultimately would have urinated voluntarily if given more time.[33] There is obviously much less

---

[31]In South Dakota, a person may be convicted of possession of a controlled substance based solely on the presence of methamphetamine in the person's urine. State v. Schroeder, 674 N.W.2d 827, 829–31 (S.D. 2004).

[32]The jury instruction in Stanley, the case Plaintiffs rely on, stated: "Evidence has been introduced that the Defendant refused to submit to a test of Defendant's urine to determine the existence of any controlled drug or substance in Defendant's urine. The refusal to submit is not sufficient by itself to establish guilt of the Defendant. It is a fact which if proved may be considered by you in light of all other proved facts in deciding whether the Defendant is guilty or not guilty of the crime of Possession of a Controlled Substance. The weight, if any, to which the refusal is entitled and whether the conduct shows a consciousness of guilt are matters for your determination." 896 N.W.2d at 676 n.5.

[33]Riis, Holcombe, and Peters argue that their catheterizations were per se unreasonable because they agreed to urinate voluntarily and thus there was no need for the procedure. These Plaintiffs

59

need to catheterize a person who will urinate voluntarily, even if it takes some time before the person can produce a sample.  For another thing, a blood draw is a less intrusive way to see whether the Plaintiffs had used drugs.  True, marijuana, amphetamine, and methamphetamine remain detectable in urine longer than in blood.  But a blood test can still detect these drugs if the suspect has ingested them within a certain period.[34]

As to probability, probable cause supported the warrants for Riis, Holcombe, Alvarez, and Peters, so this Court is satisfied that there was a "clear indication" that evidence of drug use would be found in those Plaintiffs' urine.  See Burnett v. Municipality of Anchorage, 806 F.2d 1447, 1450 (9th Cir. 1986) (finding that probable cause satisfied the "clear indication" standard).  As discussed below, however, it is a close question whether probable cause supported Henning's

---

are not entitled to summary judgment on this ground.  It is undisputed that Riis said he could not urinate after Defendants gave him 12 hours to produce a sample and that he did not tell hospital staff that he objected to being catheterized and was willing and able to urinate; that Holcombe initially refused to urinate and was then given water and multiple chances to produce a sample; and that Peters refused to provide a sample several times before he was given water and multiple chances to urinate.  Viewing the evidence in the light most favorable to the Defendants, the Defendants were not required to believe that these Plaintiffs wanted to urinate but simply couldn't.  There also are questions of fact on whether Riis and Holcombe voluntarily consented to being catheterized.

[34]Alvarez and Henning claim that they were catheterized based solely on suspicion of marijuana and that a hair test is a less invasive and more accurate test for determining marijuana use.  Doc. 98 at 66, 74–75.  As explained above, however, Trooper Woxland's pre-drug test suspicions concerning Alvarez were not limited just to marijuana.  Likewise, the search warrant in Henning's case was not based solely on marijuana use.  Although Corporal Ware's supporting affidavit discussed evidence of marijuana use, it also said that "people often package illegal substances in bags like the ones" found in the Home; that illegal drug traffickers "usually keep paraphernalia for packaging" drugs, including plastic bags; and that police had observed "several drug related items" on the bed in L.B.'s room, including "a couple homemade pipes."  Doc. 117-3 at 4–5.  Corporal Ware did not say that his statements about the plastic bags, the "several drug-related items," and the homemade pipes were only related to marijuana use.  In fact, he requested permission to search the Home for "any controlled substance," including methamphetamine, and the state court judge granted this request.  Doc. 117-3 at 2; Doc. 117-4 at 2–3.

warrant and therefore some doubt about whether there was a "clear indication" that evidence of drug use would be found in his urine.

That leaves the nature of the crime. Plaintiffs were catheterized because Defendants suspected that they had used drugs. The community, of course, has an interest in determining whether someone has violated state drug laws, and prosecuting the ingestion of drugs has some deterrent effect on what Defendants call, with some justification, South Dakota's "drug epidemic." Doc. 141 at 13. But ingesting drugs is one of the least serious drug crimes a person can commit. Ingestion of marijuana in South Dakota is a misdemeanor. SDCL § 22-42-15. And ingestion of methamphetamine in South Dakota is a Class 5 Felony. SDCL §§ 22-42-5.1, 34-20B-16. Although a Class 5 Felony carries a maximum sentence of five years' imprisonment, a first-time offender is presumptively entitled to probation under South Dakota law.[35] SDCL §§ 22-6-1(8), 22-6-11; State v. Hi Ta Lar, 908 N.W.2d 181, 183 n.1 (S.D. 2018). In contrast, the distribution of a controlled substance carries the potential for a much higher sentence. See SDCL § 22-42-2.

### iv) Balance of the **Schmerber** Factors

A balancing of the Schmerber factors indicates that the catheterizations violated the Fourth Amendment.[36] The first factor does not count much in either party's favor because although the catheterizations posed some risk to the Plaintiffs' health and safety, this risk was not great. But the unreasonableness of the Defendants' conduct becomes clear under the second and third Schmerber factors. Defendants' need to obtain the Plaintiffs' urine to prove a low-level drug crime did not justify subjecting the Plaintiffs to involuntary catheterization, a highly invasive—and in

---

[35] A charge for unauthorized possession of methamphetamine when absorbed into the human body carries the same sentence as a charge for ingestion of methamphetamine. SDCL § 22-42-5.
[36] At a minimum, there is a question of fact as to reasonableness that would bar summary judgment for the Defendants.

these cases—degrading medical procedure.  Consider Alvarez's case.  The law enforcement need

for Alvarez's urine was not so great that it was reasonable for a male officer to hold down her bare

leg, as a nurse ran a tube up her urethra and into her bladder, as Alvarez lay naked from the waist

down screaming, even though she had told all present about having been sexually assaulted and

was visibly distraught.   Indeed, by the time of the forcible catheterization of Alvarez, law

enforcement already had evidence of her driving under the influence of alcohol, so law

enforcement's purpose in her involuntary catheterization was merely to see if evidence of some

other charge of ingestion—in her case of marijuana—might also be brought.   There is no

community interest in involuntarily catheterizing an emotionally distraught woman with a history

of having been raped just to see if evidence exists to tack a drug ingestion charge onto an ironclad

case of driving under the influence of alcohol.   Peters's case also illustrates the point.  Peters was

arrested on a bench warrant for failing to pay a court-ordered financial obligation after having been

seen outside an apartment complex.  The point of catheterizing Peters was to see if he could be

charged with a drug-ingestion offense.  A video shows Peters being catheterized with four officers

holding him down and with his feet twitching as he screams in pain repeatedly.

Importantly, all the Defendants could have used a blood test to find evidence of recent drug

ingestion.   Although a blood test is inferior to a urine test in detecting past use of

methamphetamine, the Fourth Amendment limits the ability of law enforcement to always get the

best evidence, whatever the cost.  See Winston, 470 U.S. at 759 ("A compelled surgical intrusion

into an individual's body for evidence, however, implicates expectations of privacy and security

of such magnitude that the intrusion may be 'unreasonable' even if likely to produce evidence of

a crime."); United States v. Torres, 751 F.2d 875, 883 (7th Cir. 1984) (Posner, J.) ("[A] search

could be unreasonable, though conducted pursuant to an otherwise valid warrant, by intruding on

personal privacy to an extent disproportionate to the likely benefits from obtaining fuller compliance with the law."). In sum, forcing the Plaintiffs to undergo catheterization was unreasonable given the extreme intrusion on the Plaintiffs' dignitary interests, the nature of the suspected crime, and the availability of less intrusive means to collect evidence of guilt.

### b. Scope of Warrants

Even if a warrant facially satisfies the particularity requirement, the police violate the Fourth Amendment when the scope of the search exceeds what the warrant permits. Horton v. California, 496 U.S. 128, 140 (1990) ("If the scope of the search exceeds that permitted by the terms of a validly issued warrant. . ., the subsequent seizure is unconstitutional without more."). "Determining whether a search exceeds the scope of its authorizing warrant is, like most inquiries under the Fourth Amendment, an exercise in reasonableness assessed on a case-by-case basis." United States v. Loera, 923 F.3d 907, 916 (10th Cir. 2019).

The most analogous Eighth Circuit case to the facts presented here is United States v. Nelson, 36 F.3d 758 (8th Cir. 1994), and deserves discussion here. The Eighth Circuit in Nelson excluded evidence obtained by endoscopy,[37] apparently not because of a lack of particularity or reasonableness under the Schmerber factors, but because the search violated the Fourth Amendment by exceeding the scope of the warrant. In Nelson, police learned from an informant that Bruce Robert Nelson was transporting heroin through the Minneapolis/St. Paul Airport in his rectum, placed that information in an affidavit for a search warrant, and obtained a search warrant authorizing a search of Nelson's "person" but not explicitly of his body cavities. Id. at 759. Nelson was arrested and taken to the hospital for a rectal exam, which he resisted. Id. An x-ray revealed

---

[37]"An endoscopy is a medical procedure during which a tube is placed into the patient's mouth and esophagus, and then into the stomach. The tube is equipped with a snaring device that can catch an object and remove it orally." Nelson, 36 F.3d at 760 n.1.

a foreign object in Nelson's rectum or small intestine.  Id.  Nelson ultimately agreed to drink laxatives, but upon expelling the foreign object promptly swallowed it.  Id.  When efforts to flush out the object from the stomach through mass quantities of laxatives failed, Nelson was forced to choose between surgery and an endoscopy.  Id. at 760.  Based on his choice, Nelson underwent an endoscopy that removed a "packet of heroin wrapped in a plastic bag and sealed with black electrical tape."  Id.  The Eighth Circuit held that the warrant to search Nelson's "person" was "not sufficient to authorize a body cavity search" even though the affidavit had described heroin being hidden in his rectum.  Id.  The Eighth Circuit also rejected the government's argument that because the officers had a good faith belief that the warrant authorized a body-cavity search, the drugs taken from Nelson were still admissible under United States v. Leon, 468 U.S. 897 (1984).  Nelson, 36 F.3d at 760–61.  "[E]ven if we agree that the officers could have reasonably believed that the warrant included authorization for a body cavity search," the Eighth Circuit explained, "there is no objectively reasonable basis for the officers' mistaken belief that the authorization contained in the warrant extended to the endoscopy."  Id. at 761 (citation and internal marks omitted).

Similarly, the warrant language used to justify the forced catheterization of Riis, Holcombe, Henning, and Alvarez simply for their "urine" was not sufficient to authorize forced catheterization.[38]  The warrants here were more particular than the warrant in Nelson because they mentioned the search or seizure of urine as opposed to simply authorizing the search of Plaintiffs' "person."  Interpreting these warrants as authorizing catheterization remains only marginally more

---

[38]Plaintiffs cite to some recent directives from South Dakota state court judges that no forced catheterizations occur in counties within their jurisdiction absent an express order, as well as a number of instances where judges have written "no catheterization" on search warrants issued for urine in recent months.  Doc. 99 at ¶¶ 3–9.  As with then-Attorney General Jackley's statements directing the DCI to avoid forced catheterizations, this information does not affect this Court's analysis.

reasonable than interpreting the warrant in <u>Nelson</u> as authorizing an endoscopy or body cavity search.

This conclusion that forced catheterization exceeded the scope of the language of the warrants for "urine" from Riis, Holcombe, Henning, and Alvarez does not thereby entitle them to summary judgment for reasons discussed below. Particularly regarding claims of Holcombe and Riis, there are genuine questions of fact about whether Holcombe and Riis voluntarily consented to being catheterized. See <u>United States v. Uscanga-Ramirez</u>, 475 F.3d 1024, 1027 (8th Cir. 2007) ("Consent to search is a valid exception to the warrant requirement if the consent is knowingly and voluntarily given." (citation omitted)). According to Officer Swanson, Riis asked to be catheterized after Officer Swanson told him that catheterization was the alternative to not being able to urinate. Doc. 99 at ¶ 77; Doc. 138 at ¶¶ 77–78; Doc. 106-37 at 2. And according to Dr. Carda, Holcombe consented to being catheterized. Doc. 109 at ¶ 45; Doc. 136 p.10 at ¶ 45; Doc. 124-4 at 3. The fact that Riis and Holcombe have different versions of what occurred creates a genuine issue of material fact.

Peters's catheterization did not exceed the scope of his warrant. The search warrant in Peters's case "commanded" law enforcement to "transport him to the Wagner Community Hospital to have a sample of his Urine taken buy [sic] reliable and accepted method, in medically approved, reasonable manner." This language can be objectively and reasonably believed to include catheterization.[39] The language of Peters's warrant makes his Fourth Amendment claim weaker than those brought by the other Plaintiffs. Although this Opinion and Order addresses the <u>Schmerber</u> factors and the scope of the warrants separately, the ultimate question in this case is

---

[39]For reasons explained later, there is no question that Officer Gravatt would be entitled to qualified immunity on any claim against her in her personal capacity.

whether the catheterizations were reasonable.   See Winston, 470 U.S. at 763–67 (applying Schmerber factors to decide whether surgery to recover bullet from armed robbery suspect was reasonable); Loera, 923 F.3d at 916 ("Determining whether a search exceeds the scope of its authorizing warrant is, like most inquiries under the Fourth Amendment, an exercise in reasonableness assessed on a case-by-case basis.").  Peters's catheterization was less unreasonable and thus more reasonable than the catheterizations of the other Plaintiffs because his warrant actually authorized the procedure.  See Husband, 226 F.3d at 634 ("When it is possible to obtain a warrant specifically authorizing a compelled medical procedure, the State's failure to obtain such a warrant can be an important factor in considering the State's interest in the procedure and in determining the reasonableness of the search.").  This Court cannot grant the defense motion for summary judgment on Peters's claim for three reasons.  First, the Schmerber factors indicate that the search was unreasonable.  Second, to grant the defense motion for summary judgment and find the search reasonable, this Court would have to conclude that there is, as a matter of law, no constitutionally-protected right to be free from the state involuntarily catheterizing an arrestee (in Peters's case for failure to pay a court-imposed obligation) under a warrant based on the arrestee acting "strange" and then refusing to provide police a urine sample without a warrant.  Third, as discussed above, the reasonableness of a search challenged in a § 1983 case can be a question for the jury when there are material fact disputes, which there are in Peters's case.  See Gardner, 920 F.3d at 1050; Cavanaugh, 718 F.3d at 1253.  This Court intends to evaluate anew after hearing the evidence in Peters's case at trial whether the defense might be entitled to judgment under Rule 50 of the Federal Rules of Civil Procedure, but at this point the defense is not entitled to summary judgment.

### 3.  Henning's Additional Fourth Amendment Arguments

Relying on <u>Groh</u>, 540 U.S. 551, Henning argues that the warrant in his case violated the particularity requirement because it did not command a search of anyone's urine. The Supreme Court in <u>Groh</u> held that a warrant was invalid because it failed to describe the items the police intended to seize. <u>Id.</u> at 557–59. The officer in <u>Groh</u> had listed the house he intended to search in the portion of the warrant calling for a description of the person or property to be seized. <u>Id.</u> at 554, 558. The warrant thus "did not describe the items to be seized *at all*." <u>Id.</u> at 558. Henning argues that his warrant was "functionally identical" to the warrant in <u>Groh</u> because it failed to identify what was to be seized. Doc. 149 at 34–35.

Henning's warrant may have been oddly worded in places, but it still satisfied the particularity requirement. The warrant stated that there was "probable cause to believe that the property described herein may be found at the location set forth herein." Doc. 117-4 at 2. One of the items of "property" listed in the warrant was a "[u]rine sample from anyone present at the time probation agents and Chief Croymans arrived at the residence." Doc. 117-4 at 3. The warrant then described the residence as the place to be searched. Doc. 117-4 at 3. This is an adequately particular description of the thing to be seized and the place to be searched. Although it might have been more accurate to list "anyone present at the time probation agents and Chief Croymans arrived at the residence" in the portion of the warrant describing the place to be searched, "[t]he particularity requirement is a standard of practical accuracy rather than a hyper technical one." <u>Thurman</u>, 625 F.3d at 1057 (cleaned up and citation omitted). Read as a whole, the warrant told law enforcement that it could seize a urine sample from anyone present when Chief Croymans and the probation agents arrived at the particularly described residence.

Henning also argues that the "all persons" warrant used to catheterize him lacked probable cause. Again, the warrant directed law enforcement to seize a "[u]rine sample from anyone present

at the time probation agents and Chief Croymans arrived at the residence." Doc. 117-4 at 3. The majority view is that "all persons" warrants like Henning's are constitutional if there is "probable cause to believe that all persons on the premises at the time of the search are involved in the criminal activity." Owens ex rel. Owens v. Lott, 372 F.3d 267, 276 (4th Cir. 2004); see also United States v. Swift, 720 F. Supp. 2d 1048, 1056 (E.D. Ark. 2010) (explaining that the majority of courts agree that "[a]n 'all persons' search warrant is authorized under the Fourth Amendment only if the supporting affidavit establishes probable cause that evidence of illegal activity will be found upon every person likely to fall within the warrant's scope at the time of execution").

It is a close question whether Corporal Ware's affidavit established probable cause to believe that "anyone present" at the time the probation officers and Chief Croymans arrived at the Home were involved in drug use. This Court need not answer that question, however. As explained below, Corporal Ware is entitled to qualified immunity on Henning's claim that the warrant lacked probable cause and Henning has not shown that Sisseton has a policy or custom that caused this alleged violation.

### 4. Alvarez's Additional Fourth Amendment Claim

Relying on Richmond v. City of Brooklyn Center, 490 F.3d 1002 (8th Cir. 2007), Alvarez argues that her catheterization was "unlawful" for the "additional" reason that Officer Furness, a man, held her leg during the procedure while her genitalia was exposed. The Eighth Circuit in Richmond stated that as of April of 2001, the "law was . . . clear that strip searches should be conducted by officials of the same sex as the individual to be searched." Id. at 1008. Richmond did not involve a strip search by a member of the opposite sex, so it did not discuss whether the presence or participation of an officer of the opposite sex could be appropriate under certain circumstances. Id. at 1008. Just last year, the Eighth Circuit relied on Richmond for the

proposition that "clearly established law holds that strip searches are to be conducted by an officer of the same sex as the suspect." Robinson v. Hawkins, 937 F.3d 1128, 1137–38 (8th Cir. 2019). The Eighth Circuit in Robinson concluded that a jury could find that the search of the plaintiff was unreasonable in "both scope and manner" where a female officer pulled down the plaintiff's underwear while the plaintiff was pushed against an oily tractor-trailer in an open-air parking lot; touched the inside and outside of the plaintiff's vagina and anus as a male officer watched; and insulted and swore at the plaintiff throughout the search. Id. at 1137. The Eighth Circuit denied the officer qualified immunity, reasoning that Richmond made it sufficiently clear that strip searches are to be conducted by a member of the same sex, in an "area as removed from public view as possible without compromising legitimate security concerns," and "be performed in a hygienic fashion and not in a degrading, humiliating or abusive fashion." Id. at 1138 (quoting Richmond, 490 F.3d at 1008).

Relying on Hill v. McKinley, 311 F.3d 899 (8th Cir. 2002), Trooper Woxland argues that the use of opposite-sex officers to stabilize an "unruly and naked" arrestee does not violate the Fourth Amendment. Doc. 141 at 19; Doc. 147 at 3. The plaintiff in Hill alleged that her Fourth Amendment rights were violated when: "1) she was required to disrobe in the presence of a male officer; 2) she was required to walk through the jail nude in the presence of male officers; and 3) she was restrained nude on a restrainer board in the presence of male officers." Id. at 903. As to the first claim, the Eighth Circuit held that it was not "a violation of a prisoner's Fourth Amendment privacy rights for a male guard to require a loud and violent female prisoner to disrobe in his presence before placing her in a padded cell for her own safety." Id. As to the second claim, the Eighth Circuit held that the "use of male guards in an otherwise justified transfer of an unruly and naked female prisoner is not a violation of the Fourth Amendment." Id. After all, the court

explained, the male officers participated in the transfer because there were not enough female guards to complete the process and no one beyond the officers saw the plaintiff naked. Id. But the Eighth Circuit held that the officers violated the plaintiff's Fourth Amendment rights when they "allowed her to remain completely exposed to male guards for a substantial period of time after the threat to security and safety had passed." Id. at 904. Nevertheless, the Eighth Circuit held that the officers were entitled to qualified immunity because it was not clearly established that "a highly intoxicated, loud and violent prisoner could not constitutionally be restrained naked outside the view of all but a small number of guards." Id. at 905.

Alvarez's claim fits with Richmond and Robinson and is distinct from Hill. Unlike the prison-detention setting in Hill, Alvarez was being subjected to a search (like the plaintiffs in Richmond and Robinson) when being involuntarily catheterized. Involuntary catheterization is a form of strip search, indeed a more extreme form than a typical strip search, in that catheterization requires exposure of a person's genitals so that a catheter may be inserted into the urethra. With it clearly established in the Eighth Circuit by April of 2001 that "strip searches should be conducted by officials of the same sex as the individual to be searched," Richmond, 490 F.3d at 1008, then it was equally clearly established that stripping a person to reveal her genitals to search by means of involuntary catheterization (as well as facilitating the search by holding a person's leg during the catheterization) should be conducted by individuals of the same sex as the suspect. The Eighth Circuit in Hill recognized that that there are times when the absence of an officer of the same sex necessitates the involvement of officers of the opposite sex. In Alvarez's case, a female jailer had accompanied Alvarez and other officers to the hospital. Trooper Woxland admitted during his deposition that the female jailer, who was apparently just outside the room, could have held Alvarez's leg in place of Officer Furness. Doc. 123-4 at 10. At a minimum, a question of fact

exists on whether it needed to be Officer Furness rather than the female jailer to restrain Alvarez's leg.

### 5.  Peters's Additional Fourth Amendment Claim

Peters relies on <u>Richmond</u> to argue that his catheterization was unlawful for the "additional" reason that Officer Gravatt, a female, was present during the catheterization and was "video recording" it.   Doc. 133 at 52.   Officer Gravatt did not "video record" Peters's catheterization in the sense that she trained a camera on Peters's genitals and captured the insertion of the catheter; rather, Officer Gravatt's body camera was on during the procedure and recorded the male officers holding Peters down while he was catheterized.  Doc. 101-39.  Officer Gravatt stood back from the hospital bed, and the positions of the people shown on the video block from view Peters's genitals and the actual insertion and retraction of the catheter.  Doc. 101-39.  Officer Gravatt's body camera recorded what she actually could and could not see.   Unlike Officer Furness, Officer Gravatt did not physically assist with the catheterization and was not in close proximity to a person's exposed genitals before, during, and after a forced catheterization.   Her mere presence in the hospital room during the procedure did not amount to an unreasonable intrusion on Peters's privacy rights.

### 6.  Causation Regarding Defendants Sued in their Individual Capacities

#### a.  Causation Generally and for Catheterizations

An officer is liable under § 1983 only if he "subjects, or *causes* to be subjected, any citizen . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution." 42 U.S.C. § 1983 (emphasis added); <u>see also</u> <u>White v. Jackson</u>, 865 F.3d 1064, 1080 (8th Cir. 2017) (explaining that "§ 1983 liability is personal").  Courts often use general tort principles to resolve causation questions under § 1983, <u>Monroe v. Pape</u>, 365 U.S. 167, 187 (1961) (stating that § 1983

"should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions"), overruled in part on other grounds by Monell, 436 U.S. 658; Hayden v. Nevada Cty., 664 F.3d 770, 773 (8th Cir. 2012) (stating that the plaintiff had to show that the defendant's actions "were the proximate cause of the violation of his constitutional right" (citation omitted)); Doran v. Eckold, 362 F.3d 1047, 1050 (8th Cir. 2004) ("Issues of causation in § 1983 suits are decided by looking to the common law."), rev'd on other grounds en banc, 409 F.3d 958 (8th Cir. 2005), at least to the extent those principles are consistent with the underlying constitutional right, Drumgold v. Callahan, 707 F.3d 28, 48–50 (1st Cir. 2013).

Causation in a tort case has two elements: "the act must be the 'cause-in-fact' of the injury, i.e., the injury would not have occurred absent the conduct; and (2) the act must be the 'proximate cause,' sometimes referred to as the 'legal cause' of the injury, i.e. the injury is of a type that a reasonable person would see as a likely result of his or her conduct." Whitlock v. Brueggemann, 682 F.3d 567, 582–83 (7th Cir. 2012) (citation and some internal marks omitted); see also Cty. of Los Angeles v. Mendez, 137 S. Ct. 1539, 1548–49 (2017) (explaining that analysis of a proximate cause issue in a § 1983 case "required consideration of the foreseeability or the scope of the risk created by the predicate conduct, and required the court to conclude that there was some direct relation between the injury asserted and the injurious conduct alleged" (citation omitted)).

The Defendants sued in their individual capacities contend that they are entitled to summary judgment because they were not personally responsible for the catheterizations. Doc. 141 at 8–10; Doc. 113 at 9–12; Doc. 116 at 11. These officers argue that judges ordered searches of the Plaintiffs' urine and that medical professionals authorized and performed the catheterizations. In the officers' view, these facts are determinative under the decisions in LeVine, 550 F.3d 684, and Hunter v. S.D. Dep't of Soc. Servs., 377 F. Supp. 3d 964 (D.S.D. 2019).

LeVine was a § 1983 case in which the Eighth Circuit held that a correctional officer's conduct was not enough to make her liable for a catheterization performed by prison nurses on an inmate who alleged "not that he refused the procedure, but that his consent or acquiescence was induced by the threat of prison discipline." 550 F.3d at 689. The officer in LeVine had ordered the plaintiff to produce a urine sample under the prison's random drug testing program, which required inmates to provide a urine specimen within two hours or face disciplinary action. Id. at 685. The officer threatened the plaintiff with discipline after he tried but was unable to produce a sample within the allotted time. Id. at 685–86. After learning that the plaintiff had an enlarged prostate, however, the officer directed another correctional officer to take the plaintiff to the medical unit for catheterization where the plaintiff, who had been catheterized twice previously, "shrugged and stated, 'Go ahead. I don't mind.'" Id. at 686, 689. The Eighth Circuit held that the officer's actions did not render her personally responsible for the catheterization:

> [E]ven if [the officer] ordered LeVine to go to the medical unit, she had no contact with the medical professionals after he arrived and no authority to direct those professionals to undertake the catheterization procedure if they thought it medically inappropriate or if patient LeVine refused to consent. LeVine did not sue Officer Dunlap [the officer who transported him to the medical unit] and makes no claim that he ordered the medical professionals to undertake the catheterization, an action that would have been beyond Dunlap's knowledge and authority.

Id. at 689.

In Hunter, this Court relied on LeVine to hold that a Department of Social Services (DSS) employee was not personally liable for the catheterization of a three-year-old boy. 377 F. Supp. 3d at 982–83. The DSS employee had ordered the boy's mother to have her two young children drug tested because of concern that they had been exposed to methamphetamine in the home. Id. at 973. The mother took her children to the hospital for testing, where the five-year-old-girl

urinated into a cup, but where the three-year-old boy who was not potty trained would not urinate into a cup. Id. at 975–76. After discussion with the mother, a nurse catheterized the little boy. Id. at 976. The DSS employee did not direct the catheterization, was not present for the procedure, and did not know that the boy had been catheterized until well after the procedure occurred. Id. at 982. This Court concluded that the DSS employee's conduct was not enough to make him liable for the catheterization. Id. at 982–83. Indeed, the most that could be alleged about the DSS employee's conduct was that he had threatened the mother that her children would be taken away if she did not have them drug tested, scheduled the children's urinalysis appointments, dropped off some blank forms at the hospital, and obtained the results of the tests once they were completed. Id. at 974, 982.

Contrary to the officers' argument, LeVine and Hunter do not hold that the police are immune from all liability unless they ordered (or have the authority to order) medical professionals to catheterize the plaintiff. Doc. 141 at 9; Doc. 113 at 11; Doc. 116 at 13; Doc. 120 at 14–15. Instead, the Eighth Circuit in LeVine and this Court in Hunter considered the defendants' conduct as a whole and determined that it did not amount to the sort of personal involvement necessary for individual liability under § 1983. Moreover, the mere fact that judges issued warrants used by the Defendants to arrange catheterizations does not immunize the Defendants from liability. See Malley v. Briggs, 475 U.S. 335, 344 n.7 (1986) (rejecting district court's conclusion that a judge's decision to issue a warrant "breaks the causal chain between the application for the warrant and the improvident arrest"). Thus, this Court will consider each officers' actions as a whole rather than deem them immune simply because they did not personally perform the catheterizations and wish to cast responsibility on judges or medical professionals.

74

### b. Causation Concerning Individual Officers

#### i)   Trooper Weibrecht

Trooper Weibrecht is not liable for Holcombe's catheterization. Trooper Weibrecht's only involvement in Holcombe's catheterization was obtaining the warrant for Holcombe's urine. It is undisputed that neither the warrant nor Trooper Weibrecht's affidavit requesting it mention catheterization, that Officers Coppersmith and Martin decided to take Holcombe to be catheterized, and that Trooper Weibrecht was not at the hospital for the catheterization. Indeed, Trooper Weibrecht did not even learn of the catheterization until after the fact when he returned to work. Requesting a search of Holcombe's urine without even mentioning catheterization does not add up to the sort of personal involvement necessary for individual liability under § 1983. LeVine, 550 F.3d at 689; Hunter, 377 F. Supp. 3d at 982–83. This situation where Trooper Weibrecht lacked knowledge of any decision to catheterize Holcombe and was absent when the decision to catheterize and actual catheterization occurred closely parallels the DSS worker in Hunter, where this Court found an absence of causation as a matter of law. 377 F. Supp. 3d at 982–83.

As explained earlier, Holcombe argues that Trooper Weibrecht is liable under § 1983 because the following testimony shows that Trooper Weibrecht knew Holcombe would "probably" be catheterized if he refused to urinate:

> Plaintiffs' Attorney: Did you ever have any discussion with any other law enforcement agencies or their members about what to do if a person refused to give a urine sample after a Search Warrant had been issued?
> Trooper Weibrecht: I would say the understanding would be that most officers felt that they were obligated to take it by catheter.

Doc. 123-6 at 20; Doc. 136 p.40 at ¶ 42; Doc. 99 at ¶ 22; Doc. 139 at ¶ 22. However, Trooper Weibrecht went on to explain that his source for this "understanding" was his own opinion rather

than a discussion with other law enforcement officers.  Doc. 123-6 at 20–23.  More importantly,

Trooper Weibrecht testified that in the 50 to 100 times he obtained search warrants for a suspect's

urine, he never had to have a suspect catheterized.  Doc. 123-6 at 18–20.  Rather, the suspects

agreed to provide a sample when presented with the warrants.  Doc. 123-6 at 18–20.  Under these

circumstances, a reasonable person would not foresee forcible catheterization as a likely result of

getting a search warrant for Holcombe's urine.  Whitlock, 682 F.3d at 582–83.

### ii)  Corporal Ware

Corporal Ware drafted the affidavit requesting a search warrant for Henning's urine, took

him to the hospital to be catheterized, provided the hospital staff with the warrant, and stood beside

the bed while a nurse catheterized Henning.  Corporal Ware's involvement with the catheterization

was thus greater than that of the defendants in LeVine and Hunter.  Viewing the evidence in the

light most favorable to Henning, a reasonable jury could find Corporal Ware personally liable for

Henning's illegal catheterization.

### iii) Trooper Woxland

Trooper Woxland drafted a search warrant for Alvarez's urine, took her to the hospital after

she refused to provide a urine sample, provided a urine cup to the nurse, and was in the room while

Alvarez was catheterized.  Trooper Woxland's response to Alvarez's statement of material facts

says that he disputes the "implication" that he "directed personnel on what actions to take during

the course of the catheterization process."  Doc. 139 at ¶ 104.  But his testimony about a male

officer holding Alvarez's leg during the catheterization suggests that he was more than a passive

observer without any authority to direct the other officers:

> Alvarez's Attorney: All right.  So why did you have a male officer
> holding her legs when she had no pants on?
> Trooper Woxland: There was no other female officers.
> Alvarez's Attorney: Were there any female nurses?

> Trooper Woxland: Yes.  But I'm not going to have a female nurse
> try to hold this lady down.
> Alvarez's Attorney: You mentioned the jailer [Rhonda Olson] was
> a female?
> Trooper Woxland: Um-hmm.
> Alvarez's Attorney: She could have done it, correct?
> Trooper Woxland: She accompanied me there just in case something
> happened and she stayed out of the room.
> Alvarez's Attorney: But she could have done it, correct?
> Trooper Woxland: Yes.

Doc. 123-4 at 10; Doc. 99 at ¶ 104; Doc. 139 at ¶ 104.  Moreover, Trooper Woxland wrote in his

case report that he "had Winner Police Officer's [sic] Furness and [Ferguson] assist me with the

blood and urine draw."  Doc. 118-1 at 2.  Like Corporal Ware, Trooper Woxland was much more

involved with the catheterization than the defendants in LeVine and Hunter.  Viewing the evidence

in Alvarez's favor, a reasonable jury could find Trooper Woxland legally caused Alvarez to be

catheterized and to be catheterized while a male officer held down one of her legs.

### 7.  Qualified Immunity

Qualified immunity protects the individual capacity Defendants from the Plaintiffs' § 1983

claim so long as they didn't violate the Plaintiffs' "clearly established" constitutional rights.

Reichle v. Howards, 566 U.S. 658, 664 (2012).  A right is "clearly established" if the law was

sufficiently clear that every reasonable officer would understand that his conduct violated that

right.  District of Columbia v. Wesby, 138 S. Ct. 577, 589–90 (2018).  Although a plaintiff need

not cite a "case directly on point," to show that a right is clearly established, "controlling authority"

or "a robust consensus of cases of persuasive authority" must put the "constitutional question

beyond debate."  Ashcroft v. al-Kidd, 563 U.S. 731, 741–42 (2011) (citation and internal marks

omitted).  "This demanding standard protects all but the plainly incompetent or those who

knowingly violate the law."  Wesby, 138 S. Ct. at 589 (cleaned up) (citation omitted).

Courts deciding whether a constitutional right is clearly established must avoid defining the right at "a high level of generality." Kisela v. Hughes, 138 S. Ct. 1148, 1152 (2018) (per curiam) (citation and internal marks omitted). Instead, the "dispositive question is whether the violative nature of *particular* conduct is clearly established." Mullenix v. Luna, 136 S. Ct. 305, 308 (2015) (per curiam) (citation and internal marks omitted). Defining the right with "specificity is especially important in the Fourth Amendment context, where . . . it is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts." Id. (cleaned up) (citation omitted).

### a.  Qualified Immunity for Catheterizations

As discussed above, there is no case from the Supreme Court of the United States addressing when forcible catheterization could be permissible and when it is unconstitutional under the Fourth Amendment. Forced catheterization to extract urine from someone suspected of drug use falls between Schmerber, where the Court upheld the constitutionality of a blood draw from a person reasonably suspected of having been driving drunk but who refused a breathalyzer test, 384 U.S. at 772, and Winston, where the Court held that the Fourth Amendment prevented a state from compelling a criminal suspect to undergo surgery to remove a bullet lodged in his chest to collect evidence helpful to prosecute a charge of attempted robbery, 470 U.S. at 763–67.

Jurisprudence of the Eighth Circuit as of the time of Plaintiffs' catheterizations pointed in different directions as this Opinion and Order's prior discussion of Nelson and LeVine demonstrates. The more analogous case is Nelson, where the Eighth Circuit in 1994 held that a search warrant for a suspect's "person"—even though the affidavit said that the police believed the suspect was transporting heroin in his rectum—was not sufficient to authorize a body-cavity search or later endoscopy when the suspect expelled the heroin packet and swallowed it. 36 F.3d

78

at 759–61.  Based on <u>Nelson</u>, a court could be tempted to conclude that as of 1994, it was clearly established in the states within the Eighth Circuit that searches by invasive medical procedures—such as endoscopies and catheterizations—require more clear authorization in the warrant than a reference to a suspect's "body" or, here, "urine."  <u>LeVine</u> though points in a different direction.  Dealing with facts quite distinct[40] from Plaintiffs' catheterizations, the Eighth Circuit in 2008 in <u>LeVine</u> rejected an inmate's argument that prison nurses should have been aware "that an involuntary catheterization for a non-medical purpose is against a prisoner's 4th Amendment rights" by declaring "that proposition was not clearly established by those cases, or by any other."  550 F.3d at 689.  Thus, from Eighth Circuit precedent, <u>LeVine</u>, though neither overruling nor even mentioning <u>Nelson</u>, makes it difficult to consider there to be a clearly established right in the Eighth Circuit at the time of Plaintiffs' catheterizations that the Fourth Amendment bars using a warrant for "urine" to forcibly catheterize a person suspected of ingesting drugs who cannot or will not produce a urine sample voluntarily.

Outside of the Eighth Circuit, some courts confronting the issue of qualified immunity for officers involved in forcible catheterizations under warrants have extended qualified immunity.  <u>See</u> <u>Lockard v. City of Lawrenceburg</u>, 815 F. Supp. 2d 1034, 1046–51 (S.D. Ind. 2001) (applying qualified immunity to officers when a search warrant ordered "with the necessary and proper assistance to obtain and remove a blood and urine sample" from a person suspected of driving under the influence of drugs); <u>Hooper v. Pearson</u>, No. 2:08-CV-871, 2010 WL 2990809, at *12–13 (D. Utah July 26, 2010) (extending qualified immunity to officers when written warrant authorized "seizure of bodily fluids" and judge later relayed message that catheterization was

---

[40]As discussed above, the catheterization of the prisoner in <u>LeVine</u> was done with the sixty-eight-year-old prisoner's consent and was the third such time that the prisoner had been catheterized.  550 F.3d at 685–86, 689.

approved upon suspect's obvious refusal to voluntarily give a urine sample); Ellis v. Cotten, No.

3:06-CV-283-K, 2008 WL 4182359, at *8 (N.D. Tex. Sept. 9, 2008); Miller v. Idaho State Patrol,

252 P.3d 1274, 1286–87 (Idaho 2011).   However, other courts have refused to grant qualified

immunity to officers involved in forcible catheterizations.   See Ballheimer v. Batts, No. 1:17-CV-

01393-SEB-DLP, 2019 WL 1243061, at *9 (S.D. Ind. Mar. 18, 2019) (stating that "no reasonable

officer would think that shoving a tube up a man's urethra is legal" and distinguishing between

rights of arrestees and those inmates under a warden's supervision); Clark v. Djukic, No. 2:14-

CV-160, 2017 WL 4278039, at *7–8 (N.D. Ind. Sept. 25, 2017); Elliott v. Sheriff of Rush Cty.,

686 F. Supp. 2d 840, 862–64 (S.D. Ind. 2010); see also Dabbs v. Lombardi, No. 17-CV-4255-

SRB, 2019 WL 2996920, at *6 (W.D. Mo. July 9, 2019) (denying motion to dismiss in prisoner

case of forced catheterization when officers "have not shown they are entitled to qualified

immunity").   Curiously, federal district courts in Indiana have confronted this question repeatedly,

with decisions in both directions.   Compare Lockard, 815 F. Supp. 2d at 1045–51, with Ballheimer,

2019 WL 1243061, at *9, Clark, 2017 WL 4278039, at *7–8, and Elliott, 686 F. Supp. 2d at 862–

64.   As one of those decisions observes, there exists a "trend in the case law recognizing the right

of all citizens to be free from unwarranted medical procedures without the benefit of a search

warrant authorized by a detached, neutral judicial officer."   Elliott, 686 F. Supp. 2d at 863–64

(refusing to extend qualified immunity to sheriff and deputies who arranged forced catheterization

based on a search warrant ordering "necessary and proper medical and/or other appropriate health-

care professional assistance to obtain and remove a blood *or* urine sample from [plaintiff] . . . and

to use reasonable force to obtain said sample" (emphasis added)).

    Some of the different results in these cases can be attributed to the language of the warrants

the officers used to obtain catheterization.   Had Officer Gravatt been sued in her individual

capacity, it certainly would have been easier to conclude that she deserves qualified immunity given the language of the warrant used to catheterize Peters directing transport of him "to the Wagner Community Hospital to have a sample of his Urine taken buy [sic] reliable and accepted method, in medically approved, reasonable manner." Doc. 122-4 at 4. However, the cases point in different directions when dealing with qualified immunity for catheterizations under more general warrant language such as for "urine," and the differences in the wording of the warrants alone does not allow for reconciling all of the cases.

While there appears to be a majority of courts that would find it violative of the Fourth Amendment to use a warrant ordering collection of "urine" to justify forcibly catheterizing an arrestee, this Court, like several other courts, hesitates to conclude that there is a "robust consensus of cases of persuasive authority" to put the "constitutional question beyond debate." Ashcroft, 563 U.S. at 741–42. Nor can this Court agree with Plaintiffs that the unconstitutionality of the catheterizations should have been obvious to the individual officers based on "common sense and prior general case law." Morris v. Zefferi, 601 F.3d 805, 812 (8th Cir. 2010).

This conclusion seems particularly appropriate concerning South Dakota law enforcement officers engaged in forcible catheterizations in this time frame for a few additional reasons. First, the main two Eighth Circuit cases point in different directions. Second, given Judge Barnett's decision not to suppress Sparks's urine sample—a decision that was not appealed and perhaps would have been reversed if it had—an officer could view the question of propriety of assisting in forcible catheterizations despite the absence of an explicit authorization in the warrant as at least constitutionally debatable. Third, as South Dakota Supreme Court Justice Janine Kern fairly noted in a concurrence shortly after these catheterizations, "courts have been grappling with issues raised by the use of involuntary catheterizations by law enforcement in South Dakota and elsewhere."

Hi Ta Lar, 908 N.W.2d at 188 (Kern, J., concurring, in case involving person who voluntarily gave a urine sample but noting this "inevitable question looming on the horizon" of involuntary catheterization). Finally, as discussed below, the actions of several of the officers in arranging forced catheterizations appear to stem from carrying out policies and customs of their policymakers and municipal employers. These reasons are ancillary to evaluation of precedent to determine if there is a clearly established right, but they point to concluding that, at least before this case, the South Dakota law enforcement officers in their individual capacities are entitled to qualified immunity for the forcible catheterizations, except for the situation described regarding the male officer's involvement in holding down Alvarez's leg as her genitalia was exposed and during her catheterization.

### b. Qualified Immunity for Henning's Claim that his Warrant Lacked Probable Cause

As noted above, Henning argued that Corporal Ware's affidavit failed to establish probable cause to believe that "anyone present" at the time probation officers and Chief Croymans arrived at the Home was involved in drug use. "Where the alleged Fourth Amendment violation involves a search or seizure pursuant to a warrant, the fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner." Messerschmidt v. Millender, 565 U.S. 535, 546 (2012). There is a "narrow" exception to this general rule, however. Id. at 548. Qualified immunity does not apply "where the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." Id. at 547 (citation and internal marks omitted). "[T]he threshold for establishing this exception is a high one." Id. After all, "in the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination because it is the magistrate's responsibility to determine whether the officer's allegations establish probable cause and, if so, to issue a warrant

comporting in form with the requirements of the Fourth Amendment." Id. at 547 (cleaned up) (quoting Leon, 468 U.S. at 921).

Neither the Supreme Court nor the Eighth Circuit has addressed the circumstances under which an "all persons" warrant is constitutional. And those cases that have addressed "all persons" warrants "provide no clear view, let alone a consensus, regarding what factors are most significant in deciding whether sufficient probable cause exists to support the search of 'all persons' found in a private residence being searched for drugs." Owens, 372 F.3d at 280. Here, Corporal Ware explained in his affidavit that officers had found a tobacco grinder smelling of marijuana and small empty plastic bags in S.B.'s bedroom and "several drug related items," including "a couple of homemade pipes" in L.B.'s bedroom. Doc. 117-3 at 4. According to the affidavit, this evidence was "in plain view." Doc. 117-3 at 5. Corporal Ware also included several observations based on his training and experience, including that "people often use tobacco grinders to grind marijuana;" that people "often package illegal substances in bags" like the ones found in S.B.'s room; that "illegal drug traffickers usually keep paraphernalia for packaging" drugs, including "plastic bags;" and that "illegal drug traffickers commonly have people at their residence or arriving at their residence purchasing illegal substances." Doc. 117-3 at 4–5. These statements from the affidavit provide some evidence that people at the Home were using drugs, and some courts have upheld "all persons" warrants based on similar evidence, including the Supreme Court of South Dakota. See State v. Babcock, 718 N.W.2d 624, 629 (S.D. 2006) (holding that "substantial support" existed for an "all persons" warrant where the police found "numerous drug-related items" in the homeowner's trash and had received several "crime stoppers" calls reporting drug activity at the house); State v. Jackson, 616 N.W.2d 412, 419 (S.D. 2000) (finding it "important" when upholding an "all persons" warrant "that the search was of a private house, not

a public business or multi-family dwelling where innocent persons might more likely be subject to an unjustified search"); State v. Hayes, 540 N.W.2d 1, 3–5 (Wis. Ct. App. 1995) (upholding "all occupants" warrant based on an affidavit stating that an informant had obtained drugs from the resident of an apartment and that, based on the officer's training and experience, "the execution of a controlled substance search warrant often reveals the presence of . . . potential drug buyers, and drug users"); Commonwealth v. Smith, 348 N.E.2d 101, 106 (Mass. 1976) (explaining that the "insidious nature" of drugs is "such as to render it more likely than not that the participants would act in secret and to the exclusion of innocent persons and possible informants"); see also Jackson, 616 N.W.2d at 420 ("The issuance of an 'all persons' search warrant does not require a guarantee that everyone who might appear during the search must be involved in drug activity.  That is too high a burden.").

Although this evidence might not be enough to establish probable cause, it was not entirely unreasonable for Corporal Ware to conclude otherwise, especially given the lack of controlling authority on what factors are most significant in deciding whether probable cause exists to search all persons present at a private home being searched for drugs.  See Owens, 372 F.3d at 276, 280 (holding that officers were entitled to qualified immunity for executing an "all persons" warrant at a private residence based on a confidential informant's statement that he saw a large amount of cocaine sold at a residence and an officer's statement that "subjects present at the scene of an illegal drug distribution commonly have drugs in their possession" (alterations omitted)). Qualified immunity protects Corporal Ware from Henning's claim that the warrant lacked probable cause, and Corporal Ware is entitled to summary judgment on this claim.

### 8.  Municipal Liability

The Supreme Court in <u>Monell</u> held that limits exist on suing municipalities under § 1983.

436 U.S. at 690–95.  Most significantly, <u>Monell</u> held that a municipality is not liable under § 1983

simply because one of its employees violated the Constitution.  <u>Id.</u> at 691.  Rather, a plaintiff suing

a municipality under § 1983 must show that the municipality's "policy" or "custom" caused the

plaintiff's constitutional deprivation.  <u>Id.</u> at 694.  This rule "was intended to distinguish acts of the

*municipality* from acts of *employees* of the municipality, and thereby make clear that municipal

liability is limited to action for which the municipality is actually responsible." <u>Pembaur v. City</u>

<u>of Cincinnati</u>, 475 U.S. 469, 479 (1986).

"Policy" and "custom" mean different things under <u>Monell</u>.  <u>Corwin v. City of</u>

<u>Independence</u>, 829 F.3d 695, 699–700 (8th Cir. 2016).  A municipality's official policy includes

actions by its legislative body, <u>Connick v. Thompson</u>, 563 U.S. 51, 61 (2011), and decisions or

actions by a municipal employee who has "final policymaking authority" as to "the subject matter

in question," <u>Pembaur</u>, 475 U.S. at 483 (plurality opinion).  There are also "limited circumstances"

where a municipality's failure to train its employees can constitute an official policy.  <u>Connick</u>,

563 U.S. at 61.  To prove a municipal custom, on the other hand, a plaintiff must show:

> (1) the existence of a continuing, widespread, persistent pattern
> of unconstitutional misconduct by the governmental entity's
> employees; (2) deliberate indifference to or tacit authorization
> of such conduct by the governmental entity's policymaking
> officials after notice to the officials of that misconduct; and (3)
> that plaintiff was injured by acts pursuant to the governmental
> entity's custom, i.e., that the custom was a moving force behind
> the constitutional violation.

<u>Corwin</u>, 829 F.3d at 700 (citation omitted).

A municipality is not liable under § 1983 unless there is "a direct causal link between" the

municipal policy or custom and the plaintiff's constitutional deprivation.  <u>City of Canton v. Harris</u>,

489 U.S. 378, 385 (1989); <u>see also</u> <u>Bd. of Cty. Comm'rs of Bryan Cty. v. Brown</u>, 520 U.S. 397,

404 (1997) (explaining that the plaintiff must show that the municipality, "through its *deliberate* conduct, . . . was the 'moving force' behind the injury alleged"). Moreover, "there must be an unconstitutional act by a municipal employee before a municipality can be held liable," although "there need not be a finding that a municipal employee is liable in his or her individual capacity." Webb, 889 F.3d at 487 (citation omitted).

Plaintiffs argue that the Municipal Defendants are liable under Monell based upon the acts or decisions of their policymakers, a "custom" of catheterizations, or alternatively, a failure to train. Plaintiffs include a paragraph about supervisory liability for the chiefs of police in their briefing on municipal liability. Doc. 98 at 89–90. But supervisory liability is a form of individual liability, Gulett v. Haines, 229 F. Supp. 2d 806, 813 (S.D. Ohio 2002), and the Plaintiffs have not sued the chiefs of police in any capacity. Meanwhile, the Municipal Defendants argue that they can't be liable under § 1983 when their individual employees are immune, but that is not the law. Webb, 889 F.3d at 486–88.

### a. Acts or Decisions of Policy Makers

As just stated, a municipality's official policy includes decisions or actions by a municipal employee who has "final policymaking authority" as to "the subject matter in question," Pembaur, 475 U.S. at 483 (plurality opinion). Whether a municipal employee has final policymaking authority is a question for the court. Soltesz v. Rushmore Plaza Civic Ctr., 847 F.3d 941, 946 (8th Cir. 2017). "District courts should consult two sources to identify the final policymaker: (1) state and local positive law and (2) state and local custom or usage having the force of law." Id. (cleaned up and citation omitted).

Plaintiffs point to SDCL §§ 9-29-2 and 9-29-18 as evidence that the chiefs of police for Pierre, Wagner, and Sisseton are the final policymakers on law enforcement matters. Section 9-

86

29-2 provides: "Every municipality shall have power to regulate the police of the municipality and pass and enforce all necessary police ordinances." SDCL § 9-29-2. Section 9-29-18 provides: "The chief of police shall perform such duties as shall be prescribed by the governing body for the preservation of the peace." SDCL § 9-29-18. These statutes suggest that a chief of police for a South Dakota municipality may be a final policymaker, depending on what duties the governing body has prescribed to the chief of police.

### i) City of Pierre

Curiously, the City of Pierre did not respond to Plaintiffs' claim that the City's chief of police is a final policymaker regarding law enforcement practices such as whether to catheterize a suspect who will not urinate voluntarily. Testimony by the Pierre Defendants shows that Pierre's chief of police decided to stop having suspects catheterized. The City of Pierre gave its Rule 30(b)(6) deposition through Pierre Police Captain Derald Gross. Doc. 124-7. Captain Gross testified that Pierre's then chief of police told him to send an email in July 2016 directing officers to stop any further catheterizations. Doc. 109 at ¶ 52; Doc. 136 p.14 at ¶ 52; Doc. 124-7 at 3–4, 5; Doc. 124-20 at 3–4. This supports the Plaintiffs' claim that Pierre's chief of police is de facto a final policymaker, but ordinances of the City of Pierre make this conclusion less clear.

The Pierre ordinance to which Plaintiffs cite states: "The department in charge of the enforcement and maintenance of law and order in the city shall be known as the Pierre Police Department, and its officers and employees shall be responsible for the performance of all duties assigned to the department by state law, this code and the ordinances of the city, the commission, mayor and designated commissioner." Pierre Ordinance Code Chapter 2, § 2-3-417. But Pierre Ordinance § 2-2-110 on the City of Pierre's website appears to make the mayor and board of commissioners the City's final policymakers:

87

> The board constituted of the mayor and commissioners shall have control of all departments of the city and to that end shall have power to make and enforce such rules and regulation as it may see fit and proper for the organization, management, and operation of the departments of the city and of whatever agencies may be created for the administration of its affairs.

Pierre Ordinance Code Chapter 2, § 2-2-110; see Atkinson v. City of Mountain View, 709 F.3d 1201, 1215 (8th Cir. 2013) (holding that chief of police was not the final policymaker given statute stating that the mayor and board of alderman were the final policymakers for "the good government of the city and the preservation of peace and good order" (citation and internal marks omitted));[41] Breedlove v. City of Coal Hill, Civil No. 08-2018, 2009 WL 160301, at *6 (W.D. Ark. Jan. 21, 2009) (finding that chief of police was not a final policymaker based on statute stating that the city council "shall have power to establish a city police department, to organize it under the general superintendence of the mayor, and to prescribe its duties and define its powers in such manner as will most effectually preserve the peace of the city" (citation omitted)).  Also, Pierre Ordinance § 2-3-101 suggests that the Office of Public Safety exercises authority over the police department:

> The city administrative service shall consist of the following offices and departments and the officers and employees thereof who shall serve subject to the conditions and terms of employment as provided in this chapter:
> .....
> 5) Office of Public Safety, which shall have general responsibility for the functions of the Police Department, Fire Superintendent, Volunteer Fire Department, Animal Control, Health Officer and

---

[41]The statute in Atkinson read: "The mayor and board of aldermen of each city governed by this chapter shall have the care, management and control of the city and its finances, and shall have power to enact and ordain any and all ordinances not repugnant to the constitution and laws of this state, and such as they shall deem expedient for the good government of the city, the preservation of peace and good order, the benefit of trade and commerce and the health of the inhabitants thereof, and such other ordinances, rules and regulations as may be deemed necessary to carry such powers into effect, and to alter, modify or repeal the same." Mo. Ann. Stat. § 79.110.

such other functions and general employees as may be authorized
and approved[.]

Pierre Ordinance Code Chapter 2, § 2-3-101.

This Court cannot tell for certain whether these ordinances remain in effect or whether the City of Pierre has other, unpublished ordinances concerning the authority of its chief of police. Nor does this Court know whether there are any customs or usages having the force of law that might be relevant to determining whether Pierre's chief of police is a final policymaker. In short, this Court needs more information about the authority of Pierre's chief of police before it can decide as a matter of law whether he is a final policymaker as to catheterizing suspects.

If Pierre's chief of police is a final policymaker, Plaintiffs have presented enough evidence to survive summary judgment on the issue of municipal liability. Pierre police officer Lee Coppersmith decided to take Holcombe to the hospital to be catheterized. Doc. 99 at ¶¶ 131–32; Doc. 138 at ¶¶ 131–32. When asked: "In all your dealings with Mr. Holcombe, did you follow the standard procedures that you were taught by the City of Pierre Police Department?" he replied: "Yes, I did." Doc. 99 at ¶ 133; Doc. 138 at ¶ 133; Doc. 124-6 at 4. The City of Pierre does not dispute Officer Coppersmith's testimony on what its officers were trained to do if they encountered a person who they had probable cause to believe was under the influence of marijuana or methamphetamine:

> We would request that the person provide a voluntary UA. If they refused that UA, then we would apply for a search warrant. Show them the search warrant. Again, tell them, you have a search warrant for a UA, and give them a chance to voluntarily comply. And then if they did not voluntarily comply, we would take them to the hospital to have a catheterization done to be able to collect the UA sample in the search warrant that we applied for.

Doc. 124-6 at 4; Doc. 99 at ¶ 33; Doc. 138 at ¶ 33.  Indeed, the City of Pierre admits in its brief that there was "a practice of requesting a warrant when a suspect refused to provide a urine sample and then taking the suspect to a hospital so that the warrant could be executed."  Doc. 113 at 23.

Current Pierre Police Chief Jason Jones, who was simply an officer when Sparks was catheterized, testified that he was in the room when Sparks was catheterized and that he was "fully involved in the original call for service as a police officer on duty at the time, which led to an arrest, which led to a warrant process, which led to a prisoner transport from the jail to the hospital to secure the urinalysis."  Doc. 124-20 at 5; Doc. 99 at ¶ 130; Doc. 138 at ¶ 130.  Everything that the officers did with respect to Sparks was consistent with the Pierre Police Department's standard procedures.  Doc. 124-20 at 5; Doc. 99 at ¶ 130; Doc. 138 at ¶ 130.

The City of Pierre does not dispute Officer Shaver's testimony that all of the following were part of his standard procedures: taking Sparks to jail; asking him to provide a urine sample; when Sparks refused, getting a warrant; and when Sparks still refused to provide the urine sample, consulting with his superior to find out what to do.  Doc. 99 at ¶ 128; Doc. 138 at ¶ 128.  The City of Pierre also does not dispute that Shaver's superiors told him to take Sparks to the hospital to be catheterized and that he followed what his superiors told him to do from then until he returned Sparks to the jail after his catheterization.  Doc. 99 at ¶ 129; Doc. 138 at ¶ 129.

Pierre police officer Charles Swanson took Riis to the hospital to be catheterized.  Doc. 99 at ¶ 135; Doc. 138 at ¶ 135; Doc. 124-43 at 5.  Officer Swanson had been taught at "in-house" or "on-the-job" training that "if an individual refused to provide a voluntary urine sample and a court order or a Search Warrant was obtained demanding that a urine sample be collected, that person would then be transported to a medical facility, such as our local hospital, for medical staff to perform a catheterization on that subject to complete that Search Warrant."  Doc. 124-43 at 3; Doc.

99 at ¶ 136; Doc. 138 at ¶ 136.  Similarly, former Pierre police officer John Wollman testified that before July 2016, if a Search Warrant called for blood and/or urine and the suspect refused, the "standard practice" was to take the person to the hospital for what he "assume[d]" was catheterization.  Doc. 111-17 at 2.

The City of Pierre claims that the catheterizations of Sparks, Riis, and Holcombe were the only times either it or any of its officers were involved in the involuntary catheterization of an arrestee for the sole purpose of obtaining evidence.  Doc. 109 at ¶ 53.  The testimony of several Pierre police officers appears to support this claim.  Doc. 124-20 at 4; Doc. 124-7 at 4–5; 124-6 at 4; Doc. 124-19 at 5; Doc. 124-22 at 4; 124-33 at 5.  Plaintiffs, however, counter that the City of Pierre must have been involved in more forcible catheterizations.  They point to Dr. Maningas's testimony that he authorized the forcible catheterization of more than ten people at Avera St. Mary's since 2011 and ask this Court to take judicial notice that Pierre is "by far" the largest town anywhere near Avera St. Mary's.  Doc. 136 p.15 at ¶ 53.  According to Plaintiffs, it is "highly unlikely that all the other forcible catheterizations authorized by Dr. Maningas and other medical personnel at Avera [St. Mary's] came from jurisdictions other than the City of Pierre."  Doc. 136 p.14–15 at ¶ 53.

To recap, the Pierre Police Department trained its officers to obtain catheterization of suspects who refused to urinate in response to a search warrant for "urine;" its officers testified that the catheterizations were consistent with the Department's standard procedures; and the City of Pierre admits in its brief that there was "a practice of requesting a warrant when a suspect refused to provide a urine sample and then taking the suspect to a hospital so that the warrant could be executed."  Doc. 113 at 23.  This evidence, along with the reasonable inferences to be drawn from it, is sufficient to allow a reasonable jury to find that Pierre's chief of police made a deliberate

policy choice to have Pierre's police officers obtain catheterization of suspects who refused to urinate when presented with a warrant for "urine." Because this Court does not have enough information to determine whether the Pierre police chief is a final policymaker, this Court at this time denies the City of Pierre's motion for summary judgment on the issue of municipal liability. See Olson v. City of Elk Point, 655 F. Supp. 2d 973, 977 (D.S.D. 2009) (denying city's motion for summary judgment where the city did not address the scope of the chief of police's authority and the court needed more information to decide whether the chief was a final policymaker).

### ii) City of Wagner

Like the City of Pierre, the City of Wagner did not respond to Plaintiffs' claim that the City's chief of police is a final policymaker regarding law enforcement practices such as whether officers should catheterize a suspect who will not urinate voluntarily. The Wagner ordinance Plaintiffs cite suggests that Wagner's chief of police is a final policymaker on law enforcement practices. That ordinance states: "It shall be the duty of the Chief of Police and he is hereby authorized and empowered to diligently inquire into any violation of the city ordinances and to prosecute all persons guilty thereof. All policemen shall be under the control of the Mayor and the Chief of Police and shall be subject to their order." Wagner Municipal Code § 1-4-2. Another Wagner ordinance states that "[t]he members of the police department shall be charged with the enforcement of all state statutes and city ordinances and regulations of the City of Wagner." Wagner Municipal Code § 1-4-3.

Testimony by the Wagner Defendants supports the conclusion that the Wagner Police Department sets its own policies. The City of Wagner and its Police Department gave Rule 30(b)(6) depositions through Wagner Police Chief Tim Simonsen. Doc. 99 at ¶ 157; Doc. 142 at ¶ 157. He testified as follows when asked about the Wagner Police Department's policies:

> Peters's Attorney: So as far as policies with respect to people under the influence of drugs or suspected to be under the influence of drugs, policies as to catheterization and policies as to the matters you have heard discussed here this morning [by Officers Gravatt and McGuire], that's all come from and been made by the Wagner Police Department, not the City of Wagner; true?
>
> Chief Simonsen: There is no written policy.
>
> Peters's Attorney: Right.  As far as the actual policies that are used, even though they are not written.
>
> Chief Simonsen: Yes.
>
> Peters's Attorney: That all comes from the police department, not the city?
>
> Chief Simonsen: Yes.

Doc. 111-38 at 2; Doc. 99 at ¶ 158; Doc. 142 at ¶ 158.

As with the City of Pierre, this Court cannot tell for certain whether the ordinances Plaintiffs cite remain in effect or whether the City of Wagner has other, unpublished ordinances concerning the authority of its chief of police.  Nor does this Court know whether there are any customs or usages having the force of law that might be relevant to determining whether Wagner's chief of police is a final policymaker.  In short, it appears that Wagner's chief of police is a final policymaker as to police directing catheterization of suspects under search warrants, but this Court reserves final ruling on the point at this time.

If Wagner's chief of police is indeed a final policymaker, Plaintiffs have presented enough evidence to survive summary judgment on the issue of municipal liability.  As explained earlier, Peters was catheterized after Officer Gravatt arrested him, took him to jail, got a search warrant, and took him to the hospital.  Doc. 99 at ¶ 150; Doc. 142 at ¶ 150.  She testified that it was "very common" for her to make a statement about forcible catheterization during her first encounter with a suspect, because that was the "standard procedure" of the Wagner Police Department.  Doc. 99 at ¶ 152; Doc. 142 at ¶ 152.  She testified that in her dealings with Peters, she followed all the standard procedures she had been trained to follow.  Doc. 99 at ¶ 154; Doc. 142 at ¶ 154.  Officer

Gravatt also testified, however, that the incident with Peters was the only time she was involved with the catheterization of a suspect in her eight years as a police officer for the City of Wagner. Doc. 101-19 at 2. Although she recalled hearing that the City of Wagner took "two or three others, maybe four" to the hospital for catheterization during her eight years with the Department, she did not know how many were actually catheterized. Doc. 99 at ¶ 19; Doc. 142 at ¶ 19; Doc. 101-19 at 2.

Officer McGuire, who participated in Peters's catheterization by restraining him, testified that everything he and the other officers did with respect to Peters was in accordance with the Wagner Police Department's standard procedures as he was trained to follow them. Doc. 99 at ¶¶ 155–56; Doc. 142 at ¶¶ 155–56. Wagner Police Chief Tim Simonsen testified that everything Officers Gravatt and McGuire did as to Peters was in accordance with the standard procedures of the Wagner Police Department. Doc. 99 at ¶ 159; Doc. 142 at ¶ 159; Doc. 111-39 at 2.

This evidence, along with the reasonable inferences to be drawn from it, is sufficient to allow a reasonable jury to find that Wagner's chief of police made a deliberate policy choice to have Wagner's officers obtain catheterization of suspects who refused to urinate when presented with a warrant. On the record as it presently exists, this Court at this time denies Wagner's motion for summary judgment on the issue of municipal liability. See Olson, 655 F. Supp. 2d at 977.

### iii) City of Sisseton

Sisseton disputes that Chief Croymans is a final policymaker for the City, arguing that Sisseton Ordinance § 2.16.010 makes clear that its chief of police answers to its mayor and city council. That ordinance states:

> Under the direction of the mayor and city council, the chief of police is responsible for planning, organizing, and directing the functions of the police department. The chief of police determines policies to be followed by personnel in the department with respect to public

94

> relations, and enforcement of law and ordinances. The chief of
> police also assists in the development of regulating ordinances and
> laws regarding public safety. The chief of police coordinates
> municipal law enforcement activities with those of other agencies,
> analyzes budgetary problems and submits an annual budget,
> administrates personnel policies and training requirements, and
> makes recommendations on all appointments, promotions,
> discipline, and dismissals made in the department. The chief of
> police maintains a liaison with municipal officials, civic groups, and
> citizens on law enforcement concerns.

Sisseton Ordinance § 2.16.010. By ordinance, then, Sisseton's chief of police is a subordinate

whose decisions on police department policy are "[u]nder the direction of the mayor and city

council," id., and thus are "subject to review by the municipality's authorized policymakers." City

of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988). True, the ordinance gives Chief Croymans

a good deal of authority, and there is evidence that higherups in the Sisseton Police Department

made decisions about whether Sisseton officers should have suspects catheterized. Doc. 117-9 at

5. But the Supreme Court has cautioned against "assuming that municipal policymaking authority

lies somewhere other than where the applicable law purports to put it." Praprotnik, 485 U.S. at

126. Given the clear language of Sisseton Ordinance § 2.16.010, this Court finds that Chief

Croymans is not a final policymaker for the City of Sisseton and that he therefore cannot establish

official policy for which the City is liable. Atkinson, 709 F.3d at 1215; Breedlove, 2009 WL

160301, at *6.

### b. Custom

As stated above, a plaintiff must show the following to prove a municipal custom:

> (1) the existence of a continuing, widespread, persistent pattern
> of unconstitutional misconduct by the governmental entity's
> employees; (2) deliberate indifference to or tacit authorization
> of such conduct by the governmental entity's policymaking
> officials after notice to the officials of that misconduct; and (3)
> that plaintiff was injured by acts pursuant to the governmental

entity's custom, i.e., that the custom was a moving force behind the constitutional violation.

Corwin, 829 F.3d at 700 (citation omitted).

### i)  Pattern of Unconstitutional Misconduct

As to the first element, the Eighth Circuit has not adopted any clear-cut rule for how often misconduct must occur to be considered a pattern, Ball-Bey v. Chandler, 415 F. Supp. 3d 884, 895 (E.D. Mo. 2019), except to say that "a single act" is not enough, Bolderson v. City of Wentzville, 840 F.3d 982, 986 (8th Cir. 2016).  See also Brewington v. Keener, 902 F.3d 796, 802 (8th Cir. 2018) (explaining that "in the face of an express municipal policy prohibiting excessive force," two instances of excessive force "cannot be considered a pattern of widespread and pervasive unconstitutional conduct").  The Eighth Circuit in Meier v. St. Louis, 934 F.3d 824 (8th Cir. 2019), found enough evidence of a custom without specifying the number of times the misconduct occurred.  Id. at 828.  The plaintiff in Meier claimed that the City of St. Louis had a custom of reporting vehicles as "wanted" on a law enforcement computer network in hopes of detaining the vehicle against the owner's wishes and without a warrant.  Id.  The Eighth Circuit concluded that a reasonable juror could find a "continuing, widespread, persistent practice" of using "wanted" reports to seize vehicles without a warrant for investigative purposes based on testimony by a criminal defense attorney that the St. Louis Police Department "'regularly' detains vehicles suspected of criminal involvement in hopes of identifying the owner or driver of the vehicle;" testimony by a training officer that she teaches officers in St. Louis County that "'wanted' means once you stop that vehicle and confirm the status of it, that vehicle would then be held if it meets the criteria from the originating agency;" and testimony from a captain of the St. Louis Police Department that he understands that "reporting a vehicle as wanted on [the computer network] is a request that the investigating officer detain the vehicle for us."  Id. (cleaned up).

The Cities of Pierre and Sisseton are not entitled to summary judgment on the first element of the custom test. As to the City of Pierre, the Pierre Police Department trained its officers to obtain catheterization of suspects who refused to urinate in response to a search warrant for "urine"; its officers testified that the catheterizations were consistent with the Department's standard procedures; and the City of Pierre admits in its brief that there was "a practice of requesting a warrant when a suspect refused to provide a urine sample and then taking the suspect to a hospital so that the warrant could be executed." Doc. 113 at 23. Although Pierre claims that under its practices it only catheterized Riis, Holcombe, and Sparks, Dr. Maningas's testimony that he authorized the forcible catheterization of more than ten people at Avera St. Mary's since 2011 points to a question of fact on whether the Pierre Police Department took more than three people to Avera St. Mary's to be catheterized. Moreover, Officer Coppersmith agreed that the "vast majority" of suspects agreed to provide a urine sample voluntarily without a warrant and that the "majority" of those presented with a warrant for urine opt to voluntarily provide a sample then. Doc. 124-6 at 6. As such, it is not surprising that Pierre, a city with a population around 12,800, didn't forcibly catheterize more than three to ten people. And it is reasonable to infer that catheterization was how Pierre, as a custom, responded during the relevant time to the rare occasion when a suspect refused to urinate voluntarily despite a warrant for "urine."

There is also a question of fact on the first element of the custom test regarding Sisseton. Chief Croymans testified that Corporal Ware and Sergeant Stauss are the field-training officers for the Sisseton Police Department and that they would have trained the Department's officers on collecting urine samples. Doc. 99 at ¶ 139; Doc. 137 at ¶ 139; Doc. 117-9 at 3–4. Corporal Ware took Henning to the hospital where he was catheterized. Doc. 99 at ¶ 145; Doc. 137 at ¶ 145. He was also present at the forcible catheterization of two other suspects. Doc. 99 at ¶ 146; Doc. 137

at ¶ 146.  He testified that in none of these cases did he do anything contrary to his standard procedures.  Doc. 99 at ¶ 147; Doc. 137 at ¶ 147; Doc. 117-10 at 7.  Corporal Ware maintained that the City of Sisseton "doesn't have a standard policy or procedure" and that "[i]t's kind of officer discretion when it comes to collecting urine samples."  Doc. 99 at ¶ 148; Doc. 137 at ¶ 148; Doc. 117-10 at 7.  But he testified that he trains new officers on "everything we know," and when asked if he had "ever trained anyone to do anything involving marijuana or [a] controlled substance in a different way than do you it yourself [sic]," he replied, "no."  Doc. 111-29 at 2; Doc. 99 at ¶ 149; Doc. 137 at ¶ 149.

When asked, "Has the understanding been among your officers that if the person is apparently clearly under the influence of narcotics . . . that an officer should take a urine sample?" Chief Croymans responded, "[y]es."  Doc. 117-9 at 4; Doc. 99 at ¶ 141; Doc. 137 at ¶ 141.  Chief Croymans testified that in a drug arrest, when the officer wants a urine sample and the suspect will not provide it, "they apply for a search warrant" to obtain a urine sample.  Doc. 99 at ¶ 34; Doc. 137 at ¶ 34; Doc. 117-9 at 5.  When asked what the "next step" was for his office when a suspect refuses to provide a sample in response to the warrant, Chief Croymans testified that "we've taken them to the hospital to have them catheterized, but when we do take them to the hospital, we give them every opportunity to not have to be catheterized."  Doc. 99 at ¶ 34; Doc. 137 at ¶ 34; Doc. 117-9 at 5.  Chief Croymans said that the Department's approach has now changed so that if a suspect refuses to comply with the warrant the police apply for a second search warrant which specifically calls for catheterization.  Doc. 99 at ¶ 144; Doc. 137 at ¶ 144; Doc. 117-9 at 5.  Based on advice of counsel, however, the Sisseton Police Department has not done any forced catheterizations under this new approach.  Doc. 99 at ¶ 144; Doc. 137 at ¶ 144; Doc. 117-9 at 5.

Corporal Ware estimated that the Sisseton Police Department had taken "less than ten" suspects in for catheterization since he started working for the Department in 2012. Doc. 99 at ¶¶ 24–25; Doc. 137 at ¶¶ 24–25; Doc. 101-8 at 3. However, he also testified that when he asks suspects to provide a urine sample, ninety-five percent of them, "if not more," do so voluntarily. Doc. 117-10 at 4–5. Similarly, he agreed that a "large majority" of suspects who initially refuse to provide a urine sample do so voluntarily once he presents them with a warrant. Doc. 117-10 at 5. Chief Croymans testified that since 2014, the Sisseton Police Department took four people, including Henning, to the hospital for involuntary catheterization. Doc. 99 at ¶ 26; Doc. 137 at ¶ 26; Doc. 101-26 at 2; Doc. 110-7 at 2. According to Sisseton, only one of these four catheterizations occurred before Henning was catheterized in October 2016. Doc. 137 at ¶¶ 25–26; Doc. 115 at ¶ 47. The testimony Sisseton cites to support this statement identifies one person as having been catheterized before Henning, but does not give the dates when the other two suspects were catheterized. See Doc. 117-9 at 6–7; Doc. 101-26 at 2.[42]

This evidence and the inferences to be drawn from it could allow a reasonable jury to find that the City of Sisseton had a custom of catheterizing suspects who refused to urinate when presented with a warrant for "urine." Again, Chief Croymans testified that the Sisseton Police Department's "next step" when suspects refused to urinate in response to a warrant was to take them to the hospital to be catheterized, and he admitted that Sisseton had catheterized four people since 2014. Corporal Ware testified that the catheterizations he was involved with were consistent with his standard procedures and that he trained Sisseton's police officers to act in the same way

---

[42]Sisseton cited pages 28–30 and page 32 of Chief Croymans's deposition in support of its statement that Henning was the second person the Department took to the hospital for involuntary catheterization. Doc. 115 at ¶ 47; Doc. 137 at ¶¶ 25–26. Page 33 of Croymans's deposition suggests that one of the four catheterizations occurred in June 2017, which would have been after Henning's catheterization. Doc. 117-9 at 7.

he did regarding controlled substances. He also estimated that the Sisseton Police Department had taken "less than ten" suspects in for catheterization since he started working for the Department in 2012. Although Sisseton argues that the catheterizations were too isolated and infrequent to constitute a pattern, Corporal Ware testified that ninety-five percent or more of suspects would provide a urine sample voluntarily and agreed that a "large majority" of those who didn't would provide a sample when presented with a warrant. As with the City of Pierre, it is not surprising that the number of catheterizations in Sisseton, a town of about 2,500 people, wasn't higher. And it is reasonable to infer that catheterization was how Sisseton always responded to the rare occasion when a suspect refused to urinate voluntarily despite a warrant for "urine."

The evidence of a custom at the City of Wagner is a different matter. Officer Gravatt testified that the incident with Peters was the only time she was involved with the catheterization of a suspect in her eight years as a police officer for the City of Wagner. Doc. 101-19 at 2. Although Plaintiffs point out that she recalled hearing that the City of Wagner took "two or three others, maybe four" to the hospital for catheterization during her eight years with the Department, she did not know how many were actually catheterized. Doc. 99 at ¶ 19; Doc. 142 at ¶ 19; Doc. 101-19 at 2. This testimony, even when considered alongside the evidence about Wagner's standard procedures, would not allow a reasonable jury to find that Wagner had a widespread, persistent pattern of catheterizing suspects who refused to urinate in response to a warrant. Plaintiffs do not have a viable "custom" claim against the City of Wagner and its Police Department. As explained above, however, Wagner's chief of police appears to be a final policymaker, and Peters has a viable claim against Wagner on the official policy theory.

### ii) Notice and Tacit Authorization or Deliberate Indifference

The second element of the custom test requires that the municipality's policymakers have notice of the employee misconduct and be deliberately indifferent to or tacitly authorize it. Sisseton argues that Henning cannot meet the second element because only one catheterization[43] in Sisseton occurred before Henning's and there is no evidence that a policymaker for Sisseton had notice of the catheterizations. As to Sisseton's first argument, uncertainty in the record about when other catheterizations in Sisseton occurred together with Corporal Ware's testimony that the Sisseton Police Department had taken "less than ten" suspects in for catheterization since 2012 raise a question of fact over whether more than one catheterization occurred before Henning was catheterized.

As to the second argument, Sisseton is correct that there is no direct evidence showing that its final policymakers—the mayor and city council—had notice that the Sisseton Police Department was catheterizing suspects who refused to urinate in response to a warrant. But a custom may be "attributable" to a municipality through constructive knowledge. Gatlin ex rel. Estate of Gatlin v. Green, 362 F.3d 1089, 1094 (8th Cir. 2004). "Imputation of constructive knowledge requires a showing that the underlying unconstitutional misconduct was so widespread or flagrant that in the proper exercise of its official responsibilities the governing body should have known of it." Thelma D. ex rel. Delores A. v. Bd. of Educ., 934 F.2d 929, 933 (8th Cir. 1991) (cleaned up and citation omitted). Plaintiffs have presented enough evidence to raise a triable issue over whether Sisseton's mayor or city council had constructive knowledge of the catheterizations and tacitly authorized them. Sisseton is a small city with a population of approximately 2,500,

---

[43]As set forth above and in footnote 40, what Sisseton cited to support this does not give dates for when the two other individuals were catheterized while in Sisseton police custody. Doc. 115 at ¶ 47; Doc. 137 at ¶¶ 25–26.

Doc. 117-9 at 3, and a seven-person police force, Doc. 111-18 at 2. "Under the direction of the mayor and city council," Chief Croymans "is responsible for planning, organizing, and directing the functions of the police department." Sisseton Ordinance § 2.16.010. He testified that the Sisseton Police Department took suspects to the hospital for catheterization when they refused to urinate in response to a warrant and acknowledged that Sisseton had catheterized four people since 2014. A reasonable jury could find that the catheterizations were "so widespread or flagrant" that the mayor and city council of a town the size of Sisseton, who were charged with overseeing the chief of police, should have known of the catheterizations "in the proper exercise of [their] official responsibilities." Thelma D., 934 F.2d at 933.

A reasonable jury could also find against the Pierre Defendants on the second element of the custom test. Pierre argues that its policymakers could not have had prior notice of any misconduct because Sparks, Holcombe, and Riis were catheterized "essentially concurrently." Doc. 141 at 31. But these Plaintiffs were not catheterized so close in time that Pierre's policymakers couldn't have learned of the incidents and stopped them. After all, Sparks was catheterized on March 14, 2016, Riis was catheterized on March 29, 2016, and Holcombe was catheterized on June 29, 2016. Moreover, Dr. Maningas's testimony raises a question of fact on whether the Pierre Police Department took more than three people to Avera St. Mary's to be catheterized. If Pierre's chief of police is indeed a final policymaker, there is a triable issue over whether the chief had constructive knowledge of the catheterizations and tacitly authorized them. After all, the evidence suggests that the Pierre police department trained its officers to obtain catheterizations of suspects who refused to urinate in response to a search warrant for "urine" and its officers testified that the catheterizations of Riis, Holcombe, and Sparks were consistent with the Department's standard procedures. A reasonable jury could find that the catheterizations were

102

so "widespread or flagrant" that the chief of Pierre's police department, which has twenty-six sworn officers, Doc. 124-7 at 5, should have known of the catheterizations "in the proper exercise of [his] official responsibilities." Thelma D., 934 F.2d at 933.

One other argument by the Municipal Defendants deserves mention. Relying on Szabla v. City of Brooklyn Park, 486 F.3d 385 (8th Cir. 2007) (en banc), Defendants argue that Plaintiffs cannot meet the second element of the custom test because "a municipality simply cannot exhibit fault rising to the level of deliberate indifference to a constitutional right that has not yet been clearly established." Doc. 141 at 31; see also Doc. 146 at 29. Szabla did not involve a claim that a city had an unconstitutional custom. 486 F.3d at 392 n.3 (stating that the "separate doctrine providing for municipal liability in a case of widespread unconstitutional practices that constitute a custom or usage with the force of law is not at issue in this case" (cleaned up and citation omitted)). Rather, the issue in Szabla was whether a city could be liable for adopting a policy that was constitutional on its face but that failed to "give detailed guidance that might have averted a constitutional violation by" its employees. Id. at 392. The standard for municipal liability in that context is "deliberate indifference to the constitutional rights of the citizenry."[44] Id. As relevant here, the Eighth Circuit explained that "a municipal policymaker cannot exhibit fault rising to the level of *deliberate* indifference to a constitutional right when that right has not yet been clearly

---

[44]This deliberate-indifference-to-constitutional-rights standard comes from the Supreme Court's opinion in City of Canton v. Harris, 489 U.S. 378 (1989), which was a failure-to-train case. The right asserted must be clearly established for a plaintiff to succeed on a failure-to-train claim. Roberts v. City of Omaha, 723 F.3d 966, 976 (8th Cir. 2013); Veneklase v. City of Fargo, 248 F.3d 738, 748 (8th Cir. 2001) (en banc) (per curiam). This is because a municipality cannot exhibit deliberate indifference to a constitutional right—the standard for a failure-to-train claim—"when that right has not yet been clearly established." Hollingsworth v. City of St. Ann, 800 F.3d 985, 992 (8th Cir. 2015) (quoting Szabla, 486 F.3d at 393). Because the right Plaintiffs assert was not clearly established, this Court agrees with Defendants that Plaintiffs do not have a viable failure-to-train claim.

established." Id. at 393.  Defendants have not cited any cases holding that a right must be clearly established before a plaintiff can establish a custom, and for good reason: The Eighth Circuit's custom test does not require deliberate indifference to a constitutional right.  Instead, the second element of the custom test requires "deliberate indifference to or tacit authorization" of unconstitutional misconduct by municipal employees.  As such, Defendants' reliance on Szabla is misplaced.

### iii) Causation

The third element of the custom test requires less discussion than elements one and two under the circumstances.  A reasonable jury could find that Pierre and Sisseton had a custom of catheterizing suspects who refused to urinate in response to a warrant merely for "urine" and that these customs were the moving force behind the illegal catheterizations of Riis, Holcombe, and Henning.  A reasonable jury could also find that policymakers for Pierre and Sisseton tacitly authorized the custom of catheterizing suspects who refused to provide a sample in response to a warrant merely for "urine" and that there is a direct causal link between this authorization and the illegal catheterizations of Riis, Holcombe, and Henning.

Like the individual Defendants, the Municipal Defendants point to LeVine and argue that they can't be "personally responsible" for the catheterizations because they did not order (or have the authority to order) medical professionals to catheterize the Plaintiffs.  Doc. 113 at 11–12.  As explained above, this argument misreads LeVine's holding.  And the facts discussed in this Opinion and Order's section on municipal liability show that a reasonable jury could find that Pierre police officers were the legal cause of the catheterization of Sparks, Holcombe, and Riis, and that Sisseton police officers legally caused Henning's catheterization.

## IV.    Conclusion and Order

For the reasons stated above, it is hereby

ORDERED that Plaintiffs' Motion for Partial Summary Judgment on Liability, Doc. 97, is denied. It is further

ORDERED that Defendant Mark Weibrecht's Motion for Summary Judgment, Doc. 102, is granted. It is further

ORDERED that Adam Woxland's Motion for Summary Judgment, Doc. 102, is granted as to Plaintiffs' Fifth Amendment claim, conspiracy claim, claim for injunctive relief, and claim for damages against Woxland in his official capacity. Woxland's Motion for Summary Judgment is otherwise denied. It is further

ORDERED that the Pierre Defendants' Motion for Summary Judgment, Doc. 108, is granted to the extent that Matthew Shaver is entitled to summary judgment on all claims against him in his individual capacity, the City of Pierre is entitled to summary judgment on Sparks's claim against it, and all the Pierre Defendants are entitled to summary judgment on Plaintiffs' Fifth Amendment claim, conspiracy claim, and claim for injunctive relief. The Pierre Defendants' Motion for Summary Judgment is otherwise denied. It is further

ORDERED that the Sisseton Defendants' Motion for Summary Judgment, Doc. 114, is granted to the extent that Corporal Ware is entitled to summary judgment on the claims brought against him in his individual capacity and the Sisseton Defendants are entitled to summary judgment on Plaintiffs' Fifth Amendment claim, conspiracy claim, and claim for injunctive relief. The Sisseton Defendants' Motion for Summary Judgment is otherwise denied. It is further

ORDERED that the Wagner Defendants' Motion for Summary Judgment, Doc. 119, is granted as to Plaintiffs' Fifth Amendment claim, conspiracy claim, and claim for injunctive relief. The Wagner Defendants' Motion for Summary Judgment is otherwise denied at this time.

DATED this 28th day of April 2020.

BY THE COURT:

ROBERTO A. LANGE
CHIEF JUDGE